JENNER & BLOCK LLP
Kenneth K. Lee (Cal. Bar No. 264296)
klee@jenner.com
Daniel D. Welsh (Cal Bar No. 288904)
dwelsh@jenner.com
633 W. 5th Street, Suite 3600
Los Angeles, CA 90071
Phone:        (213) 239-5100
Facsimile:    (213) 239-5199

JENNER & BLOCK LLP
Dean N. Panos (to apply *pro hac vice*)
DPanos@jenner.com
353 N. Clark Street
Chicago, IL 60654-3456
Phone:        (312) 222-9350
Facsimile:  (312) 527-0484

Attorneys for Defendant
OnStar, LLC

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATHRYN M. ROBINSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ONSTAR, LLC and DOES 1 through 50, inclusive,<br><br>Defendant. | Case No. **'15CV1731 WQHBGS**<br><br>**DECLARATION OF KENNETH K. LEE IN SUPPORT OF REMOVAL PURSUANT TO 28 U.S.C. §§ 1331, 1332(d), and 1446** |

Declaration of Kenneth K. Lee

2378846.1

I, Kenneth K. Lee, hereby declare as follows:

1.    I am a lawyer with the law firm of Jenner & Block LLP, counsel for Defendant OnStar, LLC ("OnStar") in the above-captioned action.  I am a member in good standing of the State Bar of California.  I make this declaraction in support of Defendant's removal of action pursuant to 28 U.S.C. §§ 1331, 1332(d), and 1446.

2.    A true and correct copy of the Summons and Complaint served on OnStar and filed by Plaintiff Kathryn M. Robinson in the Superior Court of the State of California in and for the County of San Diego on July 2, 2015 is attached hereto as Exhibit A.

3.    A true and correct copy of the Notice of Service of Process indicating service on Corporation Service Company, OnStar's registered agent for service of process in California, on July 6, 2014 is attached hereto as Exhibit B.

4.    A true and correct copy of the Order Granting Plaintiffs' Motion for Attorney's Fees and Reimbursement of Expenses, July 27, 2015, in the matter captioned *Tait v. BSH Home Appliances Corp.* in the United States District Court for the Central District of California is attached hereto as Exhibit C.


I swear under penalty of perjury under the laws of the United States and California that the foregoing is true and correct to the best of my knowledge.

Executed in Los Angeles, California.


Dated:  August 4, 2015                              JENNER & BLOCK LLP


                                                    By:   /s/ Kenneth K. Lee_____
                                                          KENNETH K. LEE

                                                    Attorneys for Defendant
                                                    OnStar, LLC

2378846.1

# EXHIBIT A

**SUM-100**

## SUMMONS
## (CITACION JUDICIAL)

| | |
|---|---|
| | **FOR COURT USE ONLY**<br>**(SOLO PARA USO DE LA CORTE)** |

**NOTICE TO DEFENDANT:**
**(AVISO AL DEMANDADO):**

ONSTAR, LLC and DOES 1 through 50, inclusive.

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**07/02/2015** at 01:01:07 PM

Clerk of the Superior Court
By Rachel Harmon, Deputy Clerk

**YOU ARE BEING SUED BY PLAINTIFF:**
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):**

KATHRYN M. ROBINSON, individually and on behalf of all others
similarly situated.

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>(El nombre y dirección de la corte es): | CASE NUMBER:<br>(No.) **37-2015-00022176-CU-BT-CTL** |
|---|---|

SAN DIEGO SUPERIOR COURT
330 W. Broadway, San Diego, CA 92101

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):

Stuart M. Eppsteiner, Eppsteiner & Fiorica, 12555 High Bluff Dr., Ste. 155, SD, CA 92130 -Tel: 858.350.1500

| DATE:<br>(Fecha) | 07/06/2015 | Clerk, by<br>(Secretario) | **R. Harmon**<br>R. Harmon | , Deputy<br>(Adjunto) |
|---|---|---|---|---|

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):

3. ☒☒ on behalf of (specify): **Onstar, LLC**

   under: ☐ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)       ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)       ☐ CCP 416.90 (authorized person)

   ☒☒ other (specify): **a limited liability company**
4. ☐ by personal delivery on (date):

Page 1 of 1

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courtinfo.ca.gov*

**Exhibit A**
**Page 1 of 41**

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Stuart M. Eppsteiner (SBN: 098973)<br>Eppsteiner & Fiorica Attorneys, LLP<br>12555 High Bluff Drive, Suite 155<br>San Diego, CA 92130<br>TELEPHONE NO.: 858.350.1500    FAX NO.: 858.350.1501<br>ATTORNEY FOR *(Name)*: Kathryn M. Robinson | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br><br>**07/02/2015** at 01:01:07 PM<br><br>Clerk of the Superior Court<br>By Rachel Harmon, Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Diego
STREET ADDRESS: 330 W. Broadway
MAILING ADDRESS:
CITY AND ZIP CODE: San Diego, CA 92101
BRANCH NAME: Central - Hall of Justice

CASE NAME:
Kathryn M. Robinson v. Onstar, LLC

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| ✓ Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | Limited<br>(Amount<br>demanded is<br>$25,000 or less) | ☐ Counter    ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | 37-2015-00022176-CU-BT-CTL |
| | | | JUDGE: Judge Katherine Bacal | |
| | | | DEPT: | |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

   **Auto Tort**
   - ☐ Auto (22)
   - ☐ Uninsured motorist (46)

   **Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
   - ☐ Asbestos (04)
   - ☐ Product liability (24)
   - ☐ Medical malpractice (45)
   - ☐ Other PI/PD/WD (23)

   **Non-PI/PD/WD (Other) Tort**
   - ✓ Business tort/unfair business practice (07)
   - ☐ Civil rights (08)
   - ☐ Defamation (13)
   - ☐ Fraud (16)
   - ☐ Intellectual property (19)
   - ☐ Professional negligence (25)
   - ☐ Other non-PI/PD/WD tort (35)

   **Employment**
   - ☐ Wrongful termination (36)
   - ☐ Other employment (15)

   **Contract**
   - ☐ Breach of contract/warranty (06)
   - ☐ Rule 3.740 collections (09)
   - ☐ Other collections (09)
   - ☐ Insurance coverage (18)
   - ☐ Other contract (37)

   **Real Property**
   - ☐ Eminent domain/Inverse condemnation (14)
   - ☐ Wrongful eviction (33)
   - ☐ Other real property (26)

   **Unlawful Detainer**
   - ☐ Commercial (31)
   - ☐ Residential (32)
   - ☐ Drugs (38)

   **Judicial Review**
   - ☐ Asset forfeiture (05)
   - ☐ Petition re: arbitration award (11)
   - ☐ Writ of mandate (02)
   - ☐ Other judicial review (39)

   **Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
   - ☐ Antitrust/Trade regulation (03)
   - ☐ Construction defect (10)
   - ☐ Mass tort (40)
   - ☐ Securities litigation (28)
   - ☐ Environmental/Toxic tort (30)
   - ☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

   **Enforcement of Judgment**
   - ☐ Enforcement of judgment (20)

   **Miscellaneous Civil Complaint**
   - ☐ RICO (27)
   - ☐ Other complaint *(not specified above)* (42)

   **Miscellaneous Civil Petition**
   - ☐ Partnership and corporate governance (21)
   - ☐ Other petition *(not specified above)* (43)

2. This case ✓ is   ☐ is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ✓ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ✓ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ✓ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. ✓ monetary   b. ✓ nonmonetary; declaratory or injunctive relief   c. ☐ punitive
4. Number of causes of action *(specify)*: 4
5. This case ✓ is   ☐ is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: July 2, 2015

Stuart M. Eppsteiner
_____
(TYPE OR PRINT NAME)                                      (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>*www.courtinfo.ca.gov* |

Exhibit A
Page 2 of 41

1  Stuart M. Eppsteiner, Esq. (SBN 098973)
   sme@eppsteiner.com
2  Andrew J. Kubik, Esq. (SBN 246902)
   ajk@eppsteiner.com
3  **EPPSTEINER & FIORICA ATTORNEYS, LLP**
   12555 High Bluff Dr., Suite 155
4  San Diego, CA 92130
   T: 858-350-1500
5  F: 858-350-1501

6  Kimberly A. Kralowec (SBN 163158)
   kkralowec@kraloweclaw.com
7  Kathleen Styles Rogers (SBN 122853)
   krogers@kraloweclaw.com
8  **THE KRALOWEC LAW GROUP**
   44 Montgomery St., Suite 1210
9  San Francisco, CA 94194
   T: 415-546-6800
10 F: 415-546-6801

11 Counsel for Plaintiff and the Putative Class

12

13         **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

14                    **COUNTY OF SAN DIEGO**

15

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**07/02/2015** at 01:01:07 PM
Clerk of the Superior Court
By Rachel Harmon,Deputy Clerk

| | |
|---|---|
| 16 KATHRYN M. ROBINSON, individually and on behalf of all others similarly situated, | CASE NO.:  37-2015-00022176-CU-BT-CTL |
| 18              PLAINTIFF, | **CLASS ACTION COMPLAINT FOR:** |
| 19 vs. | 1) **VIOLATIONS OF THE ELECTRONIC FUNDS TRANSFER ACT, 15 U.S.C. §§ 1693 et seq.** |
| 20 ONSTAR, LLC and DOES 1 through 50, inclusive, | 2) **VIOLATIONS OF THE AUTOMATIC RENEWAL LAW, BUS. & PROF. CODE §§ 17600 et seq.** |
| 22              DEFENDANTS. | 3) **UNLAWFUL BUSINESS PRACTICES UNDER BUS. & PROF. CODE §§ 17200 et seq.** |
| | 4) **UNFAIR BUSINESS PRACTICES UNDER BUS. & PROF. CODE §§ 17200 et seq.** |
| | [Demand For Jury Trial] |

27

28

                               1
230524              **CLASS ACTION COMPLAINT**

1    Plaintiff Kathryn M. Robinson, by and through her undersigned counsel,

2  individually and on behalf of all others similarly situated, alleges facts and claims

3  upon personal knowledge and information and belief as follows:

4                                    **INTRODUCTION**

5    1.    This complaint challenges the unlawful and unfair conduct of OnStar

6  LLC ("OnStar" or "Defendant") in connection with its OnStar Telematics Service

7  ("OTS"). OnStar takes money from consumers' bank and credit card accounts

8  without obtaining the legally-required written authorization and/or express informed

9  consent from the consumers.    Specifically, OnStar surreptitiously obtains

10  consumers' debit and credit card account numbers, and then takes up to $34.99 per

11  month through electronic funds transfers from consumers' bank accounts and

12  through charges to consumers' credit cards, all without authorization.  By so doing,

13  OnStar reaps millions of dollars in unlawfully-obtained revenues.

14    2.    OnStar took money for three months from Plaintiff Robinson's

15  checking account via electronic fund transfers using her debit card, even though

16  OnStar never obtained either her express consent or her written authorization to take

17  money from her bank account for OTS.  OnStar's conduct violates numerous state

18  and federal regulations, including the Electronic Funds Transfer Act (15 U.S.C. §§

19  1693 *et seq.*), the Automatic Renewal Law (Bus. & Prof. Code §§ 17600 *et seq.*),

20  and the Unfair Competition Law (Bus. & Prof. Code §§ 17200 *et seq.*).

21    3.    This action seeks damages and restitution, as well as declaratory and

22  injunctive relief to ensure the illegal practices do not recur and that OnStar, in the

23  future, obtains express consent from consumers for preauthorized electronic funds

24  transfers and credit card charges, as required by law.

25                                    **THE PARTIES**

26    4.    Plaintiff Kathryn Robinson is a citizen of California and resides in San

27  Diego, California.

28

5.     Defendant OnStar, LLC is a Delaware limited liability company and maintains its principal place of business at 400 Renaissance Center, Detroit, Michigan 48265.

6.     At all times relevant herein, OnStar, LLC has been, and is, a fully owned subsidiary of General Motors LLC, a Delaware Limited Liability Company with its principal place of business in Detroit, Michigan.

7.     The true names and capacities of Defendants sued herein under Code of Civil Procedure section 474 as Does 1 through 50, inclusive, are presently unknown to Plaintiff, who therefore sues these Defendants by fictitious names. Plaintiff will amend this Complaint to state the Doe Defendants' true names and capacities after Plaintiff knows them. Each of the Doe Defendants is legally responsible in some manner for the conduct alleged herein.

8.     At all times mentioned in the causes of action alleged herein, each and every Defendant, expressly including the unnamed Doe Defendants, was an agent and/or employee of each and every other Defendant. In doing the things alleged in this Complaint, each and every Defendant, including all Doe Defendants, was acting within the course and scope of their agency or employment and was acting with the consent, permission, and authorization of each of the remaining Defendants. All actions of each Defendant, as alleged in this Complaint, were ratified and approved by every other Defendant or its authorized officers or managing agents. The terms "OnStar" and "Defendant," as used herein, include the Doe Defendants.

9.     Defendants, including the Doe Defendants, share the same officers and directors. In these capacities, the officers and directors of one entity comprise the majority of the other entities' boards of directors, which control and dictate Defendants' policies and practices.

10.     As a consequence of the facts pleaded herein, there exists at all relevant times, a unity of interest in ownership between Defendants. These relationships are such that any individuality and separateness between all Defendants, has never

3

230524                    **CLASS ACTION COMPLAINT**

1   existed and does not exist now. Plaintiff is informed and believes, and based thereon

2   alleges, that Defendants are each alter egos of one another, are agents or principals

3   in agency-principal relationships with one another, and are successors or

4   predecessors of each other and, based thereon, are liable for the acts and omissions

5   of each other. These alter ego, agent-principal, and successor and predecessor

6   relationships should be recognized to prevent an injustice to Plaintiff and the Classes

7   described herein.

8                          **JURISDICTION AND VENUE**

9          11.    This Court has subject matter jurisdiction over this action pursuant to

10  Article VI, section 10 of the California Constitution because this action is a cause

11  not given by statute to other trial courts, and seeks (among other relief) a permanent

12  injunction.  Subject matter jurisdiction is further premised on, *inter alia*, the Unfair

13  Competition Law (Bus. & Prof. Code §17203), and the Electronic Funds Transfer

14  Act (15 U.S.C. §§ 1693 *et seq.*), which provides that "any action under this section

15  may be brought in any … court of competent jurisdiction …." *Id.* § 1693m(g).

16         12.    This court has personal jurisdiction over the defendants in this action

17  because the defendants do sufficient business in California and have sufficient

18  minimum contacts in California to render the exercise of personal jurisdiction over

19  them by California courts consistent with traditional notions of fair play and

20  substantial justice.

21         13.    Venue is proper in this Court because Plaintiff Robinson resides in San

22  Diego County and because a substantial part of the events or omissions giving rise to

23  Plaintiff Robinson's claims and to defendants' liability took place within this

24  county.

25         ///

26         ///

27         ///

28         ///

230524                          **CLASS ACTION COMPLAINT**

**FACTUAL BACKGROUND**

**About OnStar**

14.   OnStar utilizes wireless telecommunications, satellite, vehicular, and computer technologies to provide OTS, which includes a connection to emergency assistance and access to OnStar hands-free calling and navigation services.   OTS calling services are routed on third-party cellular networks from AT&T.   OnStar resells AT&T cellular network minutes ("Minutes"), and provides navigation services and a connection to emergency assistance to free OTS registrants ("Registrants") and to subscribers who are charged for OTS ("Subscribers").

15.   Consumers who want to accept a free initial period of OTS must register their vehicles' OTS equipment with OnStar.   The initial free period can last for several months or up to one year.   Registration is achieved by pressing the blue OnStar button on the rearview mirror in a vehicle that has OTS equipment.   This action initiates a cellular telephone call to a live OnStar agent.   Registration can also be achieved by calling OnStar's toll-free number or through OnStar's website.   Registration takes only a few minutes.

16.   Once the free period of OTS is concluded, Registrants who wish to continue to have access to OTS must pay a monthly fee and become Subscribers. Subscribers pay between $19.99 and $34.99 per month for different levels of OTS.

17.   OTS equipment and software comes installed in most General Motors-manufactured vehicles, such as Chevrolet, Buick, and Cadillac brand vehicles.   OTS is also available as an aftermarket product and service by installing OnStar For My Vehicle (FMV) in any vehicle.   OnStar FMV is a rearview mirror with equipment, hardware, and software that can be installed in any vehicle to access OTS.

OnStar has approximately 6 million active United States Subscribers. California's population is approximately twelve percent of the United States population, per U.S. Census data.   Plaintiff therefore estimates there are approximately seven hundred twenty thousand (720,000) persons in California who became Registrants.   Based on

5

1   financial analyst estimates, OnStar converts approximately 50% of Registrants into

2   paying Subscribers.  Based thereon, Plaintiff estimates there are three hundred sixty

3   thousand (360,000) California OnStar Subscribers.

4   **Plaintiff's OnStar Experience**

5        18.   On or about December 15, 2013, Plaintiff and her husband, Scott

6   Robinson, visited Hoehn Buick GMC Cadillac in Carlsbad, California, where Scott

7   Robinson  leased a new 2014 Cadillac ATS sedan (VIN# 1G6AA5RX0E0103492)

8   (the "Vehicle").

9        19.   Plaintiff has a community property ownership interest in the Vehicle

10  lease agreement, and is the person who primarily operates the Vehicle.  Plaintiff and

11  her husband use the Vehicle for personal, not business, purposes.

12       20.   The Vehicle, as leased, was outfitted with the equipment and software

13  to access OTS and came with a one-year period of free OTS.

14       21.   The Vehicle dealer told Plaintiff Robinson that to activate the one year

15  of free OTS, she would have to register the Vehicle with OnStar from inside the

16  Vehicle.

17       22.   On or about December 17, 2013, Plaintiff pressed the blue OnStar

18  button located on the Vehicle's rearview mirror, thereby initiating a cellular

19  telephone call to OnStar, and was connected to a live OnStar agent.   Plaintiff

20  registered the Vehicle to receive free OTS.  At no time during Plaintiff's registration

21  call with OnStar did the OnStar agent mention there were any terms or conditions to

22  receive free OTS, nor did the agent read or refer to any terms or conditions to

23  receive OTS.

24       23.   At no time during the call did Plaintiff enter into an agreement with

25  OnStar to pay for OTS after the one-year free OTS period expired.

26       24.   During the call, the OnStar agent advertised the sale of Minutes that

27  would allow Plaintiff to make telephone calls using OTS instead of using her own

28  cellular telephone.  In the parlance of the Federal Trade Commission, this is known

6

Exhibit A
Page 8 of 41

as "upselling." *See* 12 C.F.R. § 310.2(ee). The OnStar agent expressly advertised that Plaintiff would be able to make a call through OTS even if her own cellular telephone were unable to establish a connection with a cellular network.

25.   Plaintiff understood from the OnStar agent that OTS would enable her to make a call when her own cellular telephone was out of range of, or unable to connect to, her carrier's cellular network. Plaintiff agreed to purchase 60 Minutes for a cost of $5.47, and provided her Bank of America debit card account number to the OnStar agent during this registration call.

26.   At no time prior to her purchase of Minutes did OnStar convey to Plaintiff, orally or in writing, that any terms or conditions were associated with registering for free OTS or for purchasing Minutes.

27.   At no time did Plaintiff sign any agreement nor did she orally agree to any terms or conditions with OnStar for OTS. At no time did Plaintiff agree to arbitrate any claims against OnStar.

28.   At no time did Plaintiff agree to waive her right to file litigation against OnStar that sought class action treatment or her right to serve as a class representative in a class action lawsuit in which OnStar was a defendant.

29.   At no time was Plaintiff informed by OnStar that to receive free OTS she was required to agree to pay for OTS after the free OTS terminated.

30.   At no time did Plaintiff agree to the "automatic renewal" of OTS or the delivery of OTS by "continuous service." ("[A]utomatic renewal" as used herein has the meaning stated in Bus. & Prof. Code § 17601(a) and "continuous service" as used herein has the meaning stated in Bus. & Prof. Code § 17601(e).)

31.   At no time relevant hereto did OnStar obtain express written authorization from Plaintiff to have money debited from her bank account, by any means, to pay for OTS.

32.   Plaintiff Robinson did not voluntarily provide any written or oral permission, authorization or consent for OnStar or any of its affiliates to collect any

7

Exhibit A
Page 9 of 41

1   subscription charges for OTS, automatic renewal of OTS, or continuous service of

2   OTS.

3       33.    On December 17, 2014, OnStar took $29.90 from Plaintiff's bank

4   account using her debit card account number.

5       34.    In January 2015 and again in February 2015, OnStar took $29.90 from

6   Plaintiff's bank account via her debit card.

7       35.    Upon noticing the charges for the first time in March 2015, Plaintiff

8   immediately called OnStar and instructed it to stop taking money from her bank

9   account and to cancel her OnStar account.

10      36.    OnStar has not refunded Plaintiff Robinson any part of the $89.70 that

11  it took, without agreement or authorization, from her bank account via her debit

12  card.

13      37.    OnStar actually and proximately caused Plaintiff Robinson's injury in

14  that Plaintiff Robinson would not have had $89.70 taken from her bank account via

15  her debit card but for OnStar's illegal, unlawful and unfair practices.

16  **OnStar's Similar Dealings With Consumers Across the U.S.**

17      38.    Plaintiff Robinson's experience with OnStar was not an isolated

18  incident.    OnStar engages in a nationwide practice of surreptitiously obtaining

19  consumers' debit and credit card numbers, either by requiring consumers to become

20  Registrants for free OTS, for purposes of upselling Minutes to consumers, or by

21  other means unknown to Plaintiff.    Then, without obtaining the consumers' written

22  authorization or express informed consent, OnStar charges Registrants' debit and

23  credit cards up to $34.99 every month for purported OTS services.    This conduct

24  violates numerous laws, as detailed below, and is also unfair and substantially

25  injures consumers.

26      39.    Consumer websites disclose hundreds of complaints about OnStar's

27  practices that are similar to OnStar's treatment of Plaintiff Robinson.    The following

28  is a sampling of such complaints:

8

Exhibit A
Page 10 of 41

| Source of Complaint | Content of Complaint |
|---|---|
| http://www.consumeraffairs. com/automotive/onstar.html<br><br>By Robert of Bedford, MA<br><br>Posted: 5/12/15<br><br>Retrieved: 5/26/2015 | "I had my Credit Card billed by OnStar. I never signed up or want their service. How did they get my Credit Card number? That is scary. OnStar could somehow get my card number without me giving it to them. My only contact with them has been a call from them and I told refused their service. OnStar committed fraud by somehow obtaining my Card number." |
| http://www.consumeraffairs. com/automotive/onstar.html<br><br>By Brian of Kearney, NE<br><br>Posted: 2/21/15<br><br>Retrieved: 5/26/15 | "OnStar charged my credit card without my permission or any notification for 4 months. I noticed the charge on my account for this month. Called them and they would only refund half the charges. This is a very shady way to operate a business. They got my credit card number when I opened my account when I purchased a 2014 Chevy Silverado. They charged me a 2 or 3 dollars for a phone service that I could use through the OnStar in my truck." |
| http://www.consumeraffairs. com/automotive/onstar.html<br><br>By James of Spotsylvania, VA<br><br>Posted: 2/10/2015<br><br>Retrieved: 5/26/15 | "So we get a 'free trial'. We never agreed to pay anything... We cancel before (I repeat, before) the free trial expired. They then bill us anyways and take funds from our bank without authorization! We call and give them the cancellation confirmation. This was only after trying to get through the first operator (who is reading from a script and would not listen). We had to cut her off. Once she finally listens she tries to sell us a plan anyways at 14.95... We are then put on hold for 20 minutes... The 2nd operator confirms it was cancelled and yes they did take funds without any authorization... $54 dollars. He then goes on to try to get us to buy it anyways... again. To his credit he said he was sorry. So explain why did they take the funds? No explanation... There was never authorization to take funds. FYI, |

230524                    CLASS ACTION COMPLAINT

| Source of Complaint | Content of Complaint |
|---|---|
| | that is illegal!" |
| http://www.consumeraffairs.com/automotive/onstar.html<br><br>By Katie of Cincinnati, OH<br><br>Posted: 12/24/14<br><br>Retrieved: 5/26/15 | "What a RACKET!!! Onstar called us in our new car not long after we bought it and offered us minutes. At no time did she indicate when the minutes were up that we would be automatically enrolled in a monthly program and be charge $25 a month. I called Onstar and the manager was extremely RUDE! She indicated I would have been notified by email of the automatic renewal. REALLY. At no time did I receive said email or did I agree to this program. Looking by the number of complaints they are laughing all the way to the bank! I cannot believe they have not been investigated for this scheme! Buyer beware. Don't buy minutes and don't give them your card information in ANYWAY for ANY REASON. They will just start charging you monthly until you realize it and call them." |
| http://www.consumeraffairs.com/automotive/onstar.html<br><br>By Damian of Addison, TX<br><br>Posted: 11/25/14<br><br>Retrieved: 5/26/15 | "I purchased my car on Dec of 2013 and it came with a complimentary 6-months trial. On the day of the purchase I talked to an OnStar representative who requested my credit card information. I did not want to provide it, but the person I talked to ensured me that my credit card would not be charged after the free trial without me renewing the contract. I never received a letter from OnStar informing of a renewal. Today I realized that OnStar has been charging my card since June 2014 without my authorization. I called OnStar and the representative informed me that I had been lied when told that the service would not renew automatically. She cancelled my contract and apologized for the inconvenience, but did not making things right by issuing a refund. This is very unethical and I wish consumer's rights would be protected against these companies doing whatever they want." |

230524                       CLASS ACTION COMPLAINT

| Source of Complaint | Content of Complaint |
|---|---|
| http://www.consumeraffairs.com/automotive/onstar.html<br><br>By Howard of Snyder, NY<br><br>Posted: 10/8/14<br><br>Retrieved: 5/26/15 | "A year ago, I leased a 2013 Chevy Cruze. The dealer advised me I was authorized a free 6-month trial subscription to OnStar. We realized recently, long after the 6 months had lapsed, that they (OnStar) were still withdrawing $32 /month from our Discover account. Discover will credit us for only 2 months. Upon calling OnStar, they alleged we were duly advised of the opportunity for cancellation in an emailed advisory that we should have received in January or February. As some auto preset in my email client identified all OnStar messages as Spam. I have managed to recover them all and have scoured every OnStar email I received, no such advisory - duly or other - is mentioned anywhere." |
| http://www.consumeraffairs.com/automotive/onstar.html?page=2<br><br>By Gary of Lakeville, OH<br><br>Posted: 9/16/14<br><br>Retrieved: 5/26/15 | "I recently purchased a used 2011 Cadillac CTS and was given 3 free months of OnStar service. At the end of three months I believed that the service was over and was not contacted by anyone from OnStar via phone or email to renew or change service. To my surprise I started getting overdraft notices from my bank and after reviewing my account it seems OnStar decided they would steal $29.90 from my account. This happened for two months without my knowledge." |
| http://www.consumeraffairs.com/automotive/onstar.html?page=4<br><br>By Beverly of Gilmanton, NH<br><br>Posted: 12/17/2013<br><br>Retrieved: 5/26/15 | "We purchased a new truck last year and OnStar was free for a few months. We activated OnStar and gave them banking information to pay for minutes for the phone just in case of an "emergency" when we first got the truck. Now that I think about it, why did we need minutes when that is what they are there for?? I checked my account today and noticed a charge and called the number and it was OnStar!! I couldn't believe it, I NEVER AUTHORIZED the monthly payment. It was for $29.90 per month! |

| Source of Complaint | Content of Complaint |
|---|---|
| | Never have we even used OnStar." |
| http://www.consumeraffairs.com/automotive/onstar.html?page=4<br><br>By John of Orion, MI<br><br>Posted: 10/29/13<br><br>Retrieved: 5/26/15 | "This just happened to me on my 2013 GMC Acadia, but luckily I caught it after a month, called and asked them to cancel it and refund my debit card. They then charged me another month, and I had to call my bank to dispute the charges - and my bank refunded me... We'll see if they bill me for month 3 but there definitely has to be some class action lawsuit grounds here. I specifically asked them to make sure nothing else billed besides the 100 minutes I bought for $10.00." |
| http://www.consumeraffairs.com/automotive/onstar.html?page=4<br><br>By Lynn of Pleasant Grove, AL<br><br>Posted: 12/3/12<br><br>Retrieved: 5/26/15 | "We purchased our 2012 Chevy Silverado 4x4 on 5/26/2012. As with pretty much all Chevys, there were complimentary OnStar services for six months. At the time of purchase, at the urging of the sales person, we gave OnStar our debit card information "in case" it was ever needed, for no other reason. The free service expired 11/25 and this morning, 12/3/2012, my bank account showed that I had been charged $28.90 for OnStar. We never authorized any such charges. Neither did OnStar send any advance notification that they were planning to debit our account." |
| http://www.consumeraffairs.com/automotive/onstar.html?page=5<br><br>By Brain of Burton, MI<br><br>Posted: 8/16/12<br><br>Retrieved: 5/26/15 | "When setting up my car, we sat on the ramp in the rain and I had to press the OnStar button. The girl took all my information to establish my account and tried to sell me a package with minutes. I told her I did not want that. Remember, I own cell phone stores and have unlimited cell phone usage. She said she still needed my card to put on file, so I gave it, not expecting to be charged anything. Then, my credit card bill arrived this month with a charge from OnStar. I called to find out why and the rude lady told me that I opted into this and I said I did not. Then she said, "We wouldn't have your credit |

12

CLASS ACTION COMPLAINT

| Source of Complaint | Content of Complaint |
|---|---|
| | card information to bill if you didn't opt in." I again said I did not want to be charged anything and was assured I wouldn't be when I set up the OnStar." |
| http://www.consumeraffairs.com/automotive/onstar.html?page=5<br><br>By Mary of Albuquerque, NM<br><br>Posted: 11/12/11<br><br>Retrieved: 5/26/15 | "I got charged for a subscription I did not order and it was charged on my credit card. When I called OnStar I was told that without an account number, they could not help me. I did not have an account number because I did not subscribe to OnStar. I have no clue how they got my Credit Card number to charge the subscription to my account." |
| http://www.customerservicescoreboard.com/OnStar/negative/?page=4<br><br>By Ray0314<br><br>Posted: 2/20/14<br><br>Retrieved: 6/22/14 | "OnStar has been making unauthorized charges to my credit card for two years now for my husband GMC Truck. They got my (not my husbands) CC billing information from an account I had for a GMC Enclave. I no longer own this vehicle and cancelled the service in Jan 11. When I called to inquire how they got my old account mixed up with my husbands vehicle the OnStar representative told me they could have linked it using our home telephone number. So when his 'Free Trial' period ran out they started billing my card. We have made several calls to OnStar and they tell us they are opening a dispute resolution ticket which will be handled in 10-15 days. This has not happened, we wait 10-15 days and call back. Each time we are on the phone for half an hour, wasting both of our time. Even though it is my CC they insist my husband be on the line since it is his vehicle. OnStar give me my money BACK and STOP charging my card!" |
| http://www.customerservicescoreboard.com/OnStar/negat | "I have a 2013 camaro and after the 6 months they started charging my credit card without any notice, when i talked to them they refused to give me my |

**CLASS ACTION COMPLAINT**

| Source of Complaint | Content of Complaint |
|---|---|
| ive/?page=3<br><br>By MOE<br><br>Posted: 6/1/14<br><br>Retrieved: 6/22/15 | money back and two MANAGERS hung up the phone when i started to ask for more details to get my money back, I called again and I cancelled it. Enough of them, if they don't respect us as customers.!" |
| http://www.customerservices coreboard.com/OnStar<br><br>By BCFQ<br><br>Posted: 3/7/15<br><br>Retrieved: 6/22/15 | "Onstar withdrew funds from my account without any agreement or signed documents. For over a year I am not able to get my refund. Different departments each time I call and no result." |
| http://www.customerservices coreboard.com/OnStar<br><br>By Denise g12<br><br>Posted: 4/8/15<br><br>Retrieved 6/22/15 | "I recently purchased a vehicle with OnStar equipped. The dealership helped me set up my 3 month free trial. I then purchased some phone minutes also. I was told the minutes would expire when my trial expired, which was fine. I bought the minutes with my credit card. Then OnStar charged my card for monthly service after my trial ended. I gave OnStar permission to charge my card for the minutes, NOT to set me up on a monthly subscription! When I called to see why and cancel I was told that giving my card number was a requirement for my trial, which it was NOT! My free trial had already been set up with no credit card required! I have never even used the OnStar expect for calls that were paid for with the minutes I purchased. What a rip off and scam!" |
| http://www.consumeraffairs. com/automotive/onstar.html<br><br>By Robert of Bedford, MA | "I had my Credit Card billed by OnStar. I never signed up or want their service. How did they get my Credit Card number? That is scary. OnStar could somehow get my card number without me giving it to them. My only contact with them has been a call |

14
230524                    CLASS ACTION COMPLAINT

| Source of Complaint | Content of Complaint |
|---|---|
| Posted: 5/12/15<br><br>Retrieved: 6/22/15 | from them and I told refused their service. OnStar committed fraud by somehow obtaining my Card number." |
| http://www.customerservices coreboard.com/OnStar/negat ive/?page=6<br><br>By Anonymous<br><br>Posted: 6/28/13<br><br>Retrieved: 2/23/15 | "I paid my bill once with debit card so they took the liberty and have been drafting my account for a year." |
| http://www.customerservices coreboard.com/OnStar/negat ive/?page=5<br><br>By Not Happy<br><br>Posted: 10/17/13<br><br>Retrieved: 6/22/15 | "I brought a 2013 chevy with the on-star. For the first few months it was a free service. After that term has expired they started charging me for usage. I DID NOT subscribe to them and for some reason they were able to charge it to my Discover account. I have conacted them about a refund but they refused me. I have contacted Discover and plan to contact the BBB in regards to this matter." |
| http://www.customerservices coreboard.com/OnStar/negat ive/?page=5<br><br>By Anonymous<br><br>Posted: 7/26/13<br><br>Retrieved: 6/22/15 | "Yeah, me too. I paid last year with a debit card and guess what - they took the liberty to debit my account this year. No notification, no permission, just took it upon themselves to debit my account. Is this legal? I am seriously considering taking this to JAG for their opinion." |

40.    OnStar's unlawful and unfair practices as alleged herein continue to this date.

///

///

Exhibit A
Page 17 of 41

1
## CLASS ACTION ALLEGATIONS

2   41.   Plaintiff Kathryn Robinson brings this action on behalf of herself, and

3   all others similarly situated, as a class action pursuant to Code of Civil Procedure

4   section 382.   The classes Plaintiff Robinson seeks to represent are defined as

5   follows:

6   **Nationwide EFTA Class**

7   All natural persons residing in the United States, or who have a United

8   States-based bank account, and whose debit cards or bank accounts

9   OnStar or any of its affiliates charged and/or debited for OnStar

10   telematics services without obtaining written authorization from the

11   consumer, or to whom OnStar did not provide a copy of written

12   authorization it obtained from the consumer, from July 2, 2014 through

13   the date certification notice is given to the class ("Nationwide EFTA

14   Class").

15

16   **California Class**

17   All natural persons residing in California whose debit or credit cards

18   OnStar charged for OnStar telematics services without obtaining

19   written authorization, affirmative consent, or express informed consent

20   from the consumer, or to whom OnStar did not provide a copy of

21   written authorization it obtained from the consumer, from July 2, 2011

22   through the date certification notice is given to the class ("California

23   Class").

24   The Nationwide EFTA Class and California Class are hereafter referred collectively

25   as the proposed "Classes."

26   42. Excluded from the Classes are (i) Defendant, any entity in which

27   Defendant has a controlling interest or which has a controlling interest in Defendant,

28   and Defendant's legal representatives, predecessors, successors and assigns; (ii)

16

230524   **CLASS ACTION COMPLAINT**

1  governmental entities; (iii) Defendant's employees, officers, directors, agents, and

2  representatives and their family members; (iv) the Judge and staff to whom this case

3  is assigned, and any member of the Judge's immediate family; and (v) putative class

4  members from whom OnStar obtained valid and enforceable written releases of the

5  claims asserted in this complaint. Plaintiff reserves the right to amend the Class

6  definitions if discovery and further investigation reveal the Nationwide EFTA Class

7  and/or California Class should be expanded or otherwise modified.

8      43.   This action has been brought and may properly be maintained as a class

9  action, pursuant to the provisions of Code of Civil Procedure section 382 because

10  there is a well-defined community of interest in the litigation and the proposed

11  Classes are easily ascertainable.

12      44.   Numerosity.   Members of the proposed Nationwide EFTA and

13  California Classes are so numerous that joinder of all of their members in one action

14  is impracticable. OnStar has approximately 6 million Subscribers across the United

15  States, all of whom are potentially affected by the conduct alleged herein because

16  OnStar accepts only credit cards and debit cards for purchases of Minutes or OTS.

17  Twelve percent of these, or approximately 720,000 persons, are estimated to be in

18  California.

19      45.   Common Issues Exist and Predominate.  Common questions of law and

20  fact exist as to all members of the Classes and predominate over any questions that

21  affect only individual members of the Classes. There is a well-defined community

22  of interest in the questions of law and fact involved that affect Plaintiff and members

23  of the proposed Classes. The questions of law and fact predominate over questions

24  that affect only individual members of the Classes and include, without limitation:

25          a.    Whether OnStar's uniform acts and practices violated the EFTA;

26          b.    Whether OnStar's uniform acts and practices violated the

27              Automatic Renewal Law;

28

17
**CLASS ACTION COMPLAINT**

c.   Whether OnStar's uniform course of conduct constitutes an unlawful act or business practice within the meaning of the UCL;

d.   Whether OnStar's uniform course of conduct constitutes an unfair act or business practice within the meaning of the UCL;

e.   Whether OnStar had a uniform policy of not obtaining written authorization for electronic funds transfers;

f.   Whether as a result of OnStar's misconduct Class members have suffered damages and the appropriate amount thereof; and

g.   Whether, as a result of Defendants' misconduct, Plaintiff is entitled to equitable relief and/or other relief and the nature of such relief.

46.   Typicality.  Plaintiff's claims are typical of the claims of the members of the proposed Classes. Plaintiff used her debit card to pay for Minutes and OnStar used her account information to automatically charge her for OTS services without her consent.  Members of the Classes have experienced similar situations based on nearly identical facts.  The right of each member of the Classes to payment of any actual, incidental, consequential, and/or statutory damages or equitable monetary relief resulting therefrom arises equally and is attributable to OnStar's misconduct, as these claims arise from the same nucleus of operative facts.  Therefore, the claims of the Plaintiff are, and will be, typical of the claims of the other members of the Classes.

47.   The Classes are Ascertainable.   Plaintiff has adequately defined the Nationwide EFTA Class and California Class, as detailed above, so the Court will be able to use the definitions to determine class membership.

48.   Adequacy.  Plaintiff can and will fairly and adequately represent the interests of all members of the Classes, since Plaintiff has no conflicts with or interests antagonistic to other members of the Classes.  Plaintiff has retained counsel

230524                     **CLASS ACTION COMPLAINT**

1  with substantial experience and success in the prosecution of complex consumer
2  protection class action litigation.

3      49.  Superiority.  The proposed class action is superior to other available
4  means to achieve a fair and efficient adjudication of this controversy.  Class action
5  treatment will permit a large number of similarly situated persons to prosecute their
6  common claims in a single forum simultaneously, efficiently and without the
7  unnecessary duplication of effort and expense that numerous individual actions
8  would engender.  The disposition of their claims in this case and as part of a single
9  class action lawsuit, rather than thousands of individual lawsuits, will benefit the
10  parties and greatly reduce the aggregate judicial resources that would be spent if this
11  matter were handled as hundreds of separate lawsuits.  Furthermore, given the
12  extraordinary expenses and burden required to conduct discovery and present
13  evidence about OnStar's misconduct, the burden of individual litigation would make
14  it extremely difficult, if not impossible for individual members of the Classes to
15  redress the wrongs asserted herein, while an important public interest will be served
16  by addressing the matter as a class action.  It would be impractical for a Class
17  member to sue for only her individual claim arising from Defendant's misconduct as
18  the court costs and attorney fees would be disproportionate to her individual
19  damages.  Moreover, separate prosecution by thousands of individual members of
20  the Classes would likely establish inconsistent standards of conduct for the
21  Defendant and result in the impairment of and potential harm to members' rights of
22  members of the Classes and the disposition of their interests through actions to
23  which they were not parties.

24                    **FIRST CAUSE OF ACTION**
25    **(Violations of the Electronic Funds Transfer Act, 15 U.S.C. 1693 *et seq.*)**
26              **On Behalf of the Nationwide EFTA Class**

27      50.  Plaintiff repeats and re-alleges all prior paragraphs and incorporates
28  them as if fully set forth herein.

19

230524                    **CLASS ACTION COMPLAINT**

51.     Plaintiff seeks to recover for OnStar's violations of the Electronic Funds Transfer Act on behalf of herself and the Nationwide EFTA Class.

52.     The EFTA provides a basic framework establishing the rights, liabilities, and responsibilities of participants in an electronic fund transfer system. 15 U.S.C. §§ 1693 *et seq*. The "primary objective" of the EFTA "is the provision of individual consumer rights." *Id*. § 1693(b).

53.     Any waiver of EFTA rights is void. "No writing or other agreement between a consumer and any other person may contain any provision which constitutes a waiver of any right conferred or cause of action created by this subchapter." 15 U.S.C. § 1693*l*.

54.     OnStar's transfers of money from the bank accounts of Plaintiff and members of the Nationwide EFTA class, via their debit cards, as alleged herein, are "electronic fund transfers" within the meaning of the EFTA and the EFTA's implementing regulations, known as Regulation E and codified at 12 C.F.R. §§ 205 *et seq*. An "electronic fund transfer" means "any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account."   15 U.S.C. § 1693a(7).   The term is expressly defined to include "[t]ransfers resulting from debit card transactions, whether or not initiated through an electronic terminal." 12 C.F.R. § 205.3(b)(v).

55.     The EFTA defines the term "preauthorized electronic transfer" as "an electronic fund transfer authorized in advance to recur at substantially regular intervals." 15 U.S.C. § 1693a(9). The Official Staff Interpretation of Regulation E describes a "preauthorized electronic transfer" as "one authorized by the consumer in advance of a transfer that will take place on a recurring basis, at substantially regular intervals, and will require no further action by the consumer to initiate the transfer." 12 C.F.R. Part 205, Supp. I, § 205.2(k), cmt. 1.

56. Section 1693e(a) of the EFTA prohibits preauthorized electronic transfers without written authorization: "A preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made." 15 U.S.C. § 1693e(a). Similarly, Regulation E provides: "Preauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer. The person that obtains the authorization shall provide a copy to the consumer." 12 C.F.R. § 205.10(b).

57. Plaintiff and members of the Nationwide EFTA Class each maintained an "account" as that term is defined in 15 U.S.C § 1693a(2) and are "consumers" within the meaning of 15 U.S.C. § 1693a(5).

58. OnStar uniformly and routinely initiated preauthorized electronic fund transfers and took money from the bank accounts of Plaintiff and members of the Nationwide EFTA Class without obtaining their written authorization for the transfers, as required by the EFTA and Regulation E. OnStar also uniformly and routinely failed to provide a copy of any such written authorization to Plaintiff and the Nationwide EFTA Class members from whose bank accounts OnStar took preauthorized electronic fund transfers for OTS.

59. In December 2014, and again in January and February 2015, OnStar took $29.90 from Plaintiff's Bank of America account via her debit card. In none of these instances did OnStar obtain Plaintiff's written authorization, nor did OnStar provide Plaintiff with copies of any such written authorizations.

60. The Official Staff Interpretation of Regulation E explains, "when a third-party payee," such as OnStar, "fails to obtain the authorization in writing or fails to give a copy to the consumer … it is the third-party payee that is in violation of the regulation." 12 C.F.R. Part 205, Supp. I, § 205.10(b), cmt. 2.

61. As a direct and proximate result of OnStar's violations of the EFTA and Regulation E, Plaintiff and the Nationwide EFTA Class members have suffered

21

Exhibit A
Page 23 of 41

1  damages, including statutory damages, in the amount of the unauthorized debits

2  taken by OnStar from their bank accounts.  15 U.S.C. § 1693m.  Plaintiff and the

3  Nationwide EFTA Class members are entitled to recover actual damages and/or

4  statutory damages in the amount of "the lesser of $500,000 or 1 per centum of the

5  net worth of the defendant." *Id.* § 1983m(a)(2)(B).

6      62.   Pursuant to 15 U.S.C. § 1693m, Plaintiff and the Nationwide EFTA

7  Class are also entitled to recover costs of suit and attorneys' fees from OnStar.

8

9                     **SECOND CAUSE OF ACTION**

10              **(Violations of the Automatic Renewal Law,**

11              **Cal. Bus. & Prof. Code §§ 17600 *et seq.*)**

12                  **On Behalf of the California Class**

13     63.   Plaintiff repeats and re-alleges all prior paragraphs and incorporates

14  them as if fully set forth herein.

15     64.   Plaintiff seeks to recover for OnStar's violations of California's

16  Automatic Renewal Law, Bus. & Prof. Code §§ 17600, *et seq.*, on behalf of herself

17  and the California Class.

18     65.   The express intent of the California Legislature in enacting the

19  Automatic Renewal Law was to "end the practice of ongoing charging of consumer

20  credit or debit cards or third party payment accounts without the consumer's explicit

21  consent for ongoing shipments of a product or ongoing deliveries of a service." Bus.

22  & Prof. Code § 17600.

23     66.   Bus. & Prof. Code § 17602(a)(2) makes it "unlawful for any business

24  making an automatic renewal or continuous service offer to … [c]harge the

25  consumer's credit or debit card or the consumer's account with a third party for an

26  automatic renewal or continuous service without first obtaining the consumer's

27  affirmative consent to the agreement containing the automatic renewal offer terms or

28  continuous service offer terms."

67.    The term "automatic renewal" is defined as "a plan or arrangement in which a paid subscription or purchasing agreement is automatically renewed at the end of a definite term for a subsequent term." Bus. & Prof. Code § 17601(a).  The term "continuous service" is "a plan or arrangement in which a subscription or purchasing agreement continues until the customer cancels the service." *Id.*, §17601(e).  OnStar's OTS subscription service is both an "automatic renewal" plan or arrangement and a "continuous service" plan or arrangement.

68.    OnStar uniformly failed to obtain affirmative consent from Plaintiff and the members of the California Class to its automatic renewal and continuous service offer terms before charging their debit and credit card accounts for OTS.

69.    OnStar charged Plaintiff's Bank of America debit card, thereby taking money from Plaintiff's bank account, for the first time on December 17, 2014 for $29.90, and again in January and February of 2015 for $29.90 in each of those months.  In none of these instances did OnStar first obtain Plaintiff's affirmative consent to these charges.

70.    Bus. & Prof. Code § 17603 states that if a business provides products to a consumer without first obtaining "the consumer's affirmative consent as described in Section 17602," the "products shall for all purposes be deemed an unconditional gift to the consumer," "without any obligation whatsoever on the consumer's part to the business ...."

71.    Bus. & Prof. Code § 17604(a) states that "all available civil remedies that apply to a violation of this article may be employed."

72.    Plaintiff and the California Class members seek an order of this Court awarding all available civil remedies, including but not limited to a determination that anything OnStar may have provided to Plaintiff and the California Class was provided by OnStar as an unconditional gift; awarding restitution sufficient to refund to Plaintiff and the California Class all the sums taken from them by OnStar;

1   injunctive relief; prejudgment interest according to proof; costs; and attorneys' fees

2   as may be awardable under Code of Civil Procedure section 1021.5 or otherwise.

3

4                        **THIRD CAUSE OF ACTION**

5              **(For "Unlawful" Business Practices in Violation of**

6                  **Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**

7                      **On Behalf of the California Class**

8       73.     Plaintiff repeats and re-alleges all prior paragraphs and incorporates

9   them as if fully set forth herein.

10      74.     Plaintiff brings this cause of action on behalf of herself and the

11  California Class, pursuant to the "unlawful" prong of Cal. Bus. & Prof. Code, §§

12  17200, *et seq.* (hereafter the "Unfair Competition Law" or "UCL").   The UCL's

13  unlawful prong "borrows" violations of other laws (state or federal, statutory or

14  regulatory) and makes them independently actionable.

15      75.     As alleged in more detail below, OnStar's acts and practices alleged

16  herein are "unlawful" within the meaning of the UCL because they violated the

17  following state and federal laws, regulations and rules:

18          a.     the EFTA (15 U.S.C. §§ 1693 *et seq.*) and Regulation E (12

19  C.F.R., Part 205);

20          b.     the Automatic Renewal Law (Cal. Bus. & Prof. Code §§ 17600,

21  *et seq.*);

22          c.     the "Telemarketing Sales Rule" of the Federal Trade

23  Commission ("FTC"), 16 C.F.R. §§ 310 *et seq.*; and

24          d.     the Federal Trade Commission Act, 15 U.S.C. § 5(a) ("FTC

25  Act").

26  <u>Violations of the EFTA and Regulation E</u>

27      76.     OnStar's acts and practices violated the EFTA and Regulation E, as

28  alleged in paragraphs 1 through 62 of this complaint, and particularly in the First

1  Cause of Action, which are incorporated herein by reference. Therefore, OnStar's
2  acts and practices also violated the "unlawful" prong of the UCL.

3      77.    Plaintiff suffered injury in fact and lost money or property as a result of
4  OnStar's violations of the EFTA and Regulation E because OnStar took money from
5  Plaintiff's bank account via her debit card, totaling at least $89.70, unlawfully. The
6  EFTA and Regulation E prohibit OnStar from taking any money from Plaintiff's
7  bank account without written authorization in the form specified in the EFTA and
8  Regulation E. If OnStar had complied with the law, OnStar could not have taken
9  any money from Plaintiff's account.

10     78.    The EFTA "does not annul, alter or affect the laws of any State relating
11  to electronic fund transfers" unless those laws are "inconsistent" with the EFTA. 15
12  U.S.C. § 1693q. The UCL is not "inconsistent" with the EFTA because the UCL
13  provides protection to consumers that is equal to or "greater than the protection
14  afforded by" the EFTA. *Id.*

15     79.    Under the UCL, Plaintiff and members of the California Class are
16  entitled to equitable relief, including but not limited to restitution of all sums that
17  OnStar unlawfully took from their bank accounts; as well as injunctive relief to put a
18  halt to OnStar's unlawful conduct. Bus. & Prof. Code § 17203.

19      Violations of California's Automatic Renewal Law

20     80.    OnStar's acts and practices violated California's Automatic Renewal
21  Law (Cal. Bus. & Prof. Code §§ 17600, *et seq.*), as alleged in paragraphs 1 through
22  72 of this Complaint, and particularly in the Second Cause of Action, which are
23  incorporated herein by reference. Therefore, OnStar's acts and practices also
24  violated the "unlawful" prong of the UCL.

25     81.    Plaintiff suffered injury in fact and lost money or property as a result of
26  OnStar's violations of California's Automatic Renewal Law. OnStar charged
27  Plaintiff's debit card at least $89.70 for automatic renewal or continuous service
28  without first obtaining Plaintiff's affirmative consent for the charges. OnStar was

1    prohibited from making these charges and taking Plaintiff's money without the

2    required affirmative consent. If OnStar had complied with the law, OnStar could not

3    have made the charges, and would not have obtained this money from Plaintiff.

4        82.    Under the UCL, Plaintiff and members of the California Class are

5    entitled to equitable relief, including but not limited to restitution of all sums that

6    OnStar unlawfully charged their debit and credit cards; as well as injunctive relief to

7    put a halt to OnStar's unlawful conduct. Bus. & Prof. Code § 17203.

8        Violations of the FTC's Telemarketing Sales Rule

9        83.    OnStar's acts and practices violated the FTC's Telemarketing Sales

10   Rule, 16 C.F.R. §§ 310 *et seq.*, and are therefore "unlawful" within the meaning of

11   the UCL.

12       84.    The FTC's Telemarketing Sales Rule was adopted pursuant to the

13   authority of the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15

14   U.S.C. §§ 6101 *et seq.* (hereafter the "Telemarketing Fraud Act"). Congress enacted

15   the Telemarketing Fraud Act in order to "offer consumers necessary protection from

16   telemarketing deception and abuse." *Id.* § 6101(5).

17       85.    The FTC's Telemarketing Sales Rule defines "telemarketing" as "a

18   plan, program, or campaign which is conducted to induce the purchase of goods or

19   services ... by use of one or more telephones and which involves more than one

20   interstate telephone call." 16 C.F.R. §310.2(cc). The Rule defines "telemarketer" as

21   "any person who, in connection with telemarketing, initiates or receives telephone

22   calls to or from a consumer ...." *Id.* § 310.2(cc). The communications that took

23   place between OnStar and Plaintiff, and between OnStar and the members of the

24   California Class who registered for OTS by pressing an OnStar button in their

25   vehicle or by calling OnStar's toll-free number, as alleged herein, constituted

26   telemarketing within the meaning of the Rule, because they took place over the

27   telephone and were conducted to induce the purchase by Plaintiff and the California

28   Class of services from OnStar.

230524                    **CLASS ACTION COMPLAINT**

86.    OnStar's conduct alleged herein constitutes "deceptive telemarketing acts or practices" and "abusive telemarketing acts or practices," and is prohibited by several subdivisions of the FTC's Telemarketing Sales Rule.   *See* 16 C.F.R. § 310.3(a)(1)(i), (vii) (defining "deceptive telemarketing acts or practices"); *id.* § 310.4(a) (defining "abusive telemarketing acts or practices").

87.    <u>First</u>, the Rule provides that "[i]t is a ***deceptive telemarketing act or practice and a violation of this Rule*** for any seller or telemarketer to engage in the following conduct:

> (1)    Before a customer consents to pay for goods or services offered, ***failing to disclose truthfully, in a clear and conspicuous manner***, the following material information:
>
> > (i)    ***The total costs to purchase***, receive, or use, and the quantity of, ***any goods or services that are the subject of the sales offer***; ....

16 C.F.R. § 310.3(a)(1)(i) (emphasis added).

88.    OnStar violated this provision and engaged in deceptive telemarketing acts and practices by uniformly failing to disclose to Plaintiff and members of the California Class, truthfully and in a clear and conspicuous manner, the total costs that would be charged to their debit or credit cards for OnStar's OTS subscription service.   In fact, OnStar failed to disclose that Plaintiff and members of the California Class were being signed up for OTS ***at all***, and therefore failed to disclose that ***any*** cost, let alone the "total costs," would be charged for the service.

89.    <u>Second</u>, the Rule provides that "[i]t is a ***deceptive telemarketing act or practice and a violation of this Rule*** for any seller or telemarketer to engage in the following conduct:

1

> (1)   Before a customer consents to pay for goods or services
> offered, *failing to disclose truthfully, in a clear and*
> *conspicuous manner*, the following material information:
>
> ....
>
> (vii)   If the offer includes a negative option feature, all
> material terms and conditions of the negative option
> feature, including, but not limited to, *the fact that the*
> *customer's account will be charged unless the customer*
> *takes an affirmative action to avoid the charge(s)*, the
> date(s) the charge(s) will be submitted for payment, and
> the specific steps the customer must take to avoid the
> charge(s); ....

16 C.F.R. § 310.3(a)(1)(vii) (emphasis added).   In the Rule, a "negative option feature" is defined as follows:  "[I]n an offer or agreement to sell or provide any goods or services, a provision under which a customer receives a product or service for free for an initial period and will incur an obligation to pay for the product or service if he or she does not take affirmative action to cancel before the end of that period." *Id.* § 310.2(u).

90.   OnStar violated this provision and engaged in deceptive telemarketing acts and practices by uniformly failing to disclose to Plaintiff and members of the California Class, truthfully and in a clear and conspicuous manner, that after the period of free OTS, OnStar would charge the debit or credit cards of Plaintiff and members of the California Class every month, unless and until Plaintiff and members of the California Class took affirmative action to stop the charges and cancel the OTS.

91.   Third, the Rule provides that "[i]t is an *abusive telemarketing act or practice and a violation of this Rule* for any seller or telemarketer to engage in the following conduct:

(7)    *Causing billing information to be submitted for payment …*
*without the express informed consent of the customer* ….    In any
telemarketing transaction, *the seller or telemarketer must obtain the*
*express informed consent of the customer … to be charged for the*
*goods or services … and to be charged using the identified account*."

16 C.F.R. § 310.4(a)(7) (emphasis added).  The Rule also required OnStar to keep
records of each "express informed consent … required to be provided … under this
Rule." *Id.* § 310.5(a)(5).

92.    OnStar violated this provision and engaged in abusive telemarketing
acts and practices by uniformly causing billing information of Plaintiff and the
members of the California Class to be submitted for payment without first obtaining
their express informed consent to be charged, including their express informed
consent for charges to be made to the specific debit or credit card accounts whose
numbers OnStar had obtained from them.  OnStar further violated the Rule by
failing to maintain a record of each "express informed consent" required by the
Rule.  *See* 16 C.F.R. § 310.5(a)(5); *id.* § 310.5(b) ("Failure to keep all records
required by § 310.5(a) shall be a violation of this Rule.").

93.    OnStar charged Plaintiff's Bank of America debit card, and thereby
took money from Plaintiff's account, for the first time on December 17, 2014 for
$29.90, and again in January and February of 2015 for $29.90 in each of those
months.  In each instance, OnStar made these charges: (1) without disclosing to
plaintiff, truthfully and in a clear and conspicuous manner, the total cost for OnStar
service; (2) without disclosing to plaintiff, truthfully and in a clear and conspicuous
manner, that she would continue to be charged for OnStar service unless she took
affirmative action to cancel; and (3) without plaintiff's express informed consent.
Plaintiff suffered injury in fact and lost money and property in the amount of at least
$89.70 as a result of these violations.

94.     The Telemarketing Fraud Act, and the FTC's implementing Telemarketing Sales Rule, were not intended to "restrict any right which any person may have under any statute or common law," such as the UCL. *See* 15 U.S.C. § 6104(e).

95.     Under the UCL, Plaintiff and members of the California Class are entitled to equitable relief, including but not limited to restitution of all sums that OnStar unlawfully charged their debit and credit cards; as well as injunctive relief to put a halt to OnStar's unlawful conduct. Bus. & Prof. Code § 17203.  Plaintiff and members of the California Class are also entitled to interest, attorneys' fees, and costs.

Violations of the Federal Trade Commission Act

96.     OnStar's acts and practices violated Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act"), and are therefore "unlawful" within the meaning of the UCL.

97.     Section 5 of the FTC Act prohibits "[u]nfair … acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1).  Under Section 5(n), an act or practice is "unfair" within the meaning of the FTC Act if it causes or is likely to cause substantial injury to consumers that is not reasonably avoidable by consumers and is not outweighed by countervailing benefits to consumers or to competition. *Id.*, § 45(n).

98.     Courts routinely and consistently hold that taking money from consumers' bank accounts via debit cards or charging consumers' credit cards without the consumers' authorization is "unfair" within the meaning of the FTC Act, because as a matter of law, such conduct is likely to cause substantial injury, the injury is not reasonably avoidable, and the conduct has no countervailing benefits. *See, e.g.*, *FTC v. J.K. Publications, Inc.*, 99 F.Supp.2d 1176, 1201 (C.D. Cal. 2000); *FTC v. Windward Marketing, Inc.*, 1997 WL 33642380, *11-*13 (N.D. Ga. Sept. 30, 1997).

1    99.   OnStar's conduct of charging Plaintiff's and the California Class

2   members' debit and credit cards without their authorization is "unfair" within the

3   meaning of the FTC Act, and thus "unlawful" under the UCL.

4    100.   Plaintiff suffered injury in fact and lost money or property as a result of

5   OnStar's violations of the FTC Act. OnStar charged Plaintiff's debit card at least

6   $89.70, thereby taking that sum from Plaintiff's checking account, without first

7   obtaining Plaintiff's affirmative consent. If OnStar had complied with the FTC Act,

8   OnStar could not have made the charges, and would not have obtained this money

9   from Plaintiff.

10    101.   Under the UCL, Plaintiff and members of the California Class are

11   entitled to equitable relief, including but not limited to restitution of all sums that

12   OnStar unlawfully charged their debit and credit cards; as well as injunctive relief to

13   put a halt to OnStar's unlawful conduct; all other relief allowed under Cal. Bus. &

14   Prof. Code §17203; plus interest, attorneys' fees, and costs.

15

16                        **FOURTH CAUSE OF ACTION**

17            **(For "Unfair" Business Practices in Violation of**

18                **Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**

19                    **On Behalf of the California Class**

20    102.   Plaintiff repeats and re-alleges all prior paragraphs and incorporates

21   them as if fully set forth herein.

22    103.   Plaintiff brings this cause of action on behalf of herself and the

23   California Class, pursuant to the "unfair" prong of the UCL (Cal. Bus. and Prof.

24   Code, §§ 17200, *et seq.*). Conduct may be deemed "unfair" within the meaning of

25   the UCL even if no other law explicitly proscribes the conduct.

26    104.   OnStar's acts and practices, as alleged herein, are "unfair" under all

27   three formulations developed in the case law:  the balancing test (*South Bay*

28   *Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal.App.4th 861 (1999)), the

31

1  tethering test (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20

2  Cal.4th 163 (1999)), and the Section 5 test (*Camacho v. Automobile Club*, 142

3  Cal.App.4th 1394, 1403-05 (2006)).

4      105.  <u>OnStar's Conduct is "Unfair" Under the Balancing Test</u>:  To apply the

5  balancing test, the Court asks whether the defendant's conduct is "'immoral,

6  unethical, oppressive, unscrupulous or substantially injurious to consumers,'" then

7  "'weighs the utility of the defendant's conduct against the gravity of the harm to the

8  alleged victim.'"  *South Bay*, 72 Cal.App.4th at 886 (quoting *Klein v. Earth*

9  *Elements, Inc.*, 59 Cal.App.4th 965, 970 (1997); *State Farm Fire & Cas. Co. v.*

10  *Superior Court*, 45 Cal.App.4th 1093, 1103-04 (1996)).  OnStar's conduct is

11  "unfair" under this test because charging consumers' credit or debit cards without

12  their authorization or consent significantly harms consumers, yet has no redeeming

13  moral or ethical utility that could outweigh the harm.  As the California Supreme

14  Court has explained in a similar context, "protection of unwary consumers from

15  being duped by unscrupulous sellers is an exigency of the utmost priority in

16  contemporary society." *Vasquez v. Superior Court*, 4 Cal. 3d 800, 808 (1971).

17      106.  <u>OnStar's Conduct is "Unfair" Under the Tethering Test</u>:  Under the

18  tethering test, which was developed in the context of actions between competitors, a

19  "finding of unfairness must be tethered to some legislatively declared policy or proof

20  of some actual or threatened impact on competition." *Cel-Tech*, 20 Cal.4th at 186-

21  87.  OnStar's acts and practices of surreptitiously subscribing consumers for OTS

22  and charging their debit and credits accounts for OTS without consent violates the

23  legislatively-declared policies expressed in the Electronic Funds Transfer Act, the

24  Automatic Renewal Law, and the Telemarketing Sales Rule, among other laws.

25  OnStar violated not only the letter, but also the spirit and purpose, of each of these

26  laws, thereby engaging in "unfair" conduct under the UCL's "tethering test."

27      107.  <u>OnStar's Conduct is "Unfair" Under the Section 5 Test</u>:  Under the

28  Section 5 test, which is derived from the liability standards governing the FTC Act,

1   conduct is unfair if: "(1) the consumer injury is substantial; (2) the injury is not

2   outweighed by any countervailing benefits to consumers or competition; and (3) the

3   injury could not reasonably have been avoided by consumers themselves." *Boschma*

4   *v. Home Loan Center, Inc.*, 198 Cal.App.4th 230, 253 (2011). OnStar's practices

5   have caused and are likely to cause substantial injury to Plaintiff and the California

6   Class members, which injury is not and was not reasonably avoidable. In the case of

7   Plaintiff Robinson, she lost $89.70 to OnStar's unfair business practices, and she

8   could not have avoided the charges because she had no expectation that OnStar

9   would charge her debit card without her authorization. Furthermore, OnStar's

10  practice of surreptitiously subscribing consumers for OTS and charging their debit

11  and credits accounts for OTS fees without consent is not outweighed by any

12  countervailing benefits to consumers.

13      108. Plaintiff suffered injury in fact and lost money or property as a result of

14  OnStar's "unfair" conduct. OnStar charged Plaintiff's debit card, and took from her

15  checking account, at least $89.70 for OTS without first obtaining Plaintiff's consent.

16  If OnStar had not engaged in this "unfair" conduct, OnStar could not have made the

17  charges, and would not have obtained this money from Plaintiff.

18      109. As remedies for OnStar's "unfair" conduct, Plaintiff and California

19  Class members seek an order of this Court awarding restitution, injunctive relief,

20  and all other relief allowed under Bus. & Prof. Code § 17203, plus interest,

21  attorneys' fees, and costs.

## PRAYER FOR RELIEF

23      WHEREFORE, Plaintiff prays for judgment against OnStar for the following:

24      1.  An order certifying this action as a class action, and appointing Kathryn

25  Robinson as representative plaintiff and her counsel, Stuart M. Eppsteiner and

26  Andrew J. Kubik of Eppsteiner & Fiorica Attorneys, LLP and Kimberly A.

27  Kralowec and Kathleen Styles Rogers of The Kralowec Law Group, to be class

28  counsel;

230524                    **CLASS ACTION COMPLAINT**

1    2.   Imposition of a constructive trust on, and restitution of, all amounts

2  obtained by OnStar as a result of its misconduct, together with interest thereon from

3  the date of payment;

4    3.   All recoverable compensatory and other damages sustained by Plaintiff

5  and Class members;

6    4.   Actual and/or statutory damages for injuries suffered by Plaintiff and

7  members of the proposed Classes in the maximum amount permitted by applicable

8  law;

9    5.   An order enjoining Defendant's wrongful, unlawful, and unfair conduct

10  as set forth above;

11    6.   Statutory pre-judgment and post-judgment interest on any monetary

12  relief awarded;

13    7.   Payment of attorneys' fees and costs as may be allowable under

14  applicable law, including but not limited to Code of Civil Procedure section 1021.5;

15  and

16    8.   Such other relief as the Court may deem just and proper.

DATED: July 2, 2015    By:    */s/ Stuart M. Eppsteiner*
                           Stuart M. Eppsteiner, Esq.
                           Andrew J. Kubik, Esq.
                           EPPSTEINER & FIORICA
                           ATTORNEYS, LLP

                           Kimberly A. Kralowec, Esq.
                           Kathleen Styles Rogers, Esq.
                           THE KRALOWEC LAW GROUP

                           Counsel for Plaintiff and the Putative Class

230524                **CLASS ACTION COMPLAINT**

Exhibit A
Page 36 of 41

# DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of all similarly situated persons, hereby demands a trial by jury on all issues so triable.

DATED: July 2, 2015          By:      /s/ Stuart M. Eppsteiner
                                     Stuart M. Eppsteiner, Esq.
                                     Andrew J. Kubik, Esq.
                                     EPPSTEINER & FIORICA
                                     ATTORNEYS, LLP

                                     Kimberly A. Kralowec, Esq.
                                     Kathleen Styles Rogers, Esq.
                                     THE KRALOWEC LAW GROUP

                                     Counsel for Plaintiff and the Putative Class

230524                    CLASS ACTION COMPLAINT

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | |
|---|---|
| STREET ADDRESS: | 330 W Broadway |
| MAILING ADDRESS: | 330 W Broadway |
| CITY AND ZIP CODE: | San Diego, CA 92101-3827 |
| BRANCH NAME: | Central |
| TELEPHONE NUMBER: | (619) 450-7069 |

| PLAINTIFF(S) / PETITIONER(S): | Kathryn M Robinson |
|---|---|

| DEFENDANT(S) / RESPONDENT(S): | Onstar LLC |
|---|---|

KATHRYN M ROBINSON VS ONSTAR LLC [E-FILE]

| NOTICE OF CASE ASSIGNMENT AND CASE MANAGEMENT CONFERENCE on MANDATORY eFILE CASE | CASE NUMBER:<br>37-2015-00022176-CU-BT-CTL |
|---|---|

## CASE ASSIGNMENT

Judge: Katherine Bacal                                              Department: C-69

## COMPLAINT/PETITION FILED: 07/02/2015

| TYPE OF HEARING SCHEDULED | DATE | TIME | DEPT | JUDGE |
|---|---|---|---|---|
| Civil Case Management Conference | 01/29/2016 | 10:00 am | C-69 | Katherine Bacal |

A case management statement must be completed by counsel for all parties or self-represented litigants and timely filed with the court at least 15 days prior to the initial case management conference. (San Diego Local Rules, Division II, CRC Rule 3.725).

All counsel of record or parties in pro per shall appear at the Case Management Conference, be familiar with the case, and be fully prepared to participate effectively in the hearing, including discussions of ADR* options.

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT), THE ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION FORM (SDSC FORM #CIV-730), A STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR) (SDSC FORM #CIV-359), AND OTHER DOCUMENTS AS SET OUT IN SDSC LOCAL RULE 2.1.5.

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

TIME STANDARDS: The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil cases consist of all civil cases except: small claims proceedings, civil petitions, unlawful detainer proceedings, probate, guardianship, conservatorship, juvenile, parking citation appeals, and family law proceedings.

COMPLAINTS: Complaints and all other documents listed in SDSC Local Rule 2.1.5 must be served on all named defendants.

DEFENDANT'S APPEARANCE: Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than 15 day extension which must be in writing and filed with the Court.) (SDSC Local Rule 2.1.6)

JURY FEES: In order to preserve the right to a jury trial, one party for each side demanding a jury trial shall pay an advance jury fee in the amount of one hundred fifty dollars ($150) on or before the date scheduled for the initial case management conference in the action.

MANDATORY eFILE: Case assigned to mandatory eFile program per CRC 3.400-3.403 and SDSC Rule 2.4.11. All documents must be eFiled at www.onelegal.com. Refer to General Order 051414 at www.sdcourt.ca.gov for guidelines and procedures.

*ALTERNATIVE DISPUTE RESOLUTION (ADR): THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO TRIAL, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. PARTIES MAY FILE THE ATTACHED STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (SDSC FORM #CIV-359).

Exhibit A
Page 38 of 41



# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION

CASE NUMBER: 37-2015-00022176-CU-BT-CTL   CASE TITLE:
Kathryn M Robinson vs Onstar LLC [E-FILE]

**NOTICE:** All plaintiffs/cross-complainants in a general civil case are required to serve a copy of the following three forms on each defendant/cross-defendant, together with the complaint/cross-complaint:
      (1) this Alternative Dispute Resolution (ADR) Information form (SDSC form #CIV-730),
      (2) the Stipulation to Use Alternative Dispute Resolution (ADR) form (SDSC form #CIV-359), *and*
      (3) the Notice of Case Assignment form (SDSC form #CIV-721).

Most civil disputes are resolved without filing a lawsuit, and most civil lawsuits are resolved without a trial. The courts, community organizations, and private providers offer a variety of Alternative Dispute Resolution (ADR) processes to help people resolve disputes without a trial. The San Diego Superior Court expects that litigants will utilize some form of ADR as a mechanism for case settlement before trial, and it may be beneficial to do this early in the case.

Below is some information about the potential advantages and disadvantages of ADR, the most common types of ADR, and how to find a local ADR program or neutral. A form for agreeing to use ADR is attached (SDSC form #CIV-359).

## Potential Advantages and Disadvantages of ADR
ADR may have a variety of advantages or disadvantages over a trial, depending on the type of ADR process used and the particular case:

| Potential Advantages | Potential Disadvantages |
| --- | --- |
| • Saves time | • May take more time and money if ADR does not resolve the dispute |
| • Saves money | |
| • Gives parties more control over the dispute resolution process and outcome | • Procedures to learn about the other side's case (discovery), jury trial, appeal, and other court protections may be limited or unavailable |
| • Preserves or improves relationships | |

## Most Common Types of ADR
You can read more information about these ADR processes and watch videos that demonstrate them on the court's ADR webpage at http://www.sdcourt.ca.gov/adr.

**Mediation:** A neutral person called a "mediator" helps the parties communicate in an effective and constructive manner so they can try to settle their dispute. The mediator does not decide the outcome, but helps the parties to do so. Mediation is usually confidential, and may be particularly useful when parties want or need to have an ongoing relationship, such as in disputes between family members, neighbors, co-workers, or business partners, or when parties want to discuss non-legal concerns or creative resolutions that could not be ordered at a trial.

**Settlement Conference:** A judge or another neutral person called a "settlement officer" helps the parties to understand the strengths and weaknesses of their case and to discuss settlement. The judge or settlement officer does not make a decision in the case but helps the parties to negotiate a settlement. Settlement conferences may be particularly helpful when the parties have very different ideas about the likely outcome of a trial and would like an experienced neutral to help guide them toward a resolution.

**Arbitration:** A neutral person called an "arbitrator" considers arguments and evidence presented by each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are usually relaxed. If the parties agree to binding arbitration, they waive their right to a trial and agree to accept the arbitrator's decision as final. With nonbinding arbitration, any party may reject the arbitrator's decision and request a trial. Arbitration may be appropriate when the parties want another person to decide the outcome of their dispute but would like to avoid the formality, time, and expense of a trial.

Exhibit A
Page 39 of 41

**Other ADR Processes:**  There are several other types of ADR which are not offered through the court but which may be obtained privately, including neutral evaluation, conciliation, fact finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR processes. The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute.  Be sure to learn about the rules of any ADR program and the qualifications of any neutral you are considering, and about their fees.

## Local ADR Programs for Civil Cases

**Mediation:**  The San Diego Superior Court maintains a Civil Mediation Panel of approved mediators who have met certain minimum qualifications and have agreed to charge $150 per hour for each of the first two (2) hours of mediation and their regular hourly rate thereafter in court-referred mediations.

On-line mediator search and selection:  Go to the court's ADR webpage at www.sdcourt.ca.gov/adr and click on the "Mediator Search" to review individual mediator profiles containing detailed information about each mediator including their dispute resolution training, relevant experience, ADR specialty, education and employment history, mediation style, and fees and to submit an on-line Mediator Selection Form (SDSC form #CIV-005).  The Civil Mediation Panel List, the Available Mediator List, individual Mediator Profiles, and Mediator Selection Form (CIV-005) can also be printed from the court's ADR webpage and are available at the Mediation Program Office or Civil Business Office at each court location.

**Settlement Conference:**  The judge may order your case to a mandatory settlement conference, or voluntary settlement conferences may be requested from the court if the parties certify that: (1) settlement negotiations between the parties have been pursued, demands and offers have been tendered in good faith, and resolution has failed; (2) a judicially supervised settlement conference presents a substantial opportunity for settlement; and (3) the case has developed to a point where all parties are legally and factually prepared to present the issues for settlement consideration and further discovery for settlement purposes is not required. Refer to SDSC Local Rule 2.2.1 for more information. To schedule a settlement conference, contact the department to which your case is assigned.

**Arbitration:**  The San Diego Superior Court maintains a panel of approved judicial arbitrators who have practiced law for a minimum of five years and who have a certain amount of trial and/or arbitration experience.  Refer to SDSC Local Rules Division II, Chapter III and Code Civ. Proc. § 1141.10 et seq or contact the Arbitration Program Office at (619) 450-7300 for more information.

More information about court-connected ADR: Visit the court's ADR webpage at www.sdcourt.ca.gov/adr or contact the court's Mediation/Arbitration Office at (619) 450-7300.

**Dispute Resolution Programs Act (DRPA) funded ADR Programs:**  The following community dispute resolution programs are funded under DRPA (Bus. and Prof. Code §§ 465 et seq.):
- In Central, East, and South San Diego County, contact the National Conflict Resolution Center (NCRC) at www.ncrconline.com or (619) 238-2400.
- In North San Diego County, contact North County Lifeline, Inc. at www.nclifeline.org or (760) 726-4900.

**Private ADR:**  To find a private ADR program or neutral, search the Internet, your local telephone or business directory, or legal newspaper for dispute resolution, mediation, settlement, or arbitration services.

## Legal Representation and Advice

To participate effectively in ADR, it is generally important to understand your legal rights and responsibilities and the likely outcomes if you went to trial. ADR neutrals are not allowed to represent or to give legal advice to the participants in the ADR process. If you do not already have an attorney, the California State Bar or your local County Bar Association can assist you in finding an attorney. Information about obtaining free and low cost legal assistance is also available on the California courts website at *www.courtinfo.ca.gov/selfhelp/lowcost*.

Exhibit A
Page 40 of 41

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF  SAN DIEGO**

| | | FOR COURT USE ONLY |
|---|---|---|
| STREET ADDRESS: | 330 West Broadway | |
| MAILING ADDRESS: | 330 West Broadway | |
| CITY, STATE, & ZIP CODE: | San Diego, CA  92101-3827 | |
| BRANCH NAME: | Central | |

| PLAINTIFF(S):   Kathryn M Robinson |
|---|

| DEFENDANT(S): Onstar LLC |
|---|

| SHORT TITLE:    KATHRYN M ROBINSON VS ONSTAR LLC [E-FILE] |
|---|

| **STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR)** | CASE NUMBER:<br>37-2015-00022176-CU-BT-CTL |
|---|---|

Judge: Katherine Bacal                                            Department: C-69

The parties and their attorneys stipulate that the matter is at issue and the claims in this action shall be submitted to the following alternative dispute resolution (ADR) process.  Selection of any of these options will not delay any case management timelines.

☐  Mediation (court-connected)                    ☐  Non-binding private arbitration

☐  Mediation (private)                                    ☐  Binding private arbitration

☐  Voluntary settlement conference (private)    ☐  Non-binding judicial arbitration (discovery until 15 days before trial)

☐  Neutral evaluation (private)                        ☐  Non-binding judicial arbitration (discovery until 30 days before trial)

☐  Other (specify e.g., private mini-trial, private judge, etc.): _____

_____

It is also stipulated that the following shall serve as arbitrator, mediator or other neutral: (Name)  _____

_____

_____

Alternate neutral (for court Civil Mediation Program and arbitration only): _____

Date: _____            Date: _____

_____            _____
Name of Plaintiff                                                   Name of Defendant

_____            _____
Signature                                                            Signature

_____            _____
Name of Plaintiff's Attorney                                    Name of Defendant's Attorney

_____            _____
Signature                                                            Signature

If there are more parties and/or attorneys, please attach additional completed and fully executed sheets.

It is the duty of the parties to notify the court of any settlement pursuant to Cal. Rules of Court, rule 3.1385.  Upon notification of the settlement, the court will place this matter on a 45-day dismissal calendar.

No new parties may be added without leave of court.

**IT IS SO ORDERED.**

Dated:  07/06/2015                                            _____
                                                                        JUDGE OF THE SUPERIOR COURT

SDSC CIV-359 (Rev 12-10)          **STIPULATION TO USE OF ALTERNATIVE DISPUTE RESOLUTION**          Page: 1

Exhibit A
Page 41 of 41

# EXHIBIT B



**CORPORATION SERVICE COMPANY®**

# Notice of Service of Process

**null / ALL**
**Transmittal Number: 13980978**
**Date Processed: 07/06/2015**

| | |
|---|---|
| **Primary Contact:** | Rosemarie Williams<br>General Motors LLC<br>Mail Code 48482-038-210<br>400 Renaissance Center<br>Detroit, MI 48265 |

| | |
|---|---|
| **Entity:** | Onstar, LLC<br>Entity ID Number  2599504 |
| **Entity Served:** | Onstar, LLC |
| **Title of Action:** | Robinson, Kathryn, M. vs. Onstar LLC |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Class Action |
| **Court/Agency:** | San Diego County Superior Court, California |
| **Case/Reference No:** | 37-2015-00022176-CU-BT-CTL |
| **Jurisdiction Served:** | California |
| **Date Served on CSC:** | 07/06/2015 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Eppsteiner & Fiorica Attorneys, LLP (San Diego, CA)<br>858-350-1500 |
| **Client Requested Information:** | Year:<br>Make:<br>Model:<br>VIN: |

**Notes:**   Eppsteiner & Fiorica Attorneys, LLP 12555 High Bluff Dr., Suite 155 San Diego, CA 92130
CSC Location document was served: Corporation Service Company which will do business in California as
Csc-Lawyers Incorporating Service 2710 Gateway Oaks Drive Suite 150N Sacramento, CA 95833

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not
constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**
*CSC is SAS70 Type II certified for its Litigation Management System.*
2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882   |   sop@cscinfo.com

Exhibit B
Page 1 of 1

**EXHIBIT C**

O
JS-6

1

2

3        UNITED STATES DISTRICT COURT

4        CENTRAL DISTRICT OF CALIFORNIA

5        SOUTHERN DIVISION

6

7

8

9    DIANA TAIT, ET AL.,                    Case No.: SACV 10-0711-DOC (ANx)

10        Plaintiffs,

11                                           ORDER GRANTING PLAINTIFFS'
                                             MOTION FOR ATTORNEY'S FEES
12        vs.                                AND REIMBURSEMENT OF
                                             EXPENSES, AND PLAINTIFFS'
13    BSH HOME APPLIANCES                    REQUEST FOR SERVICE
     CORPORATION,                            AWARDS [372]; GRANTING
14                                           PLAINTIFFS' MOTION FOR
         Defendants.                         FINAL APPROVAL OF CLASS
15                                           ACTION SETTLEMENT [373]

16

17

18        Before the Court is Plaintiffs' Motion for Attorney's Fees and Reimbursement of

19   Expenses, and Plaintiffs' Request for Service Awards ("Motion for Fees") (Dkt. 372) and

20   Plaintiffs' Motion for Final Approval of Class Action Settlement ("Motion for Final

21   Approval") (Dkt. 373). The Court held a hearing on this matter on June 8, 2015. Defendant did

22   not file an opposition to the two motions. The Court received a number of objections to the

23   proposed settlement. After reviewing the moving papers, considering the arguments at the

24   hearing, and reviewing the entirety of the record, the Court GRANTS the Motion for Fees and

25   the Court GRANTS the Motion for Final Approval.

26

27

28

Exhibit C
Page 1 of 27

## I. Background

### A. Procedural History

On June 3, 2010, Plaintiffs Diana Tait and Nancy Wentworth filed a Complaint against Defendant BSH Home Appliances Corporation ("BSH") alleging that certain BSH washing machines have a propensity to develop a filmy substance referred to as "Biofilm," bacteria, mold, fungus, and bioorganic material which produce foul odors (Dkt. 1). On February 14, 2011, Plaintiffs Sharon Cobb, Beverly Gibson, Trish Isabella, Diana Tait and Nancy Wentworth filed the Consolidated Amended Complaint ("CAC") (Dkt. 41). BSH moved to dismiss the CAC (Dkt. 43). In the meantime, the consolidated action was transferred from Judge Cormac J. Carney to this Court (Dkt. 58). The Court granted BSH's motion to dismiss with leave to amend (Dkt. 60), and Plaintiffs filed a Second Consolidated Amended Complaint ("SCAC") (Dkt. 66). BSH renewed its motion to dismiss (Dkt. 67), which the Court granted in part, and denied in part (Dkt. 74). BSH answered the SCAC on September 21, 2011 (Dkt. 75).

Plaintiffs moved for certification of four individual state classes comprised of purchasers of BSH washers in California, Illinois, Maryland, and New York, respectively (Dkt. 87). BSH opposed the certification motion and moved to strike Plaintiffs' experts' opinions (Dkts. 96-102, 103-104). On December 20, 2012, the Court certified four state classes and denied BSH's motion to exclude the opinions of Plaintiffs' engineering and biology experts (Dkt. 166). *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466 (C.D. Cal. 2012).

BSH petitioned the Ninth Circuit for permission to appeal the class certification order on January 3, 2013. At the same time, petitions for certiorari were pending in similar moldy washer cases against Whirlpool Corporation ("*Whirlpool*") and Sears, Roebuck & Co. ("*Kenmore*") challenging class certification decisions by the Sixth and Seventh Circuits. On April 1, 2013, the Supreme Court granted certiorari in both *Whirlpool* and *Kenmore*, vacated the respective circuit opinions, and remanded for reconsideration in light of *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) ("GVR Orders"). The same day, the Ninth Circuit denied BSH's petition for review. BSH filed a motion for reconsideration, which the Ninth Circuit denied. Following the GVR Orders, the Sixth and Seventh Circuits reaffirmed their earlier

Exhibit C
Page 2 of 27

decisions, and Whirlpool and Sears once again petitioned for certiorari. Earlier, on July 30, 2013, BSH filed its own petition for a writ of certiorari from the Ninth Circuit's denial of permission to appeal. The petitions for all three cases were denied on February 24, 2014.

Plaintiffs' claims against BSH are on behalf of all United States residents who purchased one or more Bosch or Siemens brand 27-inch front-loading washing machines. Provisional Fourth Amended Complaint (Dkt. 370) ¶ 2.[1] Plaintiffs allege that BSH designed, manufactured, marketed, and sold washers with a propensity to develop bacteria, mold and foul odors ("BMFO"), and that BSH failed to disclose this defect or the extraordinary tasks required to abate or ameliorate BMFO. *Id.* ¶¶ 4-7, 44-45. Plaintiffs brought claims against BSH for violations of state consumer protection statutes, common law fraudulent concealment and nondisclosure, breach of express and implied warranties, and unjust enrichment. *Id.* ¶¶ 98-207.

BSH filed a motion for sanctions related to Plaintiffs' damages experts (Dkt. 232), which the Court denied on August 20, 2014 (Dkt. 252). Plaintiffs filed a motion for spoliation sanctions related to discovery issues (Dkt. 265), which was also denied (Dkt. 284).

On August 25, 2014, the Court approved Plaintiffs' proposed Notice Plan and draft forms of notice to the Class (Dkt. 258). Class notice was disseminated to California, Illinois, Maryland, and New York class members beginning in late September.

On August 29, 2014, BSH filed a motion for partial summary judgment (Dkt. 259). Ten days later, BSH filed a motion to decertify the classes (Dkt. 276). The parties also filed cross-motions to exclude the opinions of each other's experts ("*Daubert* motions") (Dkts. 289, 335). At the time of settlement, the partial summary judgment and decertification motions had been fully briefed and were awaiting hearing and final rulings, and reply briefs for the *Daubert* motions were days from being filed.

Discovery in this matter may fairly be described as extensive and contentious. Plaintiffs served multiple sets of document requests, interrogatories, and requests for admissions.

---

[1] Plaintiffs originally alleged claims related to 24-inch washing machines, too, but those claims were not certified, are not included in the settlement, and will not be released. The operative Fourth Amended Consolidated Complaint clarifies that the Class includes only purchasers of the 27-inch machines.

Exhibit C
Page 3 of 27

Declaration of Kristen Law Sagafi ("Sagafi Decl.") (Dkt. 373-1) ¶ 8. BSH produced tens of thousands of pages of documents, including detailed consumer complaint records and internal correspondence regarding the design and marketing of the washers. *Id*. The parties took and defended 28 fact witness depositions, including of BSH marketing, engineering, and consumer complaint employees and former employees. These depositions took place across the United States and in the Netherlands. *Id*. The named Plaintiffs were also deposed. *Id*. ¶ 22.

The parties presented, collectively, 21 experts who together prepared and served 32 expert reports, including eight disclosed during the class certification stage. The experts prepared reports related to the washers' allegedly defective design, mold growth and testing, consumer complaints, consumer perception of BSH's marketing and alleged non-disclosures, and damages. *Id.* ¶ 9. The parties took and defended a total of 26 expert depositions, with some of the experts being deposed both at the class certification and the merits phases. *Id*.

### B. Settlement Negotiations

The parties attended mediation on December 8, 2013, with the Honorable Daniel S. Pratt (Ret.) serving as mediator. At that time, this case and similar cases against other manufacturers of front-loading washing machines were facing the possibility of Supreme Court review. The case did not settle. Sagafi Decl. ¶ 12.

Pursuant to the Court's Scheduling Order dated June 30, 2014, the parties participated in mediation again, this time with the Honorable Dickran Tevrizian (Ret.), on September 8, 2014. The parties reached agreement on some significant issues, but did not reach full agreement on all terms. *Id*. ¶ 13.

Following the second mediation, the parties resumed active litigation, including continued expert work and briefing on BSH's motion for summary judgment, BSH's motion to decertify the class, and *Daubert* motions, along with trial preparation. *Id*. ¶¶ 13-14. On October 21, 2014, the parties resumed negotiations without the assistance of the mediator. The parties reached agreement on the outstanding issues and executed a memorandum of understanding ("MOU") on November 3, 2014. The parties negotiated the amount of attorney's fees and costs and service awards for the class representatives only after completing negotiation of the

Exhibit C
Page 4 of 27

substantive settlement terms. *Id*. ¶ 14; Declaration of Dickran Tevrizian ("Tevrizian Decl.") (Dkt. 386) ¶ 7.

Following the MOU, there were further negotiations over the specifics of the claims process and the notice program, including consultation with the claims administrator, KCC. In parallel with these efforts, class counsel worked diligently to prepare the preliminary approval motion. Sagafi Decl. ¶ 18. On December 12, 2014, the parties fully executed the Settlement Agreement, and that same day, class counsel moved for preliminary approval (Dkt. 363).

On December 29, 2014, the Court granted Plaintiffs' Unopposed Motion for Preliminary Approval (Dkt. 368), preliminarily finding the Settlement to be "fair, reasonable, and adequate," and "direct[ing] the Claims Administrator and the parties to carry out the Notice Plan as provided for in the Settlement."

### C. Key Terms of the Settlement

The settlement class consists of all residents of the United States who were the original purchasers of one or more Bosch or Siemens brand 27-inch front-loading washers (with certain exclusions). Settlement Agreement (Dkt. 363-1) at 7, § II.G.

The settlement is a "claims-made" settlement. Each member of the class is eligible for a $55 cash payment from BSH. *Id.* § III.A. In order to receive the payment, class members for whom BSH had proof of ownership through its warranty records needed only to confirm their correct mailing addresses and submit a statement under penalty of perjury that they were the original purchaser. Other class members needed to provide proof of ownership through other means (such as a receipt, invoice, credit card statement, or picture of their washer's serial number) along with a statement under penalty of perjury that they were the original purchaser of the washer. Class members had until May 28, 2015, to submit a claim.

BSH agreed not to oppose a request by class counsel for attorney's fees and costs of $6.5 million, including expert fees and costs. *Id.* at 15, § VI.

The settlement provides for a release of liability that will preclude future claims "arising out of, or in any way relating to any act, failure to act, omission, misrepresentation, fact, event, transaction, or occurrence from the beginning of time until the Effective Date of this Settlement

Exhibit C
Page 5 of 27

Agreement that were raised or could have been raised in the Action relating in any way to BMFO in the Washers (including the Nationwide Claims), except for claims for personal injury, emotional distress, or wrongful death." *Id.* at 17, § VIII.B.

Notice of the settlement was provided by mail or email to over 140,000 out of an estimated 650,000 class members. Notice was also provided through the Internet, including by the use of Internet banner ads and a settlement website, which is linked to by class counsel's websites. Declaration of Eric Robin ("Robin Decl.") (Dkt. 373-2) ¶ 14; Sagafi Decl. ¶ 19. Notice was also published in the *Orange County Register* and *People* and *National Geographic* magazines. Robin Decl. ¶ 11.

## II. Legal Standard

### A. Settlement Approval

"The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). Court approval involves a two-step process: (1) preliminary approval of the settlement; and (2) following a notice period to the class, final approval of the settlement at a fairness hearing. *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004). The Court may issue final approval of a class settlement "only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011). Once the court certifies a settlement class, approval of the settlement terms rests in the court's sound discretion. *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1291 (9th Cir. 1992).

"A difficult balancing act almost always confronts a district court tasked with approving a class action settlement." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015). On the one hand, "there is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008). "But on the other hand, 'settlement class actions present unique due process concerns for absent class members,' and the district court has a fiduciary duty to look after the interests of those absent class members." *Allen*, 787 F.3d at 1223 (internal citations omitted).

Exhibit C
Page 6 of 27

Upon appellate review, approval of a settlement's substantive fairness will rarely be overturned "unless the terms of the agreement contain convincing indications that . . . self-interest rather than the class's interests in fact influenced the outcome of the negotiations." *Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003). However, district courts in the Ninth Circuit are held "to a higher *procedural* standard when making that determination of substantive fairness." *Allen*, 787 F.3d at 1223. "To survive appellate review, the district court must show it has explored comprehensively all factors, and must give a reasoned response to all non-frivolous objections." *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012) (citations and internal quotation marks omitted).

In considering final approval of a proposed settlement, the Court's discretion is guided by the following factors:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of class members to the proposed settlement.

*Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 556, 575 (9th Cir. 2004). "This list is not exhaustive, and different factors may predominate in different factual contexts." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993). In addition to these factors, the Court may consider the procedure by which the parties arrived at the settlement to determine whether the settlement is truly the product of arm's length bargaining, rather than the product of collusion or fraud. *See Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 851 (N.D. Cal. 2010).

The Court's role in evaluating the proposed settlement "must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable, and adequate to all concerned." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) (internal quotation marks omitted).

Exhibit C
Page 7 of 27

In general, there is a strong judicial policy favoring class settlements. *Class Plaintiffs*, 955 F.2d at 1276. In evaluating a settlement agreement, it is not the Court's role to second-guess the agreement's terms. *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). If the settlement cannot be approved as is, the Court must reject the settlement because it is not authorized "to delete, modify or substitute certain provisions. The settlement must stand or fall in its entirety." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) (internal quotation marks omitted).

## B. Attorney's Fees and Costs

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "[C]ourts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth*, 654 F.3d at 941. "The reasonableness of a fee award must be considered against the backdrop of the 'American Rule,' which provides that courts generally are without discretion to award attorneys' fees to a prevailing plaintiff unless" an exception applies. *Id.* "The award of attorneys' fees in a class action settlement is often justified by the common fund or statutory fee-shifting exceptions to the American Rule, and sometimes both." *Id.*

"An award of attorneys' fees incurred in a suit based on state substantive law is generally governed by state law." *Champion Produce, Inc. v. Ruby Robinson Co.*, 342 F.3d 1016, 1024 (9th Cir. 2003). "The task of a federal court in a diversity action is to approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum." *Farmers Ins. Exch. v. Law Offices of Conrado Joe Sayas, Jr.*, 250 F.3d 1234, 1236 (9th Cir. 2001) (internal quotation marks omitted); *see also Winterrowd v. Am. Gen. Annuity Ins. Co.*, 556 F.3d 815, 827 (9th Cir. 2009) ("State law establishes the required showing for attorney's fees in an action in diversity.").

## C. Representative Enhancement

"[N]amed plaintiffs, as opposed to designated class members who are not named plaintiffs, are eligible for reasonable incentive payments." *Staton*, 327 F.3d at 977. It is within

Exhibit C
Page 8 of 27

the Court's discretion to grant such an award. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000). These awards "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general. Awards are generally sought after a settlement or verdict has been achieved." *Rodriguez*, 563 F.3d at 958-59.

### III. The Court's Special Obligation

The proposed settlement contains certain features which the Court finds troubling.

As the Court indicated at the Fairness Hearing, it takes seriously its obligation to independently ensure that the settlement—including the requested attorney's fees—is fair, reasonable, and adequate. This duty compels the Court to "look for 'subtle signs that class counsel have allowed pursuit of their own self-interests . . . to infect the negotiations.'" *Allen*, 787 F.3d at 1224. In *Allen*, the Ninth Circuit reiterated three such subtle signs: "(1) 'when counsel receive a disproportionate distribution of the settlement;' (2) 'when the parties negotiate a "clear sailing" arrangement' (i.e., an arrangement where defendant will not object to a certain fee request by class counsel); and (3) when the parties create a reverter that returns unclaimed fees to the defendant." *Id.* (quoting *In re Bluetooth*, 654 F.3d at 947). The Court is concerned that each of these factors appears to be present in the proposed settlement.

The proposed settlement is a "claims-made" settlement, which "is a settlement that does not have a fixed settlement fund, but rather provides that the defendant will pay claims of class members who file them, usually up to some fixed ceiling." 4 William B. Rubenstein et al., *Newberg on Class Actions* ("*Newberg*") § 13:7 (5th ed.). As to proportionality, courts are split on whether, in claims-made settlements, attorney's fees should be viewed as a percentage of the total amount available to the class or the smaller amount actually claimed by the class. *See id.* (citing cases). Class counsel argue that fees should be viewed as a percentage of the maximum amount of funds potentially available to the class. They argue that the requested award of $4,188,981.61 is only 10% of the total "maximum value" of the settlement, which they assert is

Exhibit C
Page 9 of 27

$42.25 million—that is, \$35,750,000 (\$55 per class member × 650,000 class members) + \$6,500,000 (\$4,188,981.61 in fees + \$2,311,018.39 in costs). The Court does not agree.

The problem with class counsel's comparison is that it distorts the reality of the *actual* payment that BSH will make to the class. *Allen* supports the view that proportionality should be determined with reference to the actual amount paid to the class. In *Allen*, the settlement created a maximum fund of \$4.5 million and class counsel sought, and was awarded, a fee representing 25% of that amount. *Allen*, 787 F.3d at 1221. However, less than 8% of the class submitted timely claims and thus only a maximum of \$373,675 would be disbursed to the class. *Id.* at 1224 n.4. In reversing, the Ninth Circuit expressed its concern that the fee award exceeded the actual amount that would be paid to the class by a factor of three. *Id.* at 1224.

At the Fairness Hearing, class counsel represented that, as of the close of business on June 5, 2015, 19,469 class members, or approximately 3% of the class, submitted claims. Based on that claims rate, BSH will pay a total of \$1,070,795 to class members—assuming all claims are determined to be valid. The amount of requested attorney's fees (\$4,188,981.61) is approximately four times the maximum amount that will actually be paid to the class. Thus, the same proportionality concern identified in *Allen* is present here.

The proposed settlement also contains a "clear sailing" provision, whereby BSH agreed not to object to class counsel seeking attorney's fees and costs of \$6.5 million or less. *See Newberg* § 13:7 (combination of a claims-made settlement with a clear sailing provision "makes it appear as if class counsel agreed to a low defendant liability in exchange for an easy fee").

Class counsel argue that the settlement does not provide for a reversion of funds to BSH. Although the claims-made settlement does not contain a reverter provision, "[a] claims-made settlement is . . . the functional equivalent of a common fund settlement where the unclaimed funds revert to the defendant." *Newberg* § 13:7 (reversionary fund settlements and claims-made settlements "are fully synonymous").

As the *Allen* court stated, the existence of red flags "does not mean the settlement cannot still be fair, reasonable, or adequate." *Allen*, 787 F.3d at 1224. However, especially in light of

Exhibit C
Page 10 of 27

the troubling features of the proposed settlement, the Court has "a special obligat[ion] to assure itself" that the settlement is fair, reasonable, and adequate and "that the fees awarded in the agreement [are] not unreasonably high." *Id.* (internal quotation marks omitted; first alteration in original).

With this special obligation in mind, the Court proceeds to address the adequacy of the settlement.

## IV.     Adequacy of Settlement

The Court assesses the adequacy of the settlement in light of the *Churchill Village* factors. *See Churchill Vill.*, 361 F.3d at 575.

### A.     Strength of Plaintiffs' Case

Most of Plaintiffs' claims survived a motion to dismiss (Plaintiffs' express warranty claims under the Uniform Commercial Code and the Song Beverly Act were dismissed without leave to amend). Classes for four states were certified. BSH's pending summary judgment motion sought to eliminate the claims of a significant subset of the certified classes. BSH also had pending motions to decertify the classes and *Daubert* motions challenging Plaintiffs' experts on damages, defective design, and consumer complaints. These motions presented serious hurdles for Plaintiffs. Additionally, in the *Whirlpool* action, which involved similar claims of front-loading washing machines having a propensity to develop BMFO, a jury trial resulted in a unanimous defense verdict. Although Plaintiffs' claims were strong enough to survive a motion to dismiss, they had many evidentiary weaknesses.

### B.     Risk, Expense, Complexity

Even if Plaintiffs could be certain their claims would survive the pending motions and they would obtain a favorable verdict, defending that verdict on appeal would pose its own set of challenges. This case has already been through a round of appeals, and given the procedural history, further appeals can likely be expected if the case were to proceed in active litigation. The value of any judgment would therefore be discounted by the delay the class members would face in actually obtaining that judgment. By contrast, the proposed settlement provides certain, timely, and substantial relief. *See Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D.

Exhibit C
Page 11 of 27

482, 489 (E.D. Cal. 2010) (in weighing the risk of future litigation, "a court may consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation") (internal quotation marks omitted).

### C. Risk of Maintaining Class Action Status

Maintaining class action status itself was significantly at risk. Even as to the certified classes of consumers in California, Illinois, New York, and Maryland, maintaining certification through trial was not guaranteed in light of BSH's pending decertification motion and the expected appeals of any final class certification order. *Cf. McKenzie v. Fed. Exp. Corp.*, 2012 WL 2930201, at *4 (C.D. Cal. July 2, 2012) (even though class had been certified and defendant's motion for reconsideration of the certification decision had been denied, third *Churchill Village* factor weighed in favor of final approval because "settlement avoids all possible risk").

### D. Amount Offered in Settlement

The settlement makes all nationwide class members eligible to receive a $55 cash payment. For comparison, Plaintiffs' per-washer damages estimates ranged from $113 to $396, depending on the methodology employed. Plaintiffs' only damages model that BSH conceded could be a valid classwide measure—the price elevation model—estimated damages of $113 per washer. The potential recovery is nearly half of that figure.

Class counsel characterizes the settlement as creating a maximum value of $35.75 million ($55 × 650,000 class members). As discussed above, this "maximum value" is somewhat illusory. *See Pearson v. NBTY, Inc.*, 772 F.3d 778, 781 (7th Cir. 2014) ("The $14.2 million 'benefit' to the class members was a fiction . . . . Only 30,245 claims were filed, yielding total compensation for the class members of less than $1 million."). A case like this one presents challenges to actually notifying all class members and making sure that they all submit claims. It is patently unrealistic to expect that all—or close to all—class members would submit a claim. *See In re TJX Companies Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 405

Exhibit C
Page 12 of 27

(D. Mass. 2008) ("[I]n . . . a claims-made settlement, the defendant is likely to bear only a fraction of the liability to which it agrees.").

In fact, at the Fairness Hearing, class counsel represented that only 19,469 class members (or approximately 3% of the nationwide class) submitted claims. Assuming each of these claims are determined valid and paid, the total payout to the class will only be $1,070,795. This economic reality should be taken into account when assessing the adequacy of the settlement. *See Parker v. Time Warner Entm't Co., L.P.*, 631 F. Supp. 2d 242, 267 (E.D.N.Y. 2009) ("[T]he settlement should be valued on the basis of the number of claims that were made against it[.]"); Fed. Jud. Ctr., *Managing Class Action Litigation: A Pocket Guide for Judges* at 13 (3d ed. 2010) (advising courts reviewing settlements to obtain information about "the number of claims actually filed by class members" and "the amount of the settlement that is likely to be distributed to class members"); *see id.* at 16 ("Your appraisal of the settlement should focus on the value actually distributed to the class—based on the number and percentage of class members who have filed a claim."); Nicholas M. Pace & William B. Rubenstein, *How Transparent are Class Action Outcomes? Empirical Research on the Availability of Class Action Claims Data* 39 (RAND Institute for Civil Justice 2008) ("As part of demonstrating the amount accorded to the class, the parties should have to estimate the proportion of class members likely to make claims and the likely average amount of such claims. . . . In short, the numbers should be transparent and they should add up.").

Although only 3% of class members submitted claims, all class members—besides the approximately 30 who opted out—are releasing their claims against BSH. Put another way, the proposed settlement buys a release from approximately 650,000 class members for the price of $1.65 per class member ($55 × 19,469 claims submitted ÷ 650,000 class members). *See Pearson*, 772 F.3d at 783-84 (where class members were eligible to receive up to $12 without proof of purchase and up to $50 with proof of purchase, the actual payment to class members spread across the entire class was "only 7 cents apiece"). Quantifying the settlement as a function of the actual claims is much more meaningful—and accurate—than class counsel's version of the "maximum value" of the settlement ($35.75 million).

Exhibit C
Page 13 of 27

Nevertheless, the Court recognizes that the $1.65 figure does not tell the whole story. In the settlement, BSH agreed to pay $55 for all valid claims made. Although competent and experienced counsel for both sides could not have believed all class members would submit claims, *see In re TJX Companies Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 405 (D. Mass. 2008) (stating "attorneys for each side bargain knowing that" in "a claims-made settlement, the defendant is likely to bear only a fraction of the liability to which it agrees"), a claims rate somewhat above 3% was likely a realistic possibility, *see Sylvester v. CIGNA Corp.*, 369 F. Supp. 2d 34, 52 (D. Me. 2005) ("'[C]laims made' settlements regularly yield response rates of 10 percent or less."). BSH's agreement up front to be on the hook for all valid claims is worth something greater than simply the value of the actual payment that will be made to class members.

Unlike class counsel, the Court thus cannot call the settlement "an excellent result" for the class. That said, "[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (internal quotation marks omitted).

## E. Extent of Discovery Completed and the Stage of Proceedings

The settlement was reached two months before trial was set to commence and only after extensive fact discovery, expert discovery, and motions practice. The first mediation took place after the four classes were certified and after substantial fact and class-related expert discovery. The second mediation took place nine months later, by which time the parties had conducted additional fact discovery, deposed each other's experts, and filed opening and responding briefs to BSH's summary judgment motion. Following the second mediation, the parties resumed active litigation, including trial preparation and ongoing briefing related to summary judgment, BSH's decertification motion, and *Daubert* challenges.

This is certainly a case where both parties had ample time and information to evaluate all aspects of the case, the strength of the factual and legal questions at issue, and the likelihood of prevailing.

Exhibit C
Page 14 of 27

### F. Experience and Views of Counsel

Counsel on both sides of this case are experienced litigators. Class counsel competently investigated and litigated the factual and legal issues raised in this action, and they wholeheartedly endorse the settlement as fair, reasonable, and adequate. *See* Sagafi Decl. ¶¶ 23-24. In light of the problematic incentives inherent in agreements like the one before the Court, however, the views of counsel are not given significant weight.

### G. Presence of a Governmental Participant

There is no governmental participant in this action.

### H. Reaction of Members of the Proposed Settlement

All class representatives, who actively participated in this litigation, endorse the settlement. *See* Declaration of Beverly Gibson (Dkt. 372-2); Declaration of Dennis Demereckis (Dkt. 372-3); Declaration of Nancy Wentworth (Dkt. 372-4); Declaration of Trish Isabella (Dkt. 373-5). As of the deadline for objecting to or opting out of the settlement (April 30, 2015), the claims administrator received 30 opt-outs (0.005% of the total class).

The following class members objected to the adequacy of the settlement: Roger Kerr, Robert and Robin Munoz, Jeffrey Rudy, and Bobby Ameen.[2] One objector, for example, called the $55 payment a "miniscule settlement amount . . . in comparison [with] the outlay of funds we were forced to make." Another objector states that "[t]he $55.00 settlement seems ridiculous, and sort of a slap in the face."

The flaw with each of the objections to the adequacy of the settlement is that the objectors consider only the amount of their asserted damages and ignore both the costs and risks of litigation.

### I. Settlement Procedure

In addition to the factors enumerated in *Churchill Village*, the Court finds it appropriate to consider the procedure by which the parties arrived at the settlement to determine whether

---

[2] Carole Manuwa initially objected to the claims procedure but later withdrew her objection. Charles Moore submitted an objection because he contends that BSH did nothing wrong. Because he does not contend that the settlement is inadequate or unfair to the class, the Court does not address his objection any further.

Exhibit C
Page 15 of 27

the settlement is truly the product of arm's length bargaining, rather than the product of collusion or fraud. *See Chun-Hoon*, 716 F. Supp. 2d at 851; *Van Ba Ma v. Covidien Holding, Inc.*, 2014 WL 2472316, at *2 (C.D. Cal. May 30, 2014).

The parties engaged in two mediations with well-respected former judges: the Honorable Daniel S. Pratt (Ret.) and the Honorable Dickran Tevrizian (Ret.). In a declaration in support of final approval of the settlement, Judge Tevrizian stated that "the negotiations were intense, arms-length, non-collusive, and contentious." Tevrizian Decl. ¶ 6.

## J. Conclusion

In weighing the factors listed above, the Court cannot agree with class counsel's characterization of the settlement as being an "excellent result for the Class." However, particularly in light of the significant risks Plaintiffs would face going forward in the case, the Court finds that the settlement is fair, adequate, and reasonable. *See* Fed. R. Civ. P. 23(e)(2). And, although the settlement contains features that are less than ideal, the Court finds that the settlement "is not the product of fraud or overreaching by, or collusion between, the negotiating parties." *See Rodriguez*, 563 F.3d at 965 (internal quotation marks omitted). Rather, the less than remarkable result reflects the serious obstacles to victory Plaintiffs would have faced if the case proceeded.

## V. Attorney's Fees

Class counsel seeks to recover attorney's fees of $4,188,981.61.

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "Because there is no agreement regarding fees, the Court, sitting in diversity adjudicating state law claims, turns to applicable California law." *Parkinson v. Hyundai Motor Am.*, 796 F. Supp. 2d 1160, 1169 (C.D. Cal. 2010); *see also Mangold v. California Pub. Utils. Comm'n*, 67 F.3d 1470, 1478–79 (9th Cir. 1995) ("The method of calculating a fee is an inherent part of the substantive right to the fee itself, and a state right to an attorneys' fee reflects a substantial policy of the state.").

Exhibit C
Page 16 of 27

"Under Cal. Civ. Code § 1780(e), a prevailing plaintiff in an action under the CLRA is entitled to an award of costs and attorneys' fees." *Parkinson*, 796 F. Supp. 2d at 1169. A plaintiff is a "prevailing plaintiff" under the CLRA when, because of a judgment or settlement, "he obtain[s] a net monetary recovery or . . . he achieve[s] most or all of what he wanted by filing the action or a combination of the two." *Kim v. Euromotors W./The Auto Gallery*, 149 Cal. App. 4th 170, 181 (2007). Plaintiffs in this case qualify as "prevailing plaintiff[s]" because of the monetary recovery provided by the settlement.

## A. Method of Calculating Fees

"Courts recognize two methods for calculating attorney fees in civil class actions: the lodestar/multiplier method and the percentage of recovery method." *Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224, 254 (2001). Courts have discretion to determine which method of calculation to choose. *See, e.g.*, *In re Bluetooth*, 654 F.3d at 940; *In re Consumer Privacy Cases*, 175 Cal. App. 4th 545, 558 (2009) ("It is not an abuse of discretion to choose one method over another as long as the method chosen is applied consistently using percentage figures that accurately reflect the marketplace."). "Regardless of whether attorneys' fees are determined using the lodestar method or awarded based on a 'percentage-of-the-benefit' analysis under the common fund doctrine, [t]he ultimate goal . . . is the award of a 'reasonable' fee to compensate counsel for their efforts, irrespective of the method of calculation." *In re Consumer Privacy Cases*, 175 Cal. App. 4th at 557-58 (internal quotation marks omitted) (alterations in original). Especially in a class action, "the district court must exercise its inherent authority to assure that the amount and mode of payment of attorneys' fees are fair and proper." *Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1328-29 (9th Cir. 1999); *accord Staton*, 327 F.3d at 963-64.

The Court briefly discusses the rationale behind the two respective methods of calculation before selecting the appropriate method for this case.

### 1. Lodestar

"Generally, litigants in the United States pay their own attorneys' fees, regardless of the outcome of the proceedings." *Staton*, 327 F.3d at 965. However, "in certain cases prevailing

Exhibit C
Page 17 of 27

parties may recover their attorneys' fees from the opposing side. When a statute provides for such fees, it is termed a 'fee-shifting' statute." *Id.* Under California law, "[i]n so-called 'fee shifting' cases . . . the primary method for establishing the amount of 'reasonable' attorney fees is the lodestar method." *Lealao v. Beneficial California, Inc.*, 82 Cal. App. 4th 19, 26 (2000); *see also Staton*, 327 F.3d at 965 ("Under a fee-shifting statute, the court 'must calculate awards for attorneys' fees using the "lodestar" method' . . . ."); *Apple Computer, Inc. v. Superior Court*, 126 Cal. App. 4th 1253, 1270 (2005) (attorney's fees "under a fee-shifting statute are determined using the lodestar method"). The laws of New York, Maryland, and Illinois are in accord. *See Douyon v. NY Med. Health Care, P.C.*, 49 F. Supp. 3d 328, 340 (E.D.N.Y. 2014) (using lodestar method to calculate fees in case brought under New York's consumer protection statute and the Fair Debt Collection Practices Act); *Hyundai Motor Am. v. Alley*, 960 A.2d 1257, 1265 (2008) ("In determining an award under Maryland fee-shifting statutes, courts employ the lodestar methodology.") *Demitro v. Gen. Motors Acceptance Corp.*, 388 Ill. App. 3d 15, 25 (2009) (affirming award of attorney's fees calculated using lodestar method in case brought under Illinois's Consumer Fraud Act).

"[The lodestar] figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *In re Bluetooth*, 654 F.3d at 941. "Once the court has fixed the lodestar, it may increase or decrease that amount by applying a positive or negative 'multiplier' to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented." *Lealao*, 82 Cal. App. 4th at 26.

## 2. Percentage of Recovery

Another method of calculating reasonable attorney's fees is the percentage-of-recovery approach, which is based on the common fund doctrine. Under this doctrine, "a private plaintiff, or his attorney, whose efforts create, discover, increase or preserve a fund to which others also have a claim is entitled to recover from the fund the costs of his litigation, including attorneys' fees." *Vincent v. Hughes Air W., Inc.*, 557 F.2d 759, 769 (9th Cir. 1977). "This rule

Exhibit C
Page 18 of 27

. . . is designed to prevent unjust enrichment by distributing the costs of litigation among those who benefit from the efforts of the litigants and their counsel." *In re Omnivision Tech., Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008) (citing *Paul, Johnson, Alston, & Hunt v. Graulty*, 886 F.2d 268, 271 (9th Cir. 1989)). "Under regular common fund procedure, the parties settle for the total amount of the common fund and shift the fund to the court's supervision. The plaintiffs' lawyers then apply to the court for a fee award from the fund." *Staton*, 327 F.3d at 969.

In common fund cases, the "benchmark" percentage award is 25 percent of the recovery obtained, with 20 to 30 percent as the usual range. *See, e.g.*, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002). The "benchmark" is the starting point for the analysis, and the ultimate amount must be supported by findings that take into account all of the circumstances of the case, including the result achieved, the risk involved in the litigation, the skill required and quality of work by counsel, the contingent nature of the fee, awards made in similar cases, and the lodestar crosscheck. *Id.* at 1048-50.

There are significant benefits to the percentage approach, including consistency with contingency fee calculations in the private market, aligning the lawyers' interests with achieving the highest award for the class members, and reducing the burden on the courts that a complex lodestar calculation requires. *See In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1374-77 (N.D. Cal. 1989).

### 3. Selection of Method of Calculation

Class counsel argue that the Court should calculate reasonable attorney's fees using the lodestar method. They spent over 18,000 hours litigating this case and assert a lodestar of $9,265,612.75. In contrast, if the percentage of recovery method is used, the starting point for determining class counsel's reasonable fees would likely be around $300,000 to $400,000.

For three primary reasons, the Court finds it appropriate to calculate reasonable attorney's fees in this case using the lodestar method.

First, Plaintiffs' consumer protection claims are based on fee-shifting statutes. *See In re Bluetooth*, 654 F.3d at 941 ("The 'lodestar method' is appropriate in class actions brought

Exhibit C
Page 19 of 27

under fee-shifting statutes . . . ."). California, New York, Illinois, and Maryland—the four states for which classes were previously certified—all have statutes authorizing or requiring fee shifting in favor of the prevailing party. *See* Cal. Civ. Code § 1780(e); N.Y. Gen. Bus. Law § 349(h); 815 Ill. Comp. Stat. Ann. 505/10a; Md. Code Ann., Com. Law § 13-408.

Second, this is not a common fund case. Unlike in a common fund settlement, whatever amount of fees is awarded to class counsel, it will not affect the amount going to class members. *See In re Consumer Privacy Cases*, 175 Cal. App. at 557 ("[A] fee award may not be justified solely as a percentage of the recovery when that award will not come from the settlement fund.").

Third, although calculation of the lodestar amount focuses on class counsel's billing time and billing rate, other factors are considered both in calculating the lodestar and in determining whether to apply a multiplier (negative or positive). *See Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69-70 (9th Cir. 1975) (listing several factors). Thus, the amount of recovery to the class will be factored into the determination of class counsel's reasonable fee. *See Morales v. City of San Rafael*, 96 F.3d 359, 364 (9th Cir. 1996) ("The district court was not only free but obligated to consider 'the results obtained' by [the plaintiff], or 'the extent of [his] success,' in calculating the lodestar figure." (internal citation omitted)).

### B. Calculating Class Counsel's Lodestar

Plaintiffs' exhibits show that class counsel spent more than 18,730 hours in this case. At the Fairness Hearing, counsel for BSH represented that the amount of time put in by his firm was "in parallel" with the time spent by class counsel. At the Court's request, class counsel submitted detailed billing records. From its review of the billing records, the Court finds that, in general, the time and rates billed by class counsel is reasonable. However, the Court has identified a number of problems affecting the reasonableness of hours billed and billing rates for some attorneys/staff.

#### 1. Block Billing

Many of class counsel's time entries "lump[ed] together multiple tasks, making it impossible to evaluate their reasonableness." *Role Models Am., Inc. v. Brownlee*, 353 F.3d 962,

Exhibit C
Page 20 of 27

971 (D.C. Cir. 2004). Such "block billing makes it more difficult to determine how much time was spent on particular activities." *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007). The Court exercises its discretion to reduce block-billed time entries by 20%. *See id.* (approving reduction of block-billed time, but disapproving across-the-board reduction when not all hours were block billed). In total, class counsel block-billed 4,736.6 hours, which amount to $1,875,194.17. Cutting these entries by 20% results in a reduction of $375,788.83.

### 2. Hourly Rate

"In assessing a reasonable hourly rate for the lodestar figure, courts should consider the prevailing market rate in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Rosenfeld v. U.S. Dep't of Justice*, 903 F. Supp. 2d 859, 877 (N.D. Cal. 2012) (citing *Blum v. Stenson*, 465 U.S. 886, 895-96 (1984)). "Generally, when determining a reasonable hourly rate, the relevant community is the forum in which the district court sits." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008). "Affidavits of the plaintiffs' attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the plaintiffs' attorney, are satisfactory evidence of the prevailing market rate." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990). Class counsel, as the fee applicant, bear the burden of "produc[ing] satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum*, 465 U.S. at 896 n.11.

The billing rates of the attorneys and staff who worked on this case varied as follows: $490 to $995 per hour for partners; $300 to $800 per hour for associates; and $130 to $425 for paralegals and administrative staff. The Court finds that some of the rates billed by individual attorneys are unreasonably high. In calculating class counsel's lodestar, the Court reduces the billing rate of partner time to a maximum of $800 per hour, associate time to a maximum of $550 per hour, and paralegal time to a maximum of $225 per hour. *See Vinh Nguyen v. Radient Pharm. Corp.*, 2014 WL 1802293, at *11 (C.D. Cal. May 6, 2014) (approving rates up to $750

Exhibit C
Page 21 of 27

per hour for partners, $550 per hour for associates, and $225 per hour for paralegals). This adjustment to class counsel's billing rates reduces their asserted lodestar by $290,726.50.

Additionally, in some instances, the stated billing rate was unreasonable in light of the task performed. For example, class counsel billed at a partner's rate of $710 to $950 per hour for tasks such as: "prepare judge's courtesy copies [of court filing]"; "search offsite storage files for Castillo depo transcript"; "scan Castillo Deposition transcript and errata and email to co-counsel"; "arrange interpreter [for deposition]"; "schedule inspections"; "Administration of the case"; and "Administrate bills and expenses." The Court reduces the rate for these and other similar tasks to either an associate or paralegal rate, depending on the task, resulting in a net reduction of $62,333.50 for all such entries.

### 3. Overly Vague Entries

Many of class counsel's billing entries were so vague as to prevent the Court from assessing the reasonableness of the time and rate billed. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) ("Where the documentation of hours is inadequate, the district court may reduce the award accordingly."); *Rosenfeld*, 903 F. Supp. 2d at 876 ("The vagueness of certain documents included in Plaintiff's time records make it difficult for this Court to assess whether the time claimed was reasonably spent on this matter."). Examples of such overly vague entries include: "review docs" (several entries); "email" (1.0 hours); "certificate" (1.0 hours); "brief" (6.0 hours); "Review background materials" (8.0 hours); "Expert work" (several entries including one for 10.0 hours); "Conduct document review and analysis" (several all-day entries totaling nearly 500 hours); and "Read and summarize deposition" (several all-day entries totaling 236 hours). These entries are of particular concern to the Court given the large number of hours spent by class counsel in this case. For example, in light of class counsel's fairly detailed billing entries covering thousands of hours devoted to expert-related work, the Court cannot conclude that the additional dozens of hours vaguely described as "expert work" (or something similar) is reasonable. Giving class counsel the benefit of the doubt on these vague entries, the Court cuts them by 50%, resulting in a total reduction of $206,699.75.

Exhibit C
Page 22 of 27

The Court also made reductions where the time spent was unreasonable, a task was unnecessarily overstaffed, or the task is not billable. For example, 36.5 hours were billed to summarizing a single deposition. The Court finds this amount unreasonable and cuts it to 16 hours. This category includes reductions totaling $48,334.50.

### 4. Billing by the Quarter-Hour

One of the law firms, WeissLaw LLP, billed its time in quarter-hour increments. Although that practice is not unreasonable per se, the Court finds it resulted in time counted for hours not reasonably expended on this litigation. Some—but not all—of WeissLaw's attorneys and staff have several quarter-hour and half-hour entries for tasks, such as reviewing and drafting emails and other correspondence, that likely took only a portion of the time billed. *See Welch*, 480 F.3d at 949 (affirming district court's finding that "hours were inflated because counsel billed a minimum of 15 minutes for numerous phone calls and e-mails that likely took a fraction of the time"). The majority of the billing entries of attorney Joseph H. Weiss and paralegal LaDonna R. McDuffie are quarter-hour or half-hour tasks and the Court reduces their billed time by 20%. *See id.* (affirming across-the-board reduction of hours billed in quarter-hour increments). Attorneys Jordan L. Lurie and Leigh A. Parker also had several such entries—although not a majority—and the Court reduces their billed time by 10%. The Court does not reduce the hours of the other WeissLaw attorneys due to quarter-hour billing. In total, the Court's reduction for quarter-hour billing is $50,549.65.

Based on the Court's review of class counsel's billing records, and making the reductions discussed above, it calculates class counsel's lodestar at $8,498,409.02.

### C. Adjustment to Lodestar

Having calculated the lodestar, the Court now considers whether to increase or decrease that amount by applying a positive or negative multiplier in light of other factors, particularly the results obtained. *Lealao*, 82 Cal. App. 4th at 26; *Charlebois v. Angels Baseball LP*, 993 F. Supp. 2d 1109, 1115-16 (C.D. Cal. 2012) ("Adjustments to this presumptively reasonable amount may then be made based upon the factors set forth in *Kerr v. Screen Extras Guild, Inc.*,

Exhibit C
Page 23 of 27

526 F.2d 67, 69-70 (9th Cir. 1975) to the extent that those factors are not reflected in the lodestar calculation.").

"[W]here the plaintiff has achieved 'only limited success,' counting *all* hours expended on the litigation—even those reasonably spent—may produce an 'excessive amount,'" and courts should "instead 'award only that amount of fees that is reasonable in relation to the results obtained.'" *In re Bluetooth*, 654 F.3d at 942 (quoting *Hensley*, 461 U.S. at 436, 440); *see also McCown v. City of Fontana*, 565 F.3d 1097, 1101-02 (9th Cir. 2009) ("The reasonableness of the fee is determined primarily by reference to the level of success achieved by the plaintiff.").One way of taking into account the results achieved is by cross checking the reasonableness of a fee with the percentage of recovery method. *Lealao*, 82 Cal. App. 4th at 50; *see also In re Bluetooth*, 654 F.3d at 944 ("[E]ven though the lodestar method may be a perfectly appropriate method of fee calculation, we have also encouraged courts to guard against an unreasonable result by cross-checking their calculations against a second method.").

Here, the maximum *actual* payment that will be made to class members is $1,070,795, or approximately $1.65 per class member. As discussed above, this result for the class—though not remarkable—is not unreasonable in light of the significant risk of Plaintiffs losing their case altogether. However, in determining the reasonableness of class counsel's fee, the maximum actual payment to the class undermines to a degree the reasonableness of the total amount of time spent by class counsel litigating this case. If this case is truly worth only $1,070,795.00, or approximately $1.65 per class member, is it reasonable for class counsel to have spent over 18,000 hours (amounting to a claimed lodestar of $9,532,841.75)? Probably not. *See Redman v. RadioShack Corp.*, 768 F.3d 622, 633 (7th Cir. 2014) ("[A]ttorneys' fees don't ride an escalator called risk into the financial stratosphere. Some cases should not be brought, because the litigation costs will exceed the stakes, and others are such long shots that prudent counsel will cut his expenditure in litigating them of time, effort, and money to the bone.").

Using the percentage of recovery method as a cross check, it is clear the unadjusted lodestar dwarfs the class's recovery, suggesting a negative multiplier is appropriate. The only question is how much of a negative multiplier.

Exhibit C
Page 24 of 27

Here, class counsel's lodestar with no multiplier ($8,498,409.02) is a whopping 7.8 times the maximum amount that will be going to class members $1,090,795.00 (class payment plus incentive awards. *See Pearson*, 772 F.3d at 781 (rejecting the requested fees because they were "an outlandish 69 percent" of the aggregate value). Class counsel—no doubt aware that their lodestar would dwarf the amount of actual recovery to class members—were wise to request a fee amounting to a significant reduction of their lodestar. Class counsel request a fee of $4,188,981.61, or a negative multiplier of approximately 0.5 of the unadjusted lodestar. The requested fees are 3.8 times the amount going to the class.

The Seventh Circuit recently suggested that "in consumer class actions, where the percentage of class members who file claims is often quite low . . . the presumption should . . . be that attorneys' fees awarded to class counsel should not exceed a third or at most a half of the total amount of money going to class members and their counsel." *Pearson*, 772 F.3d at 782 (citation omitted). Although the Ninth Circuit has stated that "the benefit obtained for the class" is "[f]oremost among the[] considerations" relevant to an upward or downward adjustment of the lodestar, *In re Bluetooth*, 654 F.3d at 941-42, it has not set a mandatory not-to-exceed percentage when using the percentage of recovery method as a cross check.

The amount of fees requested by class counsel likely could not be justified under a percentage of recovery calculation. However, "[b]ecause," in a fee-shifting case, "the lodestar award is de-coupled from the class recovery, the lodestar assures counsel undertaking socially beneficial litigation (as legislatively identified by the statutory fee shifting provision) an adequate fee irrespective of the monetary value of the final relief achieved for the class." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 821 (3d Cir. 1995).

The Court believes the requested fee of $4,188,981.61, which is a negative multiplier of approximately 0.5 of the unadjusted lodestar, adequately takes into account the results achieved for the class. In light of the circumstances of this case—which can fairly be described as hotly contested litigation, spanning over five years, including an appeal in the Ninth Circuit and

Exhibit C
Page 25 of 27

petition for review in the Supreme Court—as well as the policy underlying fee-shifting statutes, the Court finds the requested amount of attorney's fees ($4,188,981.61) is reasonable.

### D.     Objections to Attorney's Fees

Some of the objectors argue the requested attorney's fees are unreasonable. The thrust of these arguments are that the reasonableness of the fees should be determined by comparison to the actual amount that will be paid to class members (that is, $1,070,795 based on a 3% claims rate), not to the "fictional" figure of $35,750,000 that assumes a 100% claims rate. Objector Bobby Ameen argues the fee is unreasonable if it is more than 40% of the actual payout to the class. As discussed above, the Court agrees with the contention that the actual payout to the class must be considered in determining reasonable attorney's fees. However, comparing the requested fee to the actual payout does not necessarily lead to the conclusion that the requested fee is unreasonable. As discussed above, the Court finds it appropriate to calculate fees using the lodestar method with a percentage of recovery cross check.

The Court thus overrules the objections, and GRANTS the motion as to attorney's fees.

## VI.  Legal Costs

Class counsel also request costs of $2,311,018.39. The vast majority of these expenses was incurred through expert opinions and testimony. The balance of the expenses includes court fees, discovery costs, travel costs, copying costs, mailing costs, and so forth. In light of the length of this litigation, the importance of expert testimony, and the number of experts on both sides (a total of 21), the Court finds these costs reasonably incurred and GRANTS the motion as to costs.

## VII.  Class Representative Award

Class counsel also request an award to the class representatives of $5,000 each (a total of $20,000).

It is common in class action cases to provide incentive awards to named plaintiffs. *See Newberg* § 11:38 (4th ed. 2008).

Over the course of this lengthy litigation, the named plaintiffs each participated in day-long depositions, made their washers available for inspections, participated in day-long

Exhibit C
Page 26 of 27

inspections of their homes, and answered discovery. BSH agreed to pay these incentive awards and such payment will not diminish the payment to be made to other class members. The Court finds that the enhancement awards requested in this case are reasonable and appropriate. *See In re Toys R Us-Delaware, Inc —Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 472 (C.D. Cal. 2014) (approving $5,000 incentive award); *Faigman v. AT & T Mobility LLC,* No. C06–04622 MHP, 2011 WL 672648, *5 (N.D. Cal. Feb. 16, 2011) (approving incentive payment of $3,333.33 and noting that "[i]n [the Northern] [D]istrict, incentive payments of $5,000 are presumptively reasonable").

The Court therefore GRANTS the request for incentive awards of $5,000 for lead plaintiffs Dennis Demereckis, Beverly Gibson, Trish Isabella, and Nancy Wentworth.

**VIII.   Disposition**

The Court GRANTS the Motion for Final Approval (Dkt. 373). The objections to the settlement are overruled.

The Court GRANTS the Motion for Fees (Dkt. 372), and awards class counsel attorney's fees of $4,188,981.61 and reimbursement of costs totaling $2,311,018.39. The objections to class counsel's fees are overruled. The Court approves awards of $5,000 for each of the four lead plaintiffs Dennis Demereckis, Beverly Gibson, Trish Isabella, and Nancy Wentworth.

DATED:  July 27, 2015

*David O. Carter*
_____
DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

Exhibit C
Page 27 of 27