UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATHRYN M. ROBINSON, individually and on behalf of all others similarly situated,<br><br>                         Plaintiff,<br><br>v.<br><br>ONSTAR, LLC; and DOES 1 through 50, inclusive,<br><br>                        Defendants. | Case No.: 15-CV-1731 JLS (MSB)<br><br>**ORDER (1) DENYING AS MOOT PLAINTIFF'S MOTION TO EXCLUDE EVIDENCE, AND (2) DENYING WITHOUT PREJUDICE PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>(ECF Nos. 150, 179) |

Presently before the Court are Plaintiff Kathryn M. Robinson's Motions for Class Certification ("Cert. Mot.," ECF No. 150) and to Exclude Portions of the New Raddatz Declaration and for Fed. R. Civ. P. 37(c) & (e)(1) Evidentiary Sanctions in the Form of an Order Excluding Portions of the New Raddatz Declaration ("Mot. to Exclude," ECF No. 179). The Court held a hearing on January 9, 2020. *See* ECF No. 199. Having carefully considered the Parties' evidence, arguments, and the law, the Court **DENIES AS MOOT** Plaintiff's Motion to Exclude and **DENIES WITHOUT PREJUDICE** Plaintiffs' Motion for Class Certification.

/ / /

/ / /

# BACKGROUND[1]

## I.  Factual Background

### A.  *Defendant and Its Services*

Defendant provides telematics services, including emergency and safety services and additional services for customers' convenience.  Decl. of Nicholis Festa ("Festa Decl.," ECF No. 169-37) ¶ 4.  For example, Defendant's technology can detect when a car has been in an accident and then connect the customer with a representative for help without the customer needing to do anything.  *Id.* ¶ 5(a).  Defendant's equipment comes pre-installed in most General Motors vehicles.  *Id.* ¶ 3.

### B.  *Defendant's Sign-Up Process*

#### 1.  *The Acknowledgment Form and Terms and Conditions*

At all relevant times, lessees or purchasers of new vehicles equipped with OnStar Telematics Services ("OTS") were required to sign a one-page GM Customer Incentive and OnStar Acknowledgment Form (the "Acknowledgment Form"), Decl. of Kimberly A. Kralowec ("Pl.'s Exs.") at 38 ¶ 9, 41–42 ¶ 23, 77,[2] which contains both a Customer Incentive Acknowledgment and a Vehicle Software and OnStar Acknowledgment (the "OnStar Acknowledgment").  *Id.* at 77.  The bottom of the Acknowledgment Form instructs that it "*is a required documents [that] . . . must be completed, signed, and retained in EVERY DEAL FILE for all customers even if there are no incentives or rate support available*."  *Id.* at 77 (emphasis in original).

The second paragraph of the OnStar Acknowledgment indicates, "I acknowledge that I have received the Terms and Conditions applicable to the OnStar Services" and that

---

[1] Plaintiff seeks to exclude portions of and exhibits to the May 7, 2019 Raddatz Declaration, ECF No. 169-15, on several grounds.  *See* ECF No. 179-1 at 2–4.  Because the Court does not rely on the challenged portions of or exhibits to the May 7, 2019 Raddatz Declaration in ruling on Plaintiff's Certification Motion, the Court **DENIES AS MOOT** Plaintiff's Motion to Exclude.

[2] Citations to the Kralowec Declaration and exhibits refer to the consecutive pagination supplied by Plaintiff and stamped on the bottom, righthand corner of each page.  The same is true of citations to the declarations and evidence provided by Defendant in opposition to the Certification Motion.

"[c]opies are available in my vehicle glove box, from my dealer, at www.onstar.com or by contacting OnStar directly." *Id.* (emphasis in original). Although the Terms and Conditions were available through a link at the bottom of Defendant's website, *id.* at 43 ¶ 26, 159 ¶ 3, Defendant discontinued the practice of including a copy of the Terms and Conditions in the vehicle glove box beginning in 2012. *Id.* at 42 ¶ 26. Defendant also mailed a copy of the Terms and Conditions to those who subscribed to OTS. *Id.* at 40 ¶¶ 16–17, 42 ¶¶ 24–25.

Defendant's "Terms and Conditions of Your OnStar® Service" (the "Terms and Conditions") open by noting that "[t]hese terms and conditions are the agreement between us" and to "PLEASE READ THIS AGREEMENT BEFORE USING ANY **OnStar** SERVICE." *Id.* at 79 (emphasis in original). Paragraph 2 provides the terms of payment:

> If you have a credit or debit card account or similar payment account on file with us, we'll automatically charge it monthly if you have not otherwise pre-paid your subscription. Once you place your payment account on file with us, we may receive automatic updates of that account information from the financial institution for that account in order to keep that payment information current. All **OnStar** service is payable and due in advance. If you do not have such an account on file with us you must provide us with payment monthly (or other payment period offered by us and chosen by you) in advance. We'll continue to charge the payment account you provided monthly (or you must continue to make payments monthly) until you or we cancel your service as allowed in this agreement, or you choose another payment period offered by us. The price of your **OnStar Plan** may change over time, and we'll use the rates then in effect for the applicable payment period for those charges.
>
> The purchase or lease price of your Car may have included a prepayment for a period of time for a specified **OnStar Plan**. If so, you must arrange for payment to us after this period of time expires. If you have a payment account on file with us, we will automatically start charging you monthly as set out above.

*Id.* at 79 (emphasis in original). As for pricing, Paragraph 5 notes that "[y]ou can get information on the prices and the services in each **OnStar Plan** and for **OnStar Hands-**

3

**Free Calling** by going to www2.onstar.com, by calling us, or by pressing the blue **OnStar** button in your Car and asking an **OnStar** Advisor." *Id.* at 80 (emphasis in original).

Paragraph 39 of the Terms and Conditions is an arbitration provision entitled "HOW WE'LL RESOLVE DISPUTES BETWEEN US." *Id.* at 84 (emphasis in original). Specifically, the Terms and Conditions establish that,

> If you and we have a disagreement related to **OnStar** service, we'll try to resolve it by talking with each other. If we can't resolve it that way, **WE BOTH AGREE, TO THE FULLEST EXTENT PERMITTED BY LAW, TO USE CONFIDENTIAL ARBITRATION, NOT LAWSUITS** (except for small claims court cases) **TO RESOLVE THE DISPUTE**.
>
> . . .
>
> . . . THIS AGREEMENT **DOESN'T** PERMIT CLASS ARBITRATIONS EVEN IF AAA OR BBB PROCEDURES OR RULES WOULD.

*Id.* at 84 (emphasis in original).

Returning to the OnStar Acknowledgment, the fourth paragraph provides:

> Unless I indicate otherwise to OnStar, I understand that if I provide OnStar with my credit or debit card information at any time, it will be kept securely on file and will be automatically charged when payment for my OnStar Plan becomes due (at the then current rate). Notice of the payment due date, the monthly amount due and how to update or remove my credit or debit card information will be provided at least 30 days prior to any charges. Current pricing and information relating to the OnStar Plans can be found at www.onstar.com.

*Id.* To locate pricing information on Defendant's website, however, a visitor to the home page would have to click the orange "account login" button and set up an account. *Id.* at 160.

A signature line for the "Purchaser/Lessee" appears under both the OnStar Acknowledgment and the distinct Customer Incentive Acknowledgment. *See id.* at 77. A

random sampling of data for new car subscribers from Defendant's databases revealed that between 70 and 80% of the customers who subscribed to OTS were also the registered owner or lessee of the vehicle who signed the Acknowledgment Form and, thereby, the OnStar Acknowledgment. Pl.'s Exs. at 107–08, 127, 217–19, 221–22; Decl. of Kirsten H. Spira ("Spira Decl.," ECF No. 169-32) ¶ 6; Spira Decl. Ex. 30 (ECF No. 169-33).

### 2. The Welcome Call

To activate a free trial of OTS, customers would press a blue button inside the vehicle, which would initiate a cell phone call (the "Welcome Call") to an OnStar advisor. Pl.'s Exs. at 258 ¶ 2. These advisors were employees of a third-party vendor, either Convergys or Minacs, *id.*, and were trained and required to provide certain mandatory disclosures during Welcome Calls.

Defendant provided "suggested scripting" for these Welcome Calls. *See id.* at 276–83. Following a Greeting and an Opening, the advisors were urged to "**Educate [Consumers] on [Defendant's] Emergency Services**," "**Roadside assistance service**," and "**OnStar Vehicle Diagnostics**." *Id.* at 276, 278–79, 281 (emphasis in original). After "**Educat[ing consumers] on Hands-free Calling**," advisors were to offer the service, using an "assumptive sales approach." *Id.* at 277, 279, 282 (emphasis in original). In the event that an advisor made a sale, the advisor was to provide the "**HFC DISCLOSURE**," which consisted of "**REQUIRED Mandatory Scripting**." *Id.* (emphasis in original). According to the script, the HFC Disclosure consisted of the following:

> Verify name on the credit card (Please provide/verify the full name as it appears on the front of the card)

> To ensure your OnStar services are always active, we recommend you place your credit card on file with us. We will notify you of the first payment due date and the monthly amount due for your service 30 days prior to any charges being made. Of course, you can modify or remove your card from your account

/ / /

/ / /

at any time by calling us or pressing your blue button.  Would you like to place this card information securely on file?[][3]

Just to confirm what we have agreed upon today **<subscriber name>**

This a one-time charge of plus taxes, fees and other service charges – the minutes will be downloaded and available within 24–48 hours.  You can confirm by pressing your white OnStar button and saying 'minutes' then 'verify[.']

These minutes have an expiration date . . . which can be extended with another Hand-Free Calling purchase.  You must be [an] active Onstar subscriber to maintain the minutes.  If you cancel or terminate the Onstar service, you will lose any unused Hands-Free Calling minutes.

*Id.* (emphasis in original); *see also id.* at 314–17.  Indeed, instructors were to train advisors to provide "4 mandatory disclosures" "[a]fter obtaining a credit card for Continuous Coverage OR after it is obtained for the purchase of Hands-Free Calling minutes," namely:

- **Can you verify the full name on the credit card?**
  (Ok, thank you)

- **Your card will be kept securely on your account**

- **You will be notified 30 days prior to your subscription renewal date which is March 2, 2011.  The card will be billed monthly after your renewal date has passed to ensure continuous coverage.**

- **You can call to modify or cancel your account at any time.**

Pl.'s Exs. at 299–302 (emphasis in original).  It was stressed that "these disclosures statements are a legal requirement" and that the advisors "need to cover each 4 disclosure points."  *Id.* at 299, 302.

/ / /

---

[3] Agents were instructed to read this particular disclosure verbatim.  *See* Pl.'s Exs. at 308, 348.

Instructional materials from 2013 also cover the Safe and Sound subscription. *See* Pl.'s Exs. at 346–57. For annual subscribers, advisors were to "[r]emind [customers] that they will roll to continuous coverage": "*I'd like to remind you that our service is currently paid through <insert renewal date>, you will be placed on our continuous coverage service which means that you will be billed on a monthly basis for your unless we hear from you before . When you are ready, please press the Blue Button and you will be connected to an advisor who can assist you.*" *Id.* at 346 (emphasis in original). The relevant disclosures, depending on the subscription, were to be read verbatim and indicate the cost associated with the plan, the amount to be charged to the customer's card plus applicable taxes, and that the customer's account would be "kept open on a month to month basis":

> To ensure coverage with your OnStar service, your account will be kept open on a month to month basis to ensure there is no lapse in coverage. This will also ensure that you can safely add On Star Hands free calling minutes whenever you need them. If you would like to change this agreement, just let us know by calling us at 1-888-4OnStar (888-466-7827) or pressing the blue OnStar button.

*Id.* at 348–57. Some of the scripts close by asking the subscriber if he or she has any questions, and inviting the subscriber to call again if any arise. *See, e.g.*, *id.* at 283 ("Mr[.]/Mrs. Subscriber, [are] there any questions you'd like to ask me now while you have me on the phone?"); 343 (reminding advisors if there is a sale to "[v]erify there are not outstanding issues/questions" by asking, "Before I let you go, do you have any questions about your service?").

### 3. *Additional Form Letters and Emails*

#### a. "Welcome Kit" Letters

Within seven to ten days following the Welcome Call, subscribers would receive a "Welcome Kit" consisting of a form letter, Defendant's Terms and Conditions, and a membership card. Pl.'s Exs. at 39 ¶¶ 11, 16–17. One version of the form letter invites subscribers to push the blue button to speak with an advisor about Defendant's services

7

and advertises several specific services and promotions, including monthly diagnostic emails, a thirty-day trial of Turn-by-Turn Navigation, and "exclusive first-time purchase offer[s]" for Hands-Free Calling minutes. *See id.* at 55. The other version similarly invites subscribers to push the blue button and notes the availability of Automatic Crash Response, Emergency Services, Crisis Assist, Turn-by-Turn Navigation, On Demand Diagnostics, Roadside Assistance, and Hands-Free Calling. *See id.* at 87. There is no mention in either of the Welcome Kit letters that subscribers' card information will be stored or charged. *See id.* at 55–57, 87–88.

b. "Continuous Coverage" Communications

Two days after the Welcome Call, Defendant would mail or email to those subscribers "who provided a method of payment for their account" a form letter informing them that they were "All Set" with "OnStar Continuous Coverage." Pl.'s Exs. at 40–41 ¶¶ 18–19, 64, 66. The communications informed subscribers that, "by associating a method of payment with [their] account, [they]'ve automatically been enrolled in OnStar Continuous Coverage," which comes with "[t]he convenience of automatic bill pay." *Id.* at 64; *see also id.* at 66. Each letter also informed the subscribers that they would "pay nothing until [their] current plan ends of [XX/XX]," when their "payment method on file will then be charged $[XX.XX] each month." *Id.* at 64; *see also id.* at 66. Subscribers were also informed that they could unenroll by pressing the blue button, calling Defendant's number, or visiting their online account. *See id.* at 64, 66.

"[E]very six months, starting approximately six months after" the Welcome Call, Defendant sent "a standard email . . . to all OnStar members who have a payment method on file with OnStar." *Id.* at 40 ¶ 14. The email notes that Defendant is "pleased that [the subscriber has] chosen to continue [his or her] service" and reminds the subscriber "that it is important to keep [his or her] payment method information up to date to ensure there is no lapse in service." *Id.* at 49. The email reminds the subscriber of the payment method "[c]urrently . . . associated with [his or her] OnStar account," asking the subscriber to either

/ / /

8

"please take a moment to update [his or her] account" if the payment information is outdated or to "disregard this notice" if the information is current. *Id.*

"[A]pproximately 30 to 45 days before the free trial period [wa]s scheduled to end," Defendant sent an email or letter to subscribers with a payment method on file. Pl.'s Ex. at 40 ¶ 2, 41 ¶ 20. The email or letter informed subscribers that they were "ALL SET" and that they would "[c]ontinue to enjoy the peace of mind of [their] OnStar services." *Id.* at 51 (emphasis in original), 68 (emphasis in original), 71 (emphasis in original). Specifically, the communications informed subscribers of the date on which their "trial period ends" and that, "because [they] enrolled in the OnStar Continuous Coverage program, [Defendant would] automatically bill $[X] each month to the payment method [they had] already provided, ensuring [they] receive uninterrupted OnStar services." *Id.* Alternatively, subscribers were informed that they could select an annual plan or change their plan for "additional savings." *See id.* at 51, 68, 71, 74.

### c. Vehicle Diagnostic Emails

Subscribers who signed up for Defendant's Vehicle Diagnostic emails also received a monthly email, beginning "approximately one or two days after the" Welcome Call. Pl.'s Ex. at 41 ¶ 22. In addition to providing "Diagnostic Information," the email noted when the subscriber's subscription expired and whether the subscriber was enrolled in "Continuous Coverage." *See id.* at 90–91, 94.

### C. *Plaintiff's Experience with Defendant*

On December 15, 2013, Scott Robinson leased a 2014 Cadillac ATS sedan. *See* Decl. of Scott Robinson ("S. Robinson Decl.," ECF No. 18-2) ¶ 2. Plaintiff sat next to her husband as he signed numerous documents pertaining to the lease transaction, including the Acknowledgment Form containing the OnStar Acknowledgment. *Id.* ¶ 10; ECF No. 47 ("Apr. 19, 2016 Tr.") at 26:6–27:21, 125:12–21. Plaintiff, however, did not sign any documents. *See* Pl.'s Exs. at 168.

As the Robinsons were leaving the dealership, the dealer representative mentioned that their new vehicle came with twelve months of free OTS, which could be activated

from inside the vehicle by pressing the blue button.  *See* Decl. of Kathryn Robinson in Opp'n to Mot. to Dismiss ("K. Robinson MTD Decl.," ECF No. 18-1) ¶ 3; Apr. 19, 2016 Tr. at 28:15–23, 29:13–18.  Plaintiff activated the OTS trial on December 17, 2013, by pressing the blue button, which connected her with an agent of Defendant.  K. Robinson MTD Decl. ¶ 2; Apr. 19, 2016 Tr. at 29:20–24.  Plaintiff provided the agent with her email address and debit card number to purchase sixty cell-phone minutes.  K. Robinson MTD Decl. ¶¶ 3, 7; Apr. 19, 2016 Tr. at 30:12–18, 37:12–24.  The agent did not inform Plaintiff during the Welcome Call that her debit card would be used to charge her for continuation of OTS after the end of her free trial.  K. Robinson MTD Decl. ¶¶ 3, 7; Apr. 19, 2016 Tr. at 38:16–23.

Defendant subsequently mailed Plaintiff a copy of its Terms and Conditions, Apr. 19, 2016 Tr. at 18:15–17, 34:6–14; ECF No. 35-4, and two "OnStar Vehicle Diagnostics" emails.  Apr. 19, 2016 Tr. at 31:25–32:6, 33:1–9; ECF Nos. 35-8, 35-9.

In December 2014, January 2015, and February 2015, following the expiration of Plaintiff's free trial, Defendant used Plaintiff's debit card three times to take $29.90 from her bank account each month as payment for continuation of OTS.  Decl. of Kathryn Robinson in Support of Cert. Mot. ("K. Robinson Cert. Decl.," ECF No. 150-3) ¶ 5.

## II.    Procedural Background

On July 2, 2015, Plaintiff filed this putative class action in the Superior Court of California, County of San Diego, alleging four causes of action for violations of the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. §§ 1693 *et seq.*; violations of the Automatic Renewal Law ("ARL"), California Business and Professions Code §§ 17600 *et seq.*; and "unlawful" and "unfair" business practices in violation of the Unfair Competition Law ("UCL"), California Business and Professions Code §§ 17200 *et seq.*  *See* ECF No. 1-2 Ex. A.  Defendant removed on the basis of federal question jurisdiction and pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), on August 4, 2015.  *See* ECF No. 1.

/ / /

On September 11, 2015, Defendant moved to dismiss and to compel arbitration pursuant to Federal Rule of Civil Procedure 12(b)(1) on the grounds that Plaintiff's husband had signed the Acknowledgment Form, which incorporated by reference the arbitration provision contained in the Terms and Conditions. *See* ECF No. 15. The Honorable William Q. Hayes heard oral argument on February 3, 2016, *see* ECF No. 22, following which he set an evidentiary hearing to resolve certain factual disputes concerning the availability of the Terms and Conditions to Plaintiff and her husband. *See* ECF Nos. 23, 24. Following the evidentiary hearing on April 19, 2016, *see* ECF No. 32, Judge Hayes granted Defendant's motion to dismiss on August 25, 2016, and directed the Parties to proceed to arbitration. *See* ECF No. 49.

Plaintiff appealed Judge Hayes' dismissal to the United States Court of Appeal for the Ninth Circuit, *see* ECF No. 52, which reversed and remanded on March 15, 2018. *See Robinson v. OnStar, LLC*, 721 Fed. App'x 704 (2018). The Ninth Circuit issued an amended memorandum and denied Defendant's petition for panel rehearing on May 1, 2018. *See* ECF No. 60. The Ninth Circuit concluded that Plaintiff had formed an agreement with Defendant when she called to activate her one-year trial subscription, at which time she was unaware that Defendant intended to send her the Terms and Conditions, including the arbitration provision. *See Robinson*, 721 Fed. App'x at 705. Accordingly, the agreement—when formed—did not include the Terms and Conditions, and Defendant's subsequent mailing of the Terms and Conditions was merely an offer to modify the agreement, which was not accepted by Plaintiff's retention of the original OTS trial subscription. *See id.*

Following the spreading of the mandate, *see* ECF Nos. 61, 62, Judge Hayes recused, *see* ECF No. 63, and this action was reassigned to this Court. *See id.* Defendant answered Plaintiff's original complaint on June 12, 2018, *see* ECF No. 71, and filed a motion for judgment on the pleadings and to modify the class allegations on July 19, 2018. *See* ECF No. 73.

/ / /

On March 18, 2019, the Court granted in part and denied in part Defendant's motion. *See generally* ECF No. 106. Specifically, the Court dismissed Plaintiff's second cause of action for violation of the ARL on the grounds that the ARL does not create a private cause of action, *see id.* at 11, but denied Defendant's motion as to Plaintiff's first, third, and fourth causes of action. *See id.* at 8–24, 26. The Court also denied without prejudice as premature Defendant's motion to strike Plaintiff's nationwide class allegations, *see id.* at 24–25, and granted Defendant's motion as to Plaintiff's class claim for actual damages under the EFTA. *See id.* at 25.

On May 31, 2019, the Parties jointly moved for Magistrate Judge Michael S. Berg to approve several stipulations, *see* ECF No. 138, including a Stipulation Regarding 30(b)(6) Deposition of OnStar, LLC, Topics 6 and 11. *See* ECF No. 138-2. *See* ECF No. 138-3. Topics 6 and 11, respectively, addressed "[Defendant's] PROCEDURES, during the COMPLIANCE PERIOD, for conducting SIGN-UP CALLS, including the use of any SCRIPTS" and "[Defendant's] PROCEDURES, if any, during the COMPLIANCE PERIOD, for orally providing any of the disclosures, and/or for orally obtaining any of the consents and/or agreements, described in Interrogatory Nos. 8, 9, 10 and 11 of Plaintiff's Interrogatories to Defendant OnStar, LLC, Set Two, dated February 7, 2019." ECF No. 183-4 at 6–7. In the stipulation, Defendant agreed that, in opposing Plaintiff's motion for class certification, it would "not contend that OnStar gave any of the putative class members any oral disclosures that differ from the five mandatory disclosures set forth in paragraph 3 of the Declaration of OnStar LLC re Welcome Call Procedures, signed by Margaret A. Raddatz on May 29, 2019" (the "Raddatz Declaration").[4] ECF No. 138-2 at

---

[4] Paragraph 3 of the Raddatz Declaration provides:

> 3.　All OnStar agents were trained and required to provide certain mandatory disclosures during these 'welcome' calls. The following mandatory disclosures were required:
>
> a.　Four credit card disclosures, as described in OnStar's response to plaintiff's Interrogatory No. 8, at p. 11:4–6. *See, e.g.*, OS00001565; OS00001534 (at slide 27); OS00001931 (at slide 26); OS00001961.

/ / /

2. In the stipulation, Defendant also agreed that, "[t]o establish the content of any oral disclosures OnStar contends were made to putative class members, OnStar d[id] not anticipate at th[at] time that it w[ould] rely on any documents other than those identified by Bates number in the" Raddatz Declaration. *Id.* at 2–3. The Parties further agreed that, "[i]f OnStar does rely on any documents reflecting oral disclosures other than those identified by Bates number in the 'Welcome Call' declaration, . . . then plaintiff may, but is not required to, proceed with a deposition on topics 6 and/or 11." *Id.* at 3. Magistrate Judge Berg approved the stipulation on June 4, 2019. *See* ECF No. 139.

The Certification Motion followed on June 24, 2019. *See generally* ECF No. 150. Having been granted leave by the Court, *see* ECF No. 170, Plaintiff filed the operative First Amended Complaint ("FAC") on August 28, 2019, which asserts the same causes of action as her original complaint but amends the proposed class definitions. *See generally* ECF No. 171. Plaintiff filed the Motion to Exclude on September 26, 2019. *See generally* ECF No. 179.

/ / /

---

b. A pricing disclosure, as described in OnStar's response to plaintiff's Interrogatory No. 8, at p. 11:8–11. *See, e.g.*, OS00000951; OS00001114; OS00001120; OS00001230; OS00001653; OS00001836; OS00009118 (at tabs "Welcome 6 Months," "Welcome," and "Midlife").

c. A "Hands Free Calling disclosure," as described in OnStar's response to plaintiff's Interrogatory No. 8, at p. 11:11–14. *See, e.g.*, OS00001121; OS00000927; OS00000939; OS00000957–58; OS00001236–37; OS00001629; OS00001641; OS00001659–60; OS00001812; OS00001824; OS00001842–43.

d. A disclosure used by OnStar to Obtain consumers' consent to enroll in OnStar continuous coverage as described in OnStar's response to plaintiff's Interrogatory No. 8, at p. 11:16–17. *See, e.g.*, OS00007704; OS00007727; OS00009146–55; OS00009664–65.

e. A disclosure informing consumers of what happens when the trial period ends, as described in OnStar's response to plaintiff's Interrogatory No. 8, at p. 11:23–25. *See, e.g.*, OS00000573; OS00001564; OS00001534 (at slide 26); OS00001931 (at slide 25); OS00001960; OS00002358; OS00002397; OS00002436; OS00003599; OS00007704; OS00007727; OS00009115; OS00009118 (at tabs "Welcome 6 Months," "Welcome," and "Midlife"); OS00009122; OS00009146–55; OS00009664–65.

ECF No. 150-20 ¶ 3.

15-CV-1731 JLS (MSB)

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## I. Legal Standard

Motions for class certification proceed under Rule 23(a) of the Federal Rules of Civil Procedure. Rule 23(a) provides four prerequisites to a class action: (1) the class is so numerous that joinder of all members is impracticable ("numerosity"), (2) there are questions of law or fact common to the class ("commonality"), (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"), and (4) the representative parties will fairly and adequately protect the interests of the class ("adequate representation"). Fed. R. Civ. P. 23(a).

A proposed class must also satisfy one of the subdivisions of Rule 23(b). Here, Plaintiff seeks to proceed under Rule 23(b)(3), which requires that "the court find[] that the [common questions] predominate over any questions affecting only individual members ['predominance'], and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy ['superiority']." The relevant factors in this inquiry include the class members' interest in individually controlling the litigation, other litigation already commenced, the desirability (or not) of consolidating the litigation in this forum, and manageability. Fed. R. Civ. P. 23(b)(3)(A)–(D).

"In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (internal quotations omitted). "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rather, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule— that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Id.* The court is "at liberty to consider evidence which goes to the requirements of Rule 23 even though the evidence may also relate to the underlying merits of the case." *Hanon v. Dataprods. Corp.*, 976 F.2d 497, 509 (9th Cir.

/ / /

1992). A weighing of competing evidence, however, is inappropriate at this stage of the litigation. *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003).

## II. Analysis

Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), Plaintiff seeks to certify the following classes and subclasses:

1. The Nationwide EFTA Class, comprised of "[a]ll persons in the U.S. who (a) activated a free trial of [OTS] during the Compliance Period . . . ; and (b) whose debit card and/or bank account was charged for OTS on or after July 2, 2014," ECF No. 150 at 1;

a. The California EFTA Subclass, comprised of "[a]ll persons in California who (a) activated a free trial of [OTS] during the Compliance Period . . . ; and (b) whose debit card and/or bank account was charged for OTS on or after July 2, 2014," *id.*;

b. The Nationwide EFTA Subclass, comprised of "[a]ll persons in the U.S. whose debit card and/or bank account was charged for OTS on or after July 2, 2014 and who either (a) activated an OTS free trial in connection with a pre-owned vehicle during the Compliance Period . . . ; or (b) activated an OTS free trial in connection with a new vehicle during the Compliance Period . . . , but was not the buyer or lessee of the vehicle according to OnStar's Customer Service Record for the vehicle," *id.*;

c. The California EFTA Sub-subclass, comprised of "[a]ll persons in California whose debit card and/or bank account was charged for OTS on or after July 2, 2014 and who either (a) activated an OTS free trial in connection with a pre-owned vehicle during the Compliance Period . . . ; or (b) activated an OTS free trial in connection with a new vehicle during the Compliance Period . . . , but was not the buyer or lessee of the vehicle according to OnStar's Customer Service Record for the vehicle," *id.* at 1–2;

/ / /

2.    The California Class, comprised of "[a]ll persons in California who (a) activated a free trial of [OTS] during the Compliance Period . . . ; and (b) whose debit card, credit card and/or bank account was charged for OTS on or after July 2, 2011," *id.* at 2; and

a.    The California Subclass, comprised of "[a]ll persons in California whose debit card, credit card and/or bank account was charged for OTS on or after July 2, 2011 and who either (a) activated an OTS free trial in connection with a pre-owned vehicle during the Compliance Period . . . ; or (b) activated an OTS free trial in connection with a new vehicle during the Compliance Period . . . , but was not the buyer or lessee of the vehicle according to OnStar's Customer Service Record for the vehicle." *Id.*

Plaintiff defines the "Compliance Period" as "the date on which defendant OnStar, LLC adopted the 'new online enrollment process' described in paragraphs 10 and 12 of the 'Fed. R. Civ. P. 30(b)(6) Declaration of OnStar LLC re Standard Form Documents,' signed by Nicholis Festa on May 7, 2019." *See* ECF No. 150 at 2. Accordingly, "for all new cars and for pre-owned cars with the new '4GLTE' technology," the "Compliance Period" ends between February 9, 2014, when OnStar began rolling out the new online enrollment process, and May 11, 2014. *See* Standard Form Documents Decl. (ECF No. 150-8) ¶ 10. "[F]or pre-owned cars with the older '2G' technology," however, the "new online enrollment process . . . started in October 2015." *Id.* ¶ 12.

### A.    *Personal Jurisdiction*

As to Plaintiff's proposed Nationwide EFTA Class and Subclass, Defendant—a Delaware corporation with its principal place of business in Detroit, Michigan—contends that "there is no basis for this Court to exercise personal jurisdiction over OnStar with respect to the claims of non-California residents" under *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. ___, 137 S. Ct. 1773 (2017). *See* ECF No. 169 at 28–29. Defendant notes that, "[w]hile the Ninth Circuit has not considered *Bristol-Myers*, well-reasoned decisions in other jurisdictions have held that *Bristol-Myers* precludes the

15-CV-1731 JLS (MSB)

imposition of jurisdiction over nationwide claims, such as those asserted here." *Id.* at 29

(citing *Practice Mgmt. Support Servs., Inc. v. Cirque du Soleil, Inc.*, 301 F. Supp. 3d 840, 864 (N.D. Ill. 2018); *DeBernardis v. NBTY, Inc.*, No. 17-6125, 2018 WL 461228, at *2 (N.D. Ill. Jan. 18, 2018); *McDonnell v. Nature's Way Prods. LLC*, No. 16-5011, 2017 WL 4864910, at *4 (N.D. Ill. Oct. 26, 2017); *Wenokur v. AXA Equitable Life Ins. Co.*, No. 17-165, 2017 WL 4357916, at *4 n.4 (D. Ariz. Oct. 2, 2017)).

Plaintiff responds that this "defense is 'waive[d]'" because "OnStar failed to raise [it] in its original and amended Rule 12(b) motions (Dkts. 15, 38)." ECF No. 176 at 14 (quoting Fed. R. Civ. P. 12(g)(2)) (citing ECF No. 83 at 23). In any event, "*Bristol-Myers* does not apply to federal courts[] and[,] even if it did, it does not apply to federal-question cases in particular . . . [or] to unnamed putative class members." *Id.* (citing *Sotomayor v. Bank of Am., N.A.*, 377 F. Supp. 3d 1034, 1037–38 (C.D. Cal. 2019); *Branca v. Bai Brands, LLC*, No. 3:18-cv-00757-BEN-KSC, 2019 WL 1082562, at *13 (S.D. Cal. Mar. 7, 2019); *In re Packaged Seafood Prod. Antitrust Litig.*, 338 F. Supp. 3d 1118, 1172 (S.D. Cal. 2018); *In re Morning Song Bird Food Litig.*, No. 12cv01592 JAH-AGS, 2018 WL 1382746, at *5 (S.D. Cal. Mar. 19, 2018)).

The Court concludes that Defendant has waived any challenge to the Court's personal jurisdiction. "'Lack of personal jurisdiction' is a 'defense to a claim for relief' that the Federal Rules expressly recognize." *McCurley v. Royal Seas Cruises, Inc.*, 331 F.R.D. 142, 164 (S.D. Cal. 2019) (quoting Fed. R. Civ. P. 12(b)(2)). "Challenges to alleged defects in a district court's personal jurisdiction are expressly waived unless a defendant timely asserts the defense in a motion to dismiss or in a responsive pleading." *Id.* (citing Fed. R. Civ. P. 12(h)(1); *Glater v. Eli Lilly & Co.*, 712 F.2d 735, 738 (1st Cir. 1983); *Williams v. Life Sav. & Loan*, 802 F.2d 1200, 1202 (10th Cir. 1986); *Braver v. Northstar Alarm Servs.*, 329 F.R.D. 320 (W.D. Okla. 2018)). "An exception to this rule exists when a defense or objection was unavailable at the time the defendant filed its earlier motion or responsive pleading." *Id.* (citing Fed. R. Civ. P. 12(g)(2)). "A defense is considered 'available' unless its legal basis did not exist at the time of the answer or earlier

pre-answer motion." *Id.* at 164–65 (citing *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 964 (D.C. Cir. 2016); *Tinn v. EMM Labs, Inc.*, No. 07-cv-00963-AC, 2008 WL 3861889, at *3 (D. Or. Aug. 19, 2008)).

Here, "[Defendant] could have asserted a personal jurisdiction challenge to Plaintiffs' initial [July 2015] . . . complaint[], . . . which alleged [a] nationwide [EFTA] class[]." *See id.* at 165. It did not. *See* ECF Nos. 15, 38. Further, "[t]he mere fact that the Supreme Court resolved the personal jurisdiction defense asserted in *Bristol-Myers* in a particular manner does not mean a personal jurisdiction defense was unavailable to [Defendant] before *Bristol-Myers*." *McCurley*, 331 F.R.D. at 165 (citing *Gilmore*, 843 F.3d at 964. Consequently, "[Defendant]'s failure to assert personal jurisdiction in its first responsive pleadings to . . . [Plaintiff]'s original complaint[] constitutes a waiver of such a defense." *See id.*; *see also Mussat v. Enclarity, Inc.*, 362 F. Supp. 3d 468, 470 (N.D. Ill. 2019) (denying Rule 12(c) motion to dismiss for lack of personal jurisdiction in putative nationwide class action on grounds that defense was waived under Rules 12(g)(2) and 12(h)).

## B. *Rule 23(a) Requirements*

### 1. *Numerosity*

"[A] proposed class must be 'so numerous that joinder of all members is impracticable.'" *Rannis v. Recchia*, 380 Fed. App'x 646, 650 (9th Cir. 2010) (quoting Fed. R. Civ. P. 23(a)(1)). While "[t]he numerosity requirement is not tied to any fixed numerical threshold[,] . . . [i]n general, courts find the numerosity requirement satisfied when a class includes at least 40 members." *Id.* at 651.

Here, "the nationwide EFTA class comprises over 7 million members, . . . the California class consists of more than 840,000 members, and the subclasses consist of at least 680,000 members." ECF No. 150 at 19–20 (footnotes omitted). Further, "OnStar has stipulated not to contest that the classes are 'so numerous that joinder of all members is impracticable.'" *Id.* at 20 (quoting Fed. R. Civ. P. 23(a)(1)) (citing ECF Nos. 138-1, 139). Accordingly, the Court concludes that the numerosity requirement is satisfied.

### 2. *Commonality*

Because the Parties collapse their arguments concerning commonality and predominance, *see* ECF No. 150 at 21–25; ECF No. 169 at 16–24; ECF No. 176 at 4–12, the Court addresses both commonality and predominance together below. *See infra* Section II.C.1.

### 3. *Typicality*

The Ninth Circuit has explained that "representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Staton*, 327 F.3d at 957; *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). The test of typicality "is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985).

Plaintiff contends that her "claims arise out of the same course of conduct as the class members'—namely, OnStar's uniform practice of charging consumers for OTS without obtaining their prior, informed and express consent." ECF No. 150 at 21. Defendant challenges Plaintiff's typicality on several grounds, all related to arbitration.

#### a. Signatories of the Acknowledgment Form

First, Defendant contends that Plaintiff is an "atypical representative of the putative Nationwide EFTA Class, the California EFTA Class, and the California UCL Class" because "the vast majority of the putative class members signed the Acknowledgement Form and are therefore bound to arbitrate, whereas Plaintiff's husband, rather than Plaintiff, signed the Acknowledgment Form." *See* ECF No. 169 at 12–14. Plaintiff responds that "[t]he arbitration clause on which OnStar relies appears in the 'Terms and Conditions,' *not* in the 'Acknowledgment' form" and "OnStar offers no *argument* in support of its contention that the arbitration clause in the 'Terms and Conditions,' which no one signed, is legally binding on any class members." ECF No. 176 at 2 (emphasis in original). Consequently, "OnStar has not met its burden of proving that *any* class members agreed to

arbitrate, let alone so many that plaintiff would be atypical or inadequate to represent the proposed classes." *Id.* at 3 (emphasis in original).

As an initial matter, although a party seeking to compel arbitration bears the burden of proving that a valid arbitration agreement exists, *see, e.g.*, *Castillo v. CleanNet USA, Inc.*, 358 F. Supp. 3d 912, 928 (N.D. Cal. 2018) (citing *Bruni v. Didion*, 160 Cal. App. 4th 1272, 1282 (2008)), it is Plaintiff who bears the burden of demonstrating compliance with Rule 23. *See, e.g.*, *Lim v. Helio, LLC*, No. CV119183PSGACRX, 2012 WL 12884439, at *4 (C.D. Cal. Apr. 18, 2012) (denying class certification where the plaintiff had failed to meet her burden of demonstrating that class action was superior and manageable given that "the evidence before the Court strongly suggest[ed] that the vast majority of potential members signed arbitration agreements containing class action waivers"); *see also Dukes*, 564 U.S. at 350 ("A party seeking class certification must affirmatively demonstrate compliance with [Rule 23]—that is, the party must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc."). Indeed, the Supreme Court has repeatedly cautioned that "certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" *Dukes*, 564 U.S. at 350–51 (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160, 161 (1982)). Accordingly, it would be inappropriate for the Court to grant certification without "rigorous[ly] analy[zing]" Defendant's claim that many of the proposed class members may be bound to arbitrate.

Here, the arbitration provision appears in Defendant's Terms and Conditions, which begin by noting that "[t]hese terms and conditions are the agreement between us . . . and apply to *all* your **OnStar** service until changed or replaced by new terms and conditions." Pl.'s Exs. at 000079 (emphasis in original). They also caution the subscriber to "PLEASE READ THIS AGREEMENT BEFORE USING ANY **OnStar** SERVICE." *Id.* (emphasis in original). The arbitration provision appears on the sixth printed page of the Terms and Conditions in paragraph 39, titled "HOW WE'LL RESOLVE DISPUTES BETWEEN US." *Id.* at 84 (emphasis in original). The beginning of that section provides that, "[i]f

you and we have a disagreement related to **OnStar** service, we'll try to resolve it by talking with each other. If we can't resolve it that way, **WE BOTH AGREE, TO THE FULLEST EXTENT PERMITTED BY LAW, TO USE CONFIDENTIAL ARBITRATION, NOT LAWSUITS** (except for small claims court cases) **TO RESOLVE THE DISPUTE**." *Id.* (emphasis in original). There is no place for the subscriber to sign the Terms and Conditions. *See generally id.* at 79–84. Instead, the purchaser of the vehicle signs the Acknowledgment Form, which indicates "I acknowledge that I have received the Terms and Conditions applicable to the OnStar Services. Copies are available in my vehicle glove box, from my dealer, at www.onstar.com or by contacting OnStar directly." *Id.* at 77 (emphasis in original).

The question, therefore, is whether the arbitration clause in the Terms and Conditions may be enforceable against those who signed the Acknowledgment Form. Applying California law,[5] the Court concludes that it may.[6] Pursuant to California contract law, "the parties may incorporate by reference into their contract the terms of some other document," although "the reference must be clear and unequivocal[ and] . . . called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties." *Shaw v. Regents of Univ. of Cal.*, 58 Cal. App. 4th 44, 54 (1997) (quoting *Williams Constr. Co. v. Standard-Pac. Corp.*, 254 Cal. App. 2d 442, 454 (1967)). "The contract need not recite that it 'incorporates' another document, so long as it 'guide[s] the reader to the incorporated

---

[5] State contract law governs whether there is a valid and enforceable agreement to arbitrate. *See Doctors Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996). Although the Terms and Conditions provide that "this agreement and any disputes arising out of or relating to it will be governed by the laws of the state of Michigan." Pl.'s Exs. at 000085, Plaintiff applies California law, *see* ECF No. 176 at 3, as did Defendant in its prior motion to compel arbitration, *see* ECF No. 15-1 at 6–10, and the Ninth Circuit. *See Robinson*, 721 F. App'x at 705. Further, the Parties agreed at the January 9, 2020 hearing that California contract law would determine whether California subscribers were bound to arbitrate.

[6] For the avoidance of any doubt, nothing in this Order constitutes a definitive determination as to the enforceability of the arbitration clause found in the Terms and Conditions against either a signatory or non-signatory of the Acknowledgment Form.

15-CV-1731 JLS (MSB)

document.'" *Id.* (citing *Baker v. Aubry*, 216 Cal. App. 3d 1259, 1264 (1989); *Chan v. Drexel Burnham Lambert, Inc.*, 178 Cal. App. 3d 632, 644 (1986)). Further, "[t]here is no authority requiring the defendant to specify that the incorporated document contains an arbitration clause in order to make the incorporation valid. All that is required is that the incorporation be clear and unequivocal and that the plaintiff can easily locate the incorporated document." *Wolschlager v. Fid. Nat'l Title Ins. Co.*, 111 Cal. App. 4th 784, 791, *as modified* (Aug. 27, 2003)).

*Koffler Electrical Mechanical Apparatus Repair, Inc. v. Wärtsilä North America, Inc.*, No. C-11-0052 EMC, 2011 WL 1086035 (N.D. Cal. Mar. 24, 2011), is instructive. In *Koffler*, the defendant issued to the plaintiff a purchase order for the Plaintiff's repair of a generator. *Id.* at *1. The bottom of the third page of the purchase order noted that "ALL SUPPLIES OF GOODS AND/OR SERVICES ARE SUBJECT TO THE [DEFENDANT'S] GENERAL TERMS AND CONDITIONS . . . . THE COMPANY WILL SUPPLY COPIES OF THE GENERAL TERMS AND CONDITIONS UPON REQUEST." *Id.* The General Terms and Conditions were not attached to the purchase order, although Paragraph 17 of the General Terms and Conditions contained an arbitration clause. *See id.* The plaintiff acknowledged receipt of the purchase order the following day. *Id.* After the plaintiff filed a lawsuit regarding the defendant's refusal to pay for the plaintiff's repairs, the defendant moved to compel arbitration. *Id.* at *1–2. The district court concluded that the parties had agreed to arbitrate the dispute even though the plaintiff had been unaware of the arbitration provision because the General Terms and Conditions containing the arbitration provision were validly incorporated by reference into the purchase order. *Id.* at *3–5. The court reasoned that the incorporation was explicit and specific and that the reference to the General Terms and Conditions was clear and unequivocal. *Id.* at *4 (citing *Shaw*, 54 Cal. App. 4th at 54; *Wolshlager*, 111 Cal. App. 4th at 790). The court also reasoned that the General Terms and Conditions were easily available to the plaintiff even though the plaintiff had not requested a copy or read them.

/ / /

*See id.* Consequently, "by agreeing to the purchase order which effectively incorporated the General Terms and Conditions, [the plaintiff] consented to it." *Id.*

As in *Koffler*, a court may determine that Defendant's Terms and Conditions containing the arbitration clause were both easily available and explicitly and unequivocally incorporated by reference into the Acknowledgment Form, which acknowledged receipt of "the Terms and Conditions applicable to the OnStar Services," copies of which were "available . . . from [the] dealer, at www.onstar.com or by contacting OnStar directly." Pl.'s Exs. at 000077 (emphasis in original). Although not attached to the Acknowledgment form, the Terms and Conditions appear to have been readily available from multiple sources and the Acknowledgment Form clearly guided the signatory to the Terms and Conditions. Under California law, whether or not the signatory actually requested or read the Terms and Conditions, including the arbitration clause, has no impact on whether or not those terms were validly incorporated into the agreement. *See Koffler*, 2011 WL 1086035, at *4; *Wolschlager*, 111 Cal. App. 4th at 791.

On the other hand, Plaintiff's cases appear to be distinguishable. In *Esparza v. Sand & Sea, Inc.*, "the handbook [including the arbitration agreement] . . . indicated to the reader that it was not intended to establish an agreement" because "[t]he welcome letter at the beginning of the handbook explicitly stated that 'this handbook is not intended to be a contract (express or implied), nor is it intended to otherwise create any legally enforceable obligations on the part of the Company or its employees.'" 2 Cal. App. 5th 781, 789 (2016). Here, by contrast, the Terms and Conditions note upfront that "[t]hese terms and conditions are the agreement between us" and urge the user to "PLEASE READ THIS AGREEMENT BEFORE USING ANY **OnStar** SERVICE." Pl.'s Exs. at 79 (emphasis in original). Similarly, the handbook in *Mitri v. Arnel Management Co.* indicated that it was not intended to constitute an arbitration agreement because it noted that, "[a]s a condition of employment, all employees are required to sign an arbitration agreement." 157 Cal. App. 4th 1164, 1170–71 (2007). Defendant's Terms and Conditions in this case, however, include a provision on "HOW WE'LL RESOLVE DISPUTES," which indicates that "**WE**

15-CV-1731 JLS (MSB)

**BOTH AGREE, TO THE FULLEST EXTENT PERMITTED BY LAW, TO USE CONFIDENTIAL ARBITRATION, NOT LAWSUITS . . . TO RESOLVE THE DISPUTE.**" Pl.'s Exs. at 84 (emphasis in original). Finally, the court in *Chan* determined that the arbitration provision at issue in that case was not properly incorporated by reference into the parties' agreement. 178 Cal. App. 3d at 641–42. Here, however, the signed Acknowledgment noted that "[the signatory] acknowledge[s] that [she] ha[s] received the Terms and Conditions applicable to the OnStar Services" and that "[c]opies are available . . . from [her] dealer, at www.onstar.com or by contacting OnStar directly," which may be sufficient for incorporation by reference under California law. Pl.'s Exs. at 77.

In this case, it is undisputed that between 70 and 80% of the putative members of the Nationwide EFTA, California EFTA, and California Classes signed the Acknowledgment Form before subscribing to OTS, *see* Pl.'s Exs. at 107–08, 127, 217–19, 221–22; Spira Decl. ¶ 6 & Ex. 30, whereas Plaintiff did not. Accordingly, the Court concludes that Plaintiff is not typical of those putative members of the Nationwide EFTA Class, the California EFTA Class, and the California Class, who—unlike Plaintiff—may be bound to arbitrate their claims.

### b. Those with Preexisting Relationships to the Signatories

Second, Defendant argues that Plaintiff's claims are atypical of those of putative members of the Nationwide EFTA Sub-Class, California EFTA Sub-Subclass, and California Subclass, members of which may also be bound to arbitrate based on preexisting relationships with the signatories of the Acknowledgment Form or the laws of other states. *See* ECF No. 169 at 14–15. Plaintiff rejoins that Defendant does not "cite any authority for the notion that the *subclass* members—none of whom signed anything, not even the 'Acknowledgment' form—are somehow bound to arbitrate," ECF No. 176 at 3 (emphasis in original), and "OnStar has identified no 'unique laws' that differ from California law on contract formation." *Id.* at 4.

/ / /

Contrary to Plaintiff's assertion, *see* ECF No. 176 at 3, Defendant does cite several cases to support its argument that those who did not sign the Acknowledgment Form may still be bound to arbitrate. *See* ECF No. 169 at 15 (citing *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148, 1151 (7th Cir. 1997); *Rivera v. AT&T Corp.*, 420 F. Supp. 2d 1312, 1320–21 (S.D. Fla. 2006); *Matthau v. Super. Ct.*, 151 Cal. App. 4th 593, 599–600 (2007); *Cty. of Contra Costa v. Kaiser Found. Health Plan, Inc.*, 47 Cal. App. 4th 237, 242, *as modified* (Aug. 1, 1996)).

Under California law, there are two categories of cases in which a non-signatory can be bound to arbitrate her claims: (1) where a benefit was conferred on the non-signatory as a result of the contract, making the non-signatory a third party beneficiary of the arbitration agreement; or (2) where "a preexisting relationship existed between the nonsignatory and one of the parties to the arbitration agreement, making it equitable to compel the nonsignatory to also be bound to arbitrate his or her claim." *Cty. of Contra Costa*, 47 Cal. App. 4th at 242; *see also* ECF No. 169 at 15 (citing *Matthau*, 151 Cal. App. 4th at 599–600; *Cty. of Contra Costa*, 47 Cal. App. 4th at 237). The Court, however, concludes that Defendant's cited cases are distinguishable and, therefore, that it is unlikely that a significant number of California non-signatories would be bound to arbitrate their claims.

First, none of the non-signatories in Defendant's cited cases were actually held to be bound by the arbitration agreements. *See Matthau*, 151 Cal. App. 4th at 600; *Buckner*, 98 Cal. App. 4th at 143–44; *Cty. of Contra Costa*, 47 Cal. App. 4th at 243. Consequently, Defendant's cases offer minimal support in favor of Defendant's argument.

Second, it appears from Defendant's cited authorities that California courts are more willing to compel a non-signatory to arbitrate where the underlying agreement is one for medical services. *See Matthau*, 151 Cal. App. 4th at 600 (citing several cases involving contracts for medical services, including a child bound by a parent's contract to arbitrate medical malpractice claims with a group health plan, a wife bound by a husband's contracting for a health plan for himself and his wife, and adult heirs of a member of a group health plan who agreed to arbitration of claims by his heirs); *Buckner*, 98 Cal. App.

4th at 141–42 (children suing for wrongful death of father who signed medical arbitration agreement, with the court noting that, "[u]nder three circumstances . . . , someone can bind another person to a medical arbitration agreement without that other person's consent"); *Cty. of Contra Costa*, 47 Cal. App. 4th at 243 ("In some circumstances, a person who has authority to contract for medical services on behalf of another may, in the exercise of that authority, bind that person to an agreement to arbitrate his or her medical malpractice claims."). Such cases differ from the present controversy in that "issues of privacy and access to medical treatment are not involved" here. *NORCAL Mut. Ins. Co. v. Newton*, 84 Cal. App. 4th 64, 74 (2000).

Third and finally, in Defendant's cases, "the party seeking relief was suing on the contract itself, not a statute or some other basis outside the contract." *Crowley Mar. Corp. v. Bos. Old Colony Ins. Co.*, 158 Cal. App. 4th 1061, 1071 (2008). Here, neither Party is suing to enforce the Acknowledgment Form or Terms and Conditions; rather, Plaintiff is pursuing statutory rights under the EFTA and UCL. For all these reasons, the Court is not convinced that Plaintiff is a atypical of the members of the California EFTA Sub-Subclass or California Subclass.

As for the Nationwide EFTA Sub-Class, however, the Court concludes that Plaintiff may be atypical because the "putative members . . . could be bound to arbitrate their claims based on the unique laws in their jurisdictions." *See* ECF No. 169 at 15. Defendant cites, for example, to *Rivera v. AT&T Corp.*, 420 F. Supp. 2d 1312 (S.D. Fla. 2006), in which the district court compelled the plaintiffs, who purchased international calling plans from the defendant and alleged that they were billed without authorization for uncompleted telephone calls to Cuba, to arbitration. *See id.* at 1314. In that case, the defendant mailed to each of the plaintiffs a customer services agreement after they purchased a calling plan. *Id.* at 1315–16. The customer services agreement provided that, "**BY ENROLLING IN, USING OR PAYING FOR THE SERVICES, YOU AGREE TO THE PRICES, CHARGES, TERMS AND CONDITIONS IN THIS AGREEMENT. IF YOU DO NOT AGREE TO THESE PRICES, CHARGES, TERMS AND CONDITIONS, DO**

**NOT USE THE SERVICES, AND CANCEL THE SERVICES IMMEDIATELY.**" *Id.* at 1315 (emphasis in original). It also contained an arbitration provision. *See id.* Although the plaintiffs never signed the agreement and claimed never to have received a copy of it, *see id.* at 1317, the district court concluded that they were bound by the arbitration clause. *See id.* at 1320–21. The district court rejected one plaintiff's argument that the service representative from whom she purchased the minutes over the phone did not mention or explain the arbitration agreement, noting that "[c]ommercial transactions occur every day in which people pay for products with terms to follow—terms about which they did not learn when placing their order." *Id.* at 1321 n.13 (citing *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991); *Hill v. Gateway 2000*, 105 F.3d 1147 (7th Cir. 1997); *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447 (7th Cir. 1996)). Because the plaintiffs continued to use the defendant's services after the defendant mailed them a copy of the agreement containing the arbitration provision, the court concluded that they were bound to arbitrate. *See id.* at 1320–21.

Although the Ninth Circuit rejected this argument as to Plaintiff, *see Robinson*, 721 Fed. App'x at 705 ("Because the agreement when formed did not include the terms and conditions, OnStar's subsequent mailing of them to Robinson was an offer to modify the agreement. Robinson did not accept this offer by retaining the OnStar service to which she was entitled under the original agreement.") (citing *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1285–86 (9th Cir. 2017); *Main St. & Agric. Park R.R. v. L.A. Traction Co.*, 129 Cal. 301, 305 (1900)), it appears that putative class members may be found to have entered into a valid arbitration agreement with Defendant under the laws of other jurisdictions. Here, as in *Rivera*, the subsequently mailed terms indicate that they "are the agreement between us" and caution the subscriber to "PLEASE READ THIS AGREEMENT BEFORE USING ANY **OnStar** SERVICE." Pl.'s Ex. at 79 (emphasis in original). Further, "ANY **OnStar** DOCUMENTS THAT SAY THEY BECOME PART OF YOUR **OnStar** AGREEMENT ARE PART OF THIS AGREEMENT IF YOU ACCEPT ANY OF THE SERVICES THEY DESCRIBE." *Id.* (emphasis in original).

Like the plaintiffs in *Rivera*, putative members of the Nationwide EFTA Sub-Class who continued to use Defendant's services after receipt of the subsequently mailed terms and conditions may therefore be bound by the arbitration clause. The Court therefore concludes that Plaintiff is atypical of these putative class members.

### c.    Plaintiff's Standing

Third and finally, Defendant contends that, "[g]iven the Ninth Circuit's ruling that Plaintiff is not bound by the [Terms and Conditions], Plaintiff now has no standing to challenge the [Terms and Conditions], or their application to absent class members," ECF No. 169 at 13, because she "has no legal interest in the application of the arbitration clause and no standing to challenge its enforceability." *Id.* at 14. Defendant claims that this "places Plaintiff . . . in a materially different position from the vast majority of the class members she purports to represent," thereby rendering "her claims atypical of those of the putative Nationwide EFTA Class, California EFTA Class, and the California UCL Classes as a matter of well-established law." *Id.* (citing *Tan v. Grubhub, Inc.*, No. 15-cv-05128-JSC, 2016 WL 4721439, at *6 (N.D. Cal. July 19, 2016). As before, *see supra* Sections II.B.3.a–b, Plaintiff contends that "OnStar offers no *argument* in support of its contention that the arbitration clause in the 'Terms and Conditions,' which no one signed, is legally binding on any class members." ECF No. 176 at 2.

For the reasons articulated above, *see supra* Sections II.B.3.a–b, the Court disagrees with Plaintiff. The question, therefore, is whether this deprives Plaintiff of standing to challenge the enforceability of the arbitration clause, thereby rendering her claims atypical of those of putative class members who may be bound to arbitrate. The Court concludes that it does. *See, e.g.*, *Tan*, 2016 WL 4721439, at *6 ("[The named plaintiff, who opted out of the arbitration and class waiver provisions,] has no standing to challenge the applicability or enforceability of the arbitration and class action waiver provisions."). The Court therefore concludes that Plaintiff's claims are not typical of those of putative members of the Nationwide EFTA, California EFTA, and California Classes, a majority of whom may be subject to arbitration.

### 4. Adequacy

Finally, Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." "To determine whether the representation meets this standard, [courts] ask two questions: (1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton*, 327 F.3d at 957.

As for Plaintiff, she urges that she "has no conflicts of interest with the other class and subclass members, and she . . . 'will prosecute the action vigorously' on their behalf." ECF No. 150 at 21 (citing *Hanlon*, 150 F.3d at 1020). Defendant urges that the arbitration issues discussed above, *see supra* Section II.B.3, "place[] Plaintiff . . . in a materially different position from the vast majority of the class members she purports to represent" and that "[t]his divergence in interests . . . renders Plaintiff an inadequate representative." *See* ECF No. 169 at 14. For the reasons discussed above, *see supra* Section II.B.3, the Court agrees that Plaintiff is not an adequate representative of those putative class members who may be bound to arbitrate their claims.

Regarding Plaintiff's counsel, Plaintiff notes that "her counsel 'will prosecute the action vigorously' on . . . behalf [of the class and subclass members], as they have done consistently up to now, including through a successful Ninth Circuit Appeal." ECF No. 150 at 21 (citing *Hanlon*, 150 F.3d at 1020). Defendant does not contest the adequacy of Plaintiff's counsel, *see generally* ECF No. 169, who appear to be eminently qualified. *See* Pl.'s Exs. at 394–402. Consequently, the Court concludes that Plaintiff's counsel "will fairly and adequately protect the interests of the class." *See* Fed. R. Civ. P. 23(a)(4).

### C. Rule 23(b)(3) Requirements

Rule 23(b)(3) states that a class may be maintained if the requirements of Rule 23(a) are fulfilled and if "the court finds that the questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a

///

class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### 1. Commonality and Predominance

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy this requirement, "[a]ll questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon*, 150 F.3d at 1019. The common contention, however, "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.

The predominance analysis focuses on "the legal or factual questions that qualify each class member's case as a genuine controversy" to determine "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623 (1997); *see also* Fed. R. Civ. P. 23(b)(3) (to certify a class, the court must find that "questions of law or fact common to class members predominate over any questions affecting only individual members"). "Considering whether questions of law or fact common to class members predominate begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) (quotation marks omitted). A court must analyze these elements to "determine which are subject to common proof and which are subject to individualized proof." *In re TFT-LCD I*, 267 F.R.D. at 310–11.

### a. EFTA Claims for Statutory Damages

Plaintiff contends that "the EFTA claim presents the predominating, common question of whether OnStar's 'Acknowledgment' form—the only 'signed' writing on which OnStar relies—constitutes an authorization with 'clear and readily understandable' disclosures of the 'terms,' 'amount' and 'frequency' of the sums to be debited." ECF No. 150 at 21. According to Plaintiff, "[t]he formatting and content of this standard form is

uniform, so the answer to this question will be common for all class members who signed it." *Id.* "As for the EFTA subclasses, the common proof will consist of evidence that they did *not* sign the standard form at all, and that OnStar nonetheless charged their debit cards." *Id.*

Defendant contends that the "Court w[ill] have to conduct a multitude of complex, individual questions to determine which, and how many, of the[ class members] are bound by OnStar's arbitration provision[,]" which "is no small task." ECF No. 169 at 15–16. Further, "for the Nationwide EFTA Subclass, the Court would also have to consider state-level issues of contract interpretation that would predominate over any common issues." *Id.* at 16.

Plaintiff rejoins that "OnStar offers no *argument* in support of its contention that the arbitration clause in the 'Terms and Conditions,' which no one signed, is legally binding on any class members." ECF No. 176 at 2 (emphasis in original). Instead, Plaintiff contends, "OnStar simply assumes it is, without discussion," which "is not sufficient to defeat class certification." *Id.* At any rate, "the 'Acknowledgment' form contains *no* language of consent stating that the signed either 'accepts' or 'agrees' to be bound by the 'Terms of Conditions[,]'" which "is fatal to OnStar's unsupported assumption that class members who signed the 'Acknowledgement' form, which contains no arbitration clause, are somehow bound to arbitrate." *Id.* at 3 (emphasis in original) (citing *Esparza*, 2 Cal. App. 5th at 789; *Mitri*, 157 Cal. App. 4th at 1173; *Chan*, 178 Cal. App. 3d at 642).

As discussed above, *see supra* Section II.B.3, the Court concludes that common issues do not predominate as to the Nationwide EFTA Class, the Nationwide EFTA Subclass, and the California EFTA Subclass, all of which include putative class members who may be subject to the arbitration provision contained in the Terms and Conditions. The Court also concludes that common issues do not predominate as to the California EFTA Sub-subclass, which may also contain putative class members who are bound to arbitrate. Although the Court concluded that Plaintiff was not atypical of the members of the California EFTA Sub-subclass, *see supra* Section II.B.3.b, there still exist

individualized inquiries as to who in the California EFTA Sub-subclass may be bound to arbitrate.

As discussed above, *see supra* Section II.B.3.b, under California law there exist exceptions to the general rule that a non-signatory to an arbitration provision may still be bound to arbitrate his or her claims, including where the non-signatory is a third-party beneficiary of the agreement, where there exists a preexisting relationship between the non-signatory and one of the parties to the arbitration agreement, and where there exists an agency relationship between the non-signatory and a signatory. *See, e.g.*, *Matthau*, 151 Cal. App. 4th at 599–600; *Buckner*, 98 Cal. App. 4th at 142. To determine whether putative class members are members of the California EFTA Sub-subclass, the Court would have to determine whether each putative class member had such a relationship with a signatory or not. Under such circumstances, Plaintiff has failed to satisfy the predominance requirement as to the EFTA claims. *See, e.g.*, *Conde v. Sensa*, No. 14-CV-51 JLS WVG, 2018 WL 4297056, at *11 (S.D. Cal. Sept. 10, 2018) (concluding that the plaintiff had failed to demonstrate predominance of common issues where majority of putative class members purchased product through the defendant's website and might be subject to arbitration clause appearing on the defendant's website).

### b. UCL "Unlawful" Prong Claims

#### i. The Electronic Funds Transfer Act

For the same reasons as above, *see supra* Section II.C.2.a, Plaintiff contends that common questions of law and fact predominate to the extent her UCL "unlawful" prong claim is predicated on the EFTA violations. *See* ECF No. 150 at 22. Because the Court concludes that common questions do not predominate as to the EFTA claims, *see supra* Section II.C.2.a, the Court also concludes that common issues do not predominate as to the "unlawful" UCL claims to the extent they are predicated on the alleged EFTA violations.

#### ii. The Automatic Renewal Law

Plaintiff claims that "[t]he UCL claim for 'unlawful' conduct in violation of the ARL presents the predominating, common question of whether OnStar charged plaintiff's and

class members' cards 'without the consumer's explicit consent,' including a 'clear and conspicuous' presentation of the 'offer terms' 'prior to the completion of the initial order for . . . service.'" ECF No. 150 at 22 (citing Cal. Bus. & Prof. Code §§ 17600, 17602(a)(1)–(2), (e)). Plaintiff adds that "the evidence of OnStar's oral and written disclosures will be common, consisting of two standard-form documents that OnStar contends were provided or available 'prior to' the 'Welcome Calls'; and four oral disclosures OnStar contends were made during the 'Welcome Calls[,]'" meaning "[w]hether this finite group of common alleged disclosures meets the ARL's requirements for 'clear and conspicuous' presentation of the 'offer terms' can be adjudicated in common for all class members." *Id.*

Defendant raises several challenges. First, Defendant contests whether the disclosures are susceptible to common proof, noting that "the ARL, TSR, [and] FTC Act . . . *permit oral disclosures*, and OnStar's continuous coverage options were explained to customers by live representatives in interactive dialogues." ECF No. 169 at 16 (emphasis in original). According to Defendant, "the mandatory disclosures were merely the *minimum* of what representatives said during a Welcome Call" and "[r]epresentatives were instructed to enter into a two-way dialogue with customers to ensure that the customers understood what they were purchasing and were satisfied." *Id.* at 17 (emphasis in original). Consequently, class members' "calls with [Defendant's] 'live' operators necessarily vary, requiring individual inquiries into what was actually said." *See id.* at 18 (citing *Dioquino v. Sempris, LLC*, No. CV 11-05556, 2012 WL 6742528, at *7 (C.D. Cal. Apr. 9, 2012)).

Plaintiff counters that the four oral disclosures identified in the Welcome Call Declaration were "required" and "mandatory" and that OnStar's training documents required all four disclosures to be delivered "verbatim." ECF No. 176 at 5. Plaintiff notes that Defendant has not introduced any evidence that these four required disclosures ever varied. *See id.* at 5–8. In any event, "class actions are routinely certified based on evidence of common oral disclosures patterned after standardized scripts, as in this case." *Id.* at 8 (citing *Risinger v. SOC LLC*, 708 Fed. App'x 304, 306 (9th Cir. 2017); *Takiguchi v. MRI*

*Int'l, Inc.*, No. 2:13-cv-01183-HDM-VCF, 2016 WL 1091090, *7 (D. Nev. Mar. 21, 2016); *Hahn v. Massage Envy Franchising, LLC*, No. 12CV153 DMS (BGS), 2014 WL 5099373, *10 (S.D. Cal. Apr. 15, 2014)).

Even if the four required disclosures were made verbatim, individual class members may have received additional, non-scripted information from the advisors. Some of the scripts introduced by Plaintiff instruct the advisor to elicit any questions. *See, e.g.*, Pl.'s Exs. at 283 ("Mr[.]/Mrs. Subscriber, [are] there any questions you'd like to ask me now while you have me on the phone?"), 343 (reminding advisors if there is a sale to "[v]erify there are not outstanding issues/questions" by asking, "Before I let you go, do you have any questions about your service?"). Although Plaintiff objects that this argument is foreclosed by the Stipulation Regarding 30(b)(6) Deposition of OnStar, LLC, Topics 6 and 11 and Raddatz Declaration, the Court does not see any incompatibility between certain scripted disclosures being delivered verbatim but additional, non-scripted disclosures being made to some putative class members based on the organic nature of a telephone conversation.[7] *See, e.g.*, *Marshall v. H & R Block Tax Servs. Inc.*, 270 F.R.D. 400, 411

---

[7] The Court also does not see any incompatibility between this argument and the Stipulation Regarding 30(b)(6) Deposition of OnStar, LLC, Topics 6 and 11. The stipulation provided that, "[i]n opposition plaintiff's motion for class certification only[,] . . . OnStar will not contend that OnStar gave any of the putative class members any oral disclosures that differ from the five mandatory disclosures set forth in paragraph 3 of the [Raddatz] Declaration." ECF No. 138-2 at 2. The Raddatz Declaration, however, addressed only "mandatory disclosures" required to be made during the Welcome Calls. *See generally* Pl.'s Exs. at 258–59. Further, the Raddatz Declaration incorporated by reference portions of Defendant's response to Plaintiff's Interrogatory No. 8, *see generally id.*, including that "OnStar advisors are trained to ensure every consumer makes an informed decision and to obtain express, informed, affirmative consent." *See* ECF No. 183-2 at 21. The next sentence in Defendant's response makes clear that Defendant envisioned this as requiring a dialogue with its subscribers: "OnStar advisors are taught that they are to provide ' . . . straight forward answers to their questions . . . .'" *Id.*

Further, in the stipulation, Defendant also agreed that, "[t]o establish the content of any oral disclosures OnStar contends were made to putative class members, OnStar d[id] not anticipate *at th[at] time* that it w[ould] rely on any documents other than those identified by Bates number in the '*Welcome Call*' Raddatz Declaration. ECF No. 138-2 at 2–3 (emphasis added). The Parties further agreed that, "[i]f OnStar does rely on any documents reflecting oral disclosures other than those identified by Bates number in the 'Welcome Call' declaration, of if OnStar's opposition brief's characterization of the documents cited in the 'Welcome Call' declaration is materially different from what is stated in the declaration, then plaintiff may, but is

(S.D. Ill. 2010) ("It defies common sense to suggest that these scripts would be read verbatim.").

Further, Plaintiff's cases are distinguishable. In *Hahn*, the "[d]efendant . . . presented no evidence that the [defendant's] clinics varied from the script regarding the uniform manner in which membership agreements were presented to customers." 2014 WL 5099373, at *10. Further, that case involved the unconscionability of written membership agreements, which did not materially differ as to the relevant provisions. *See id.* at *9. And unlike *Risinger* and *Takiguchi*, this is not a case in which the defendant made scripted misrepresentations to putative class members. *Cf. Risinger*, 708 Fed. App'x at 306 ("The district court permissibly found that [the defendant's] recruiters made nearly identical representations concerning guards' anticipated work schedule . . . , which [were] reflected in scripts used by recruiters."); *Takiguchi*, 2016 WL 1091090, at *8 ("[P]laintiffs allege that defendants made to all investors substantially similar, if not identical, misrepresentations as to the safety of investing with [defendant company]. The court finds the alleged misrepresentations sufficiently uniform to raise a presumption of reliance."). In those cases, the courts could conclude with some certainty that the putative class members each had received the requisite, scripted misrepresentations; here, by contrast, Plaintiff alleges that certain required disclosures were *not* made because they were *not* contained in Defendant's scripts. That Plaintiff did not receive those disclosures, however, does not mean that other class members did not. As in *Dioquino*, "determination of the uniformity of the sales pitches and scripts would require an extensive individualized inquiry into the experiences of the class members during their telephone conversations." *See* 2012 WL 6742528, at *8. Accordingly, the Court concludes that common questions do not predominate as to the unlawful prong UCL claims to the extent they are predicated on alleged violations of the ARL.

─────────────

not required to, proceed with a deposition on topics 6 and/or 11." *Id.* at 3. These additional provisions of the stipulation make clear that the Parties anticipated that Defendant might introduce new documents or arguments concerning the disclosures made during the Welcome Calls.

Second, Defendant argues that "the Talking Points themselves varied significantly over the relevant time period, so that, even if the Court makes the unrealistic assumption that each customer listened to the same words and did not engage in any dialogue with the representative, it would still be impossible to adjudicate this dispute using common evidence." ECF No. 169 at 19. Plaintiff rejoins that this argument is foreclosed by Defendant's "stipulation that it would not argue that it gave any class members 'any oral disclosures that differ' from the ones identified in its 'Welcome Call' declaration." ECF No. 176 at 9. In any case, the additional disclosure identified by Defendant in its Opposition "simply adds one more item to the finite, manageable list of oral disclosures by which OnStar claims it met its statutory obligations." *Id.* The Court agrees with Plaintiff. Here, "the various versions of the [Talking Points] are not materially different" and, therefore, do not defeat commonality or predominance. *Hahn*, 2014 WL 5099373, at *9.

Third and finally, Defendant contends that "Plaintiff's allegations that the disclosures were 'confusing' necessarily requires individual inquires into the class members' states of mind." ECF No. 169 at 17. This is because "[e]ach consumer will necessarily have a different subjective understanding of OnStar's verbal and written disclosures" and "[w]hether, and to what degree, each and every customers understood these disclosures[] will necessarily vary from person-to-person and cannot be adjudicated on a class-wide basis." *Id.* at 23–24 (citing *In re First Am. Home Buyers Prot. Corp. Class Action Litig.*, 313 F.R.D. 578, 609 (S.D. Cal. 2016); *Jones v. ConAgra Foods, Inc.*, No. 12-016332014, WL 2702726, at *17 (N.D. Cal. June 13, 2014); *Berger v. Home Depot USA Inc.*, No. 10-00678, 2011 WL 13224881, at *4–5 (C.D. Cal. Mar. 18, 2011); *Quezada v. Loan Ctr. of Cal., Inc.*, No. 2:0800177, 2009 WL 5113506, at *8 (E.D. Cal. Dec. 18, 2009)). Plaintiff responds that "reliance is not an element of any of" Plaintiff's claims and that Defendant's "cited cases all involve fraud-based claims." ECF No. 176 at 10. Further, "[w]hether OnStar's disclosures were 'clear and conspicuous,' as required by both the ARL and the TSR, presents an objective question, which does not depend on the subjective understanding of particular consumers." *Id.* (footnote omitted).

Again, the Court agrees with Plaintiff. As Plaintiff notes, *see* ECF No. 176 at 10, the Court previously concluded that "her allegations here do not sound in fraud and, consequently, . . . she need not plead reliance to establish standing under the UCL." *See* ECF No. 106 at 14. Further, the Court agrees that the clear and conspicuous inquiry under the ARL appears to be objective. With respect to written disclosures, the ARL defines "clear and conspicuous" as "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language." Cal. Bus. & Prof. Code § 17601(c). "In the case of an audio disclosure, 'clear and conspicuous' . . . means in a volume and cadence sufficient to be readily audible and understandable." Cal. Bus. & Prof. Code § 17601(c). Because these inquiries have nothing to do with consumers' subjective understanding of the disclosures, the Court sees no reason why this issue could not be adjudicated on a class-wide basis. Nonetheless, because Plaintiff has failed to establish that the oral disclosures are subject to class-wide proof, the Court concludes that Plaintiff has failed to establish that common questions predominate as to the unlawful prong UCL claims to the extent they are predicated on alleged violations of the ARL.

iii.    The Telemarketing Sales Rule

As for the UCL "unlawful" prong claims premised on violations of the TSR, "OnStar's liability will turn on whether the two pre-'Welcome Call' standard forms, plus the four oral disclosures, 'truthfully' disclosed, 'in a clear and conspicuous manner,['] 'all material terms and conditions of the [free trial],' including the 'total costs' to purchase OTS after the end of the free trial, as well as 'the fact that the customer's account will be charged unless the customer takes an affirmative action to avoid the charge(s), the date(s) the charges will be submitted for payment, and the specific steps the consumer must take to avoid the charge(s).'" ECF No. 150 at 23 (quoting 16 C.F.R. §§ 310.3(a)(1)(i), (vii)). As above, *see supra* Section II.C.1.b.ii, Plaintiff claims that "the sufficiency of th[e] finite

/ / /

37

group of six uniform disclosures can be assessed in common for all class members." ECF No. 150 at 23.

Again, because the Court concludes that Plaintiff has failed to establish that common issues predominate as to the unlawful prong UCL claims to the extent they are predicated on alleged violations of the ARL because "determination of the uniformity of the sales pitches and scripts would require an extensive individualized inquiry into the experiences of the class members during their telephone conversations," *supra* Section II.C.1.b.ii (quoting *Dioquino*, 2012 WL 6742528, at *8), the Court also concludes that Plaintiff has failed to establish that common issue predominate to the extent the unlawful prong UCL claims are predicated on violations of the TSR.

### iv.    The FTC Act

Finally, Plaintiff contends that there exist common questions for the UCL "unlawful" prong claims premised on violations of the FTC Act for the same reasons as the claims based on violations of the TSR. *See* ECF No. 150 at 24. Again, because the Court concludes that Plaintiff has failed to establish predominance as to the unlawful UCL claims to the extent they are predicated on alleged violations of the TSR, *see supra* Section II.C.2.b.ii, the Court also concludes that Plaintiff has failed to establish predominance to the extent the unlawful prong UCL claims are predicated on alleged violations of the FTC Act.

In addition to the arguments raised above, *see supra* Section II.C.2.b.ii, Defendant also contends that "Plaintiff fails to show that class-wide evidence can be used to establish that putative class members could not have 'reasonably avoided' OnStar's charges." ECF No. 169 at 20 (citing 15 U.S.C. § 45(n); *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012); *FTC v. Neovi Inc.*, No. 06-CV-1952, 2009 WL 56130, at *2 (S.D. Cal. Jan. 7, 2009)). Here, "customers were emailed multiple notifications expressly advising them how to cancel[,]" meaning "the putative class members were reasonably able to avoid OnStar's charges." *Id.* "To prove otherwise would require the Court to examine the exact disclosures made to each class member to determine whether, under

those particular circumstances, it was 'reasonable' for them to fail to timely cancel their service." *Id.* Plaintiff counters that this is a merits-based inquiry that is inappropriate at the class-certification stage. *See* ECF No. 176 at 11.

The Court agrees with Defendant. As a district court in Washington applying a law similar to California's UCL[8] noted in denying a motion for class certification on predominance grounds:

> While plaintiff is correct that the test is "objective," that premise does not result in the conclusion that individual circumstances are irrelevant. Instead, courts look to how a reasonable consumer (i.e., an objective test), would act in the specific facts presented. Whether the harm was reasonably avoidable in this case for class members necessarily turns on what information the class members saw.

*Geier v. M-Qube, Inc.*, No. C13-354-TSZ, 2016 WL 3458345, at *5 (W.D. Wash. June 24, 2016). Because the Court concludes that determining the information available to the putative class members here requires individual inquiries into the oral disclosures made during their Welcome Calls, *see supra* Section II.C.1.b.ii, the Court also concludes that individual questions predominate as to the unlawfulness of Defendant's disclosures to the extent they are predicated on violations of the FTC Act. *See Geier*, 2016 WL 3458345, at *5; *see also In re Motions to Certify Classes Against Ct. Reporting Firms for Charges Relating to Word Indices*, 715 F. Supp. 2d 1265, 1277–78 (S.D. Fla. 2010) ("The plaintiffs are unable to show on a class-wide basis that the alleged injury was not 'reasonably avoidable' . . . [because a] class definition that includes experienced and novice users of court-reporting services, necessarily includes those with differing abilities to reasonably avoid the allegedly unfair charge. . . . Further, individualized inquiry is necessary to determine whether the index charges were reasonably known and avoidable."), *aff'd*, 439

---

[8] *Compare* Wash. Rev. Code Ann. § 19.86.020 ("Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."), *with* Cal. Bus. & Prof. Code § 1770(a) ("The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer are unlawful.").

F. App'x 849 (11th Cir. 2011); *Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1100 (Fla. Dist. Ct. App. 2014) ("In the present case, the class representatives similarly are unable to show that the injury was not 'reasonably avoidable' on a class-wide basis . . . [because] to resolve the issue, there would need to be a series of mini-trials to ascertain each absent members' knowledge of these matters.").[9]

### c. UCL "Unfair" Prong Claims

Plaintiff argues that "[w]hether OnStar's conduct is 'unfair' under the tethering test or the balancing test presents common and predominating questions, suitable for class treatment." ECF No. 150 at 24. Under the tethering test articulated in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 1394 (2006), Defendant's violations of the EFTA, the ARL, the TSR, and the FTC Act—which are subject to common proof—would establish liability. *See* ECF No. 150 at 24. As for the balancing test, "Plaintiff contends that OnStar's uniform practice of failing to adequately disclose, or obtain express informed consent to, monthly charges for OTS benefits neither consumers nor competition," a "theory of liability [that] will stand or fall for all OnStar customers, as a class." *Id.* at 25 (citing *FTC v. Amazon.com, Inc.*, No. C14-1038-JCC, 2016 WL 10654030 at *11 (W.D. Wash. July 22, 2016)).

Pursuant to the tethering test, "unfairness . . . under section 17200 [must] be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." *Cel-Tech Commc'ns, Inc.*, 20 Cal. 4th at 186–87. Plaintiff urges that "the evidence that OnStar violated both the letter and the spirit of the EFTA, the ARL, the TSR, and the FTC Act is common across the class, for the reasons already discussed above in

---

[9] Both *Court Reporting* and *Porsche Cars* applied Florida's Deceptive and Unfair Trade Practices Act, which—like the Washington law in *Geier*—is also similar to California's UCL. *Compare* Fla. Stat. Ann. § 501.204 ("Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."), *with* Cal. Bus. & Prof. Code § 1770(a) ("The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer are unlawful.").

connection with each of those statutes." ECF No. 150 at 24. Because the Court concludes that common issues do not predominate as to those alleged violations, *see supra* Sections II.C.1.a–b, the Court also concludes that Plaintiff has failed to establish that common issues predominate as to the claims for the unfair prong UCL claims to the extent they are predicated on the tethering test.

Under the balancing test, "an 'unfair' business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 886–87 (1999). "Plaintiff contends that OnStar's uniform practice of failing to adequately disclose, or obtain express informed consent to, monthly charges for OTS benefits neither consumers nor competition," a "theory of liability will stand or fall for all OnStar customers, as a class." ECF No. 150 at 25 (citing *Amazon.com*, 2016 WL 10654030, at *11). Again, because the Court concludes that common issues do not predominate as to the disclosures made by Defendant, *see supra* Section II.C.1.b.ii, the Court also concludes that Plaintiff has failed to establish that common issues predominate as to the claims for the unfair prong UCL claims to the extent they are predicated on the balancing test.

> d.      Defendant's Additional Challenges to Predominance for the UCL Claims

Although the Court has already determined that common issues do not predominate as to the California Class and Subclass, *see supra* Sections II.C.1.b–c, Defendant raises additional challenges to certification of Plaintiff's UCL claims: "Plaintiff's proposed California UCL Class and Subclass are populated with members who could not have been injured because they received the disclosures required by law and affirmatively chose to sign up for continuous coverage anyway," ECF No. 169 at 21; and (2) "Plaintiff has . . . failed to demonstrate that UCL recovery here can be measured on a class-wide basis as required by *Comcast Corp. v. Behrend*[, 569 U.S. 27 (2013),] because she has proposed no recovery model at all." *Id.* at 24.

41

### i. Uninjured Class Members

Defendant first urges that common issues do not predominate as to the California Class and Subclass because they "are populated with members who could not have been injured because they received the disclosures required by law and affirmatively chose to sign up for continuous coverage anyway." ECF No. 169 at 21. "For example, Plaintiff . . . does not argue that the script she denotes as Oral Disclosure #4 was in any way insufficient" because she "could find nothing to criticize because Oral Disclosure #4, like many of the other mandatory disclosures, required specification of the date and amount of the upcoming charge." *Id.* at 21–22 (citing ECF No. 150 at 13–14). Plaintiff counters that "[t]hese are merits arguments not proper for adjudication now." ECF No. 176 at 11 (citing *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136–37 (9th Cir. 2016); *In re Packaged Seafood Prods. Antitrust Litig.*, No. 15-MD-2670 JLS (MDD), 2019 WL 3429174, at *3 (S.D. Cal. Aug. 14, 2019)). The Court agrees with Plaintiff that Defendant's "argument reflects a merits dispute about the scope of that liability, and is not appropriate for resolution at the class certification stage of this proceeding." *See Torres*, 835 F.3d at 1137.

### ii. Class-Wide Determination of Restitution

Defendant also contends that "Plaintiff's only *mention* of how . . . restitution [for the UCL claim] should be calculated is a vague statement that class members would be entitled to 'restitution for all unlawfully charged sums.'" ECF No. 169 at 24 (emphasis in original) (quoting ECF No. 150 at 18). "To the extent this statement is intended to suggest that putative UCL class members should be entitled to a *full refund* of all amounts they paid for their OnStar service, such a model would be contrary to well-established law" because "[l]ongstanding UCL laws provides that a 'full refund' model is not permitted as a matter of law, unless the product or service at issue provided the class with 'no value.'" *Id.* at 24–25 (emphasis in original) (citing *In re Tobacco Cases II*, 240 Cal. App. 4th 779, 789–802 (2015); *Chowning v. Kohl's Dep't Stores, Inc.*, No. CV1508673, 2016 WL 1072129, at *7 (C.D. Cal. Mar. 15, 2016), *aff'd*, 735 Fed. App'x 924 (9th Cir. 2018); *Red v. Kraft Foods, Inc.*, CV 10-1028, 2012 WL 8019257, at *11 (C.D. Cal. Apr. 12, 2012)).

"That OnStar provides valuable services to its customers cannot be credibly denied, and Plaintiff has never, in fact, made this claim." *Id.* at 26. Further, Plaintiff cannot seek a full refund under Section 17603 of the ARL because that section does not (1) provide that consumers are entitled to a full refund, (2) apply to services, and (3) apply where Plaintiff cannot state a cause of action under the ARL. *See id.* at 27 n.13. "Because Plaintiff has failed to propose any way to measure restitution on a classwide basis—or even on an individual basis—Plaintiff's putative California UCL Class and California UCL Subclass cannot be certified." *Id.* at 27 (citing *Grace v. Apple, Inc.*, 328 F.R.D. 320, 337 (N.D. Cal. 2018); *Fernandez v. UBS AG*, No. 15-CV-2859, 2018 WL 4440498, at *22 (S.D.N.Y. Sept. 17, 2018); *Herron v. Best Buy Stores, LP*, No. 2-12-cv-02103, 2016 WL 1572909, at *9–11 (E.D. Cal. Apr. 18, 2016); *Saavedra v. Eli Lilly & Co.*, No. 2:12- CV-9366, 2014 WL 7338930, at *6–11 (C.D. Cal. Dec. 18, 2014); *Astiana v. Ben & Jerry's Homemade, Inc.*, No. 10-4387, 2014 WL 60097, at *13 (N.D. Cal. Jan. 7, 2014)).

Plaintiff responds that she "contends that OnStar was prohibited by law from charging any sums to the class members' cards without making the statutorily-required 'prior' disclosures, and if she prevails on that theory, the full sums charged (minus any refunds) will be recoverable." ECF No. 176 at 12 (citing *Medrazo v. Honda of N. Hollywood*, 205 Cal. App. 4th 1, 13–14 (2012)). She claims that Defendant "attacks this proposed calculation method on the *merits*, . . . [b]ut at the class certification stage, the plaintiff need only show that the monetary relief is '*capable* of classwide measurement.'" *Id.* (emphasis in original) (quoting *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017)). "Moreover, . . . [f]ull refund *is* an awardable measure of restitution in a UCL class action, especially in an 'unlawful' prong case like this one, predicated on a defendant's violation of statutes that expressly prohibit *any* charges unless specified requirements are met 'before' the charges are made." *Id.* (emphasis in original) (citing *Lambert*, 870 F.3d at 1183; *Krueger v. Wyeth, Inc.*, 396 F. Supp. 3d 931, 951–54 (S.D. Cal. 2019); *Medrazo*, 205 Cal. App. 4th at 13–14). "This measure is especially appropriate for OnStar's ARL violations, given the Legislature's recognition that goods provided without

43

the required prior disclosures should be treated as 'gifts' to the consumer." *Id.* at 12–13 (citing Cal. Bus. & Prof. Code §17603).

The Court agrees with Defendant that Section 17603 of the ARL is of no help to Plaintiff because that provision applies to "goods" and not "services." *Cf. Johnson v. Pluralsight, LLC*, 728 Fed. App'x 674, 677 (9th Cir. 2018) (holding that district court erred in concluding that software subscription was an intangible service where the "subscriptions grant users a license to download materials such as exercise files, course slides, and sample codes"). The question, therefore, is whether Plaintiff adequately has established that damages are capable of measurement on a class-wide basis pursuant to *Comcast Corp.*, 569 U.S. 27. The Court concludes that she has not.

"[T]he Full Refund model depends upon the assumption that not a single consumer received a single benefit . . . from Defendant's [services]." *See In re POM Wonderful LLC*, No. ML 10-02199 DDP RZX, 2014 WL 1225184, at *3 (C.D. Cal. Mar. 25, 2014). Defendant offers a number of services, including directing emergency services to location of an accident involving a subscriber, providing roadside assistance by connecting subscribers to local service providers in the event of service issues, locating stolen vehicles, providing hands-free calling and turn-by-turn navigation, remotely locking an unlocking subscribers' vehicles, sending monthly diagnostic updates and diagnostic alerts when issues are detected, providing vehicle location services, and giving customers information and tips to help improve their driving. *See* Festa Decl. ¶¶ 5–6. Plaintiff cannot reasonably contest that these services are beneficial, and it strains credulity that no putative class members used or benefitted from these services despite Defendant's allegedly unauthorized charges to their accounts.

Plaintiff attempts to argue that the full refund model is appropriate where the defendant unlawfully charges the putative class members without making requisite disclosures. *See* ECF No. 176 at 12 (citing *Lambert*, 870 F.3d at 1183; *Krueger*, 396 F. Supp. 3d at 951–54; *Medrazo*, 205 Cal. App. 4th at 13–14). Plaintiff's authorities, however, do not support her position. *Lambert* was reversed and remanded by the Supreme

Court on the grounds that the petition for appellate review was untimely. *See Nutraceutical Corp. v. Lambert*, 586 U.S. ___, 139 S. Ct. 710, 717–18 (2019). To the extent the Ninth Circuit's decision in *Lambert* remains good law, it is distinguishable because "[the plaintiff] presented evidence that the product at issue was valueless and therefore amenable to full refund treatment."[10] 870 F.3d at 1183.

The court in *Krueger* ruled on motions to exclude expert testimony and for summary judgment, not a motion for class certification, as here. *See* 396 F. Supp. 3d at 937. Further, the plaintiff in *Krueger* contended that she would not have purchased the defendant's product—despite its benefits—had it been marketed accurately, *see id.* at 952, and introduced evidence to support her position. *See id.* at 952–53. Here, by contrast, Plaintiff is proceeding on a theory that she is entitled to a full refund for charges made in "violation of statutes that expressly prohibit *any* charges unless specified requirements are met 'before' the charges are made." *See, e.g.*, ECF No. 176 at 12. Consequently, unlike in *Krueger*, there is no evidence in the record that Plaintiff would not have activated her OTS trial or purchased Hands Free Calling minutes had Defendant made the requisite disclosures.

Finally, in *Medrazo*, the California Court of Appeal for the Second District concluded that, "[i]f, on retrial, the court determines that [the defendant]'s sale of motorcycles without hanger tags (or without tags that discloser dealer-added charges) violated the UCL, class members will be entitled to restitution of any money 'which may have been acquired [by [the defendant]] by means of such unfair competition' . . . —i.e., the dealer-added charges that were not discloser on hanger tags." 205 Cal. App. 4th at 30 (second alteration in original) (footnote omitted) (quoting Cal. Bus. & Prof. Code § 17203). The court did not conclude that the plaintiff in *Medrazzo* was entitled to "full restitution"

---

[10] The product at issue in *Lambert* was "'Cobra Sexual Energy,' an alleged aphrodisiac dietary supplement . . . , which the Food and Drug Administration . . . has not approved" and which "boasted that it contained performance-enhancing herbs that would provide users with 'animal magnetism' and 'potency wood.'" 870 F.3d at 1173.

or that she would be eligible for a refund of the rest of the purchase price of the motorcycle. *See id.* Consequently, the Court sees no conflict between *Medrazzo* and *Lambert* or *Krueger*, in which an aggrieved party may be entitled to full restitution if she proves either that the defendant's product had no value or that she would not have purchased the defendant's product absent the alleged misrepresentations. Because Plaintiff has made neither showing here, the Court concludes that Plaintiff has failed adequately to establish that her full restitution damages model measures class-wide damages.[11]

### 2. Superiority

The final requirement for class certification is "that a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy." Fed R. Civ. P. 23(b)(3). "In determining superiority, courts must consider the four factors of Rule 23(b)(3)." *Zinser*, 253 F.3d at 1190. The Rule 23(b)(3) factors are:

> (A) [T]he class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). The superiority inquiry focuses "on the efficiency and economy elements of the class action so that cases allowed under [Rule 23(b)(3)] are those that can be adjudicated most profitably on a representative basis." *Zinser*, 253 F.3d at 1190 (internal quotation marks omitted). A district court has "broad discretion" in determining whether class treatment is superior. *Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 210 (9th Cir. 1975).

---

[11] At the hearing, Plaintiff proposed for the first time an alternative damages theory, in which the services Defendant provides could be assigned a value and the value of the services used by each putative class member could be subtracted from the total amount of the allegedly unauthorized charges. Because this argument was not raised in any of Plaintiff's briefing, *see generally* ECF Nos. 150, 176, the Court declines to consider it now; however, Plaintiff may develop this argument further should she choose to renew her motion for class certification.

Plaintiff argues that a class action is superior given "the relatively low potential recovery for each class member." ECF No. 50 at 25. She adds that "[t]he trial will be easily managed, consisting of common documentary evidence of OnStar's relevant classwide procedures and standard form writings and oral disclosures." *Id.*

Defendant counters that "management factors weigh heavily against class certification" because "identification of the California EFTA Subclass, California EFTA Sub-Subclass, and California UCL Subclass members . . . will be onerous as their identities can be approximated only through a burdensome person-by-person review of OnStar's records." ECF No. 169 at 29. Further, "the question of whether any individual class member is bound to arbitrate[] will dominate the inquiry and make class treatment ineffective and inefficient" and "the class definitions are overbroad and include persons who were never . . . harmed." *Id.* at 30. Finally, "refund programs are a superior remedy for consumers" and "[c]onsumers who did not request, or were not granted, a refund[] could seek relief in individual small claims actions." *Id.*

Plaintiff responds that Defendant's refund policy is insufficient and "cannot 'immunize' OnStar from 'any suit seeking restitution' and is 'not superior to obtaining relief as a class.'" *See* ECF No. 176 at 15 (quoting *Korolshteyn v. Costco Wholesale Corp.*, No. 15-CV-709 CAB (RBB), 2017 WL 1020391, at *8 (S.D. Cal. Mar. 16, 2017)).

The Court agrees with Plaintiff that a class action is superior to other available methods for fairly and efficiently adjudicating this controversy. As in *Korolshteyn*, "allowing class members to obtain a refund is not an alternative to 'adjudicating' whether Defendant[ is] liable" because, "[i]f it were, then [Defendant] (and any [service provider]) could freely [engage in the alleged wrongdoing] secure in the knowledge that their return policy effectively immunizes them from any suit seeking restitution." *See* 2017 WL 1020391 at *8. "Moreover, to require each absent class member to [call Defendant] . . . and ask for a relatively small refund is not superior to obtaining relief as a class." *See id.* Accordingly, the Court concludes that the superiority requirement is met here.

///

## CONCLUSION

In light of the foregoing, the Court **DENIES WITHOUT PREJUDICE** Plaintiffs' Motion for Class Certification (ECF No. 150) and **DENIES AS MOOT** Plaintiff's Motion to Exclude (ECF No. 179).

**IT IS SO ORDERED.**

Dated: January 22, 2020

Hon. Janis L. Sammartino
United States District Judge

15-CV-1731 JLS (MSB)